**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. _____

CHARLES COSTELLO,
BRUCE FILIPIAK,
JOSH SELDNER,
ANTHONY BAUMANN,
KOURTNEY ERVINE,
HANS HASS,
IVA HAUKENES,
and BRAD and LINDA McHENRY on behalf of
themselves and all others similarly situated,

      Plaintiffs,

v.

HOMEADVISOR, INC.,
IAC/INTERACTIVECORP,
ANGI HOMESERVICES, INC.,
CROWDSTEER INC.,
and DOES 1 through 11,

      Defendants.

---

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

---

## TABLE OF CONTENTS

NATURE OF THE CASE ................................................................................1

PARTIES ......................................................................................................6

    The Plaintiffs............................................................................................6

    The Defendants .......................................................................................11

HOMEADVISOR'S FORMER EMPLOYEES ...........................................13

JURISDICTION AND VENUE ...................................................................14

FACTS .......................................................................................................14

I.     HOMEADVISOR'S LEAD BUSINESS IS DEFECTIVE,
       DECEPTIVE AND FRAUDULENT ...............................................14

    A.    The Leads That Are Sold to HSPs Are Overwhelmingly
          Bogus Because The Lead Sources are Incapable of Generating
          Project Ready, Targeted Leads ...............................................18

        i.    Contrary to HomeAdvisor's Representations,
             HomeAdvisor Blindly Purchases "Leads" that are
             Devoid of Oversight and Any Quality Control..........................19

        ii.    Leads are Concocted Through HomeAdvisor's Internal Departments......24

        iii.    HomeAdvisor's Employees Corroborate the Deficient
             and Fraudulent Nature of the Leads..........................25

    B.    Use of Purported Monthly Lead Budgets to Deceive and Cheat HSPs.................27

    C.    Concealment of Lead Fee Schedules to Deceive HSPs.........................29

    D.    HSPs Nationwide were Defrauded into Buying Memberships
          and Unlawfully Charged for Bogus Leads..............................30

II.    THE TREATMENT OF HSPS IS DECEITFUL,
       UNLAWFUL AND UNCONSCIONABLE.................................40

    A.    The Sales and Account Management Processes
          Are Fraudulent and Deceitful..............................40

i

      B.      Fraud and Deceit Inflicted on HSPs Seeking Recourse.........................................48

III.    HOMEADVISOR IMPOSES UNAUTHORIZED
      MHELPDESK CHARGES ON HSPS.................................................................................53

IV.    HOMEADVISOR RELIES ON OTHER BUSINESSES TO HELP CONCEAL AND
      FURTHER THE FRAUD

      A.      The Better Business Bureau....................................................................55

      B.      Debt Collection Agencies ........................................................................57

VII.   THE LANHAM ACT DEFENDANTS UNLAWFULLY
      DIVERT BUSINESS FROM HSPs..................................................................................59

      A.      Online Public Profiles..............................................................................60

      B.      HomeAdvisor Premier Online Directory ................................................63

      C.      Exclusive Partner Network ......................................................................65

      D.      Exact Match Listings ...............................................................................67

      E.      Website Hijacking....................................................................................73

VII.   IAC AND ANGI EXERT OPERATIONAL CONTROL OVER,
      AND PROFIT FROM, HOMEADVISOR .......................................................................81

      A.      IAC Led the Fraud to Achieve Record Growth for HomeAdvisor........82

      B.      IAC Not Only Financed The Fraudulent Business
            Model of HomeAdvisor, IAC Actively Controlled HomeAdvisor's
            Business Operations.................................................................................85

CLASS ACTION ALLEGATIONS .................................................................................91

I.     Class Action Allegations for The Deceptive Business Practices Claims .........................91

II.    Classes Action Allegations for The Misappropriation Claims .........................................97

CAUSES OF ACTION .................................................................................................102

I.     The Deceptive Business Practices Claims ....................................................................102

<u>California</u>

COUNT I
Violation of the California Unfair Competition Law,
Cal. Bus. & Prof. Code §§ 17200, et seq.
(On Behalf Plaintiff Seldner and the California Class) ..................................................102

COUNT II
False and Misleading Advertising,
Cal. Bus. & Prof. Code §§ 17500, et seq.
(On Behalf Plaintiff Seldner and the California Class) ..................................................105

COUNT III
Fraud/Fraudulent Concealment
(On Behalf of Plaintiff Seldner and the California Class) ..............................................107

COUNT IV
Aiding and Abetting Fraud/Fraudulent Concealment
(On Behalf of Plaintiff Seldner and the California Class) ..............................................110

COUNT V
Breach Of Implied Contract
(On Behalf of Plaintiff Seldner and the California Class) ..............................................112

COUNT VI
Unjust Enrichment/Restitution
(On Behalf of Plaintiff Seldner and the California Class) ..............................................113

<u>Colorado</u>

COUNT VII
Violations of Colorado Consumer Protection Act ("CCPA"),
Colo. Rev. Stat. § 6-1-101, et seq.
(On Behalf of Plaintiffs Brad and Linda McHenry and the Colorado Class)..................115

COUNT VIII
Fraud/Fraudulent Concealment
(On Behalf of Plaintiffs Brad and Linda McHenry and the Colorado Class)..................120

COUNT IX
Aiding and Abetting Fraud/Fraudulent Concealment
(On Behalf of Plaintiff Brad and Linda McHenry and the Colorado Class) ...................122

COUNT X
Breach Of Implied Contract
(On Behalf of Plaintiffs Brad and Linda McHenry and the Colorado Class)..................124

COUNT XI
Unjust Enrichment/Restitution
(On Behalf Of Plaintiffs Brad and Linda McHenry and the Colorado Class)................126

Florida

COUNT XII
Violation of the Florida Deceptive and Unfair Trade Practices Act,
Fla. Stat. §501.201, et seq. ("DUTPA")
(On Behalf of Plaintiff Ervine and the Florida Class) ....................................................127

COUNT XIII
Fraud/Fraudulent Concealment
 On Behalf of Plaintiff Ervine and the Florida Class)....................................................129

COUNT XIV
Aiding and Abetting Fraud/Fraudulent Concealment
(On Behalf of Plaintiff Ervine and the Florida Class) ....................................................131

COUNT XV
Breach Of Implied Contract
(On Behalf of Plaintiff Ervine and the Florida Class) ....................................................133

COUNT XVI
Unjust Enrichment/Restitution
(On Behalf of Plaintiff Ervine and the Florida Class) ....................................................135

Idaho

COUNT XVII
Violations of the Idaho Consumer Protection Act,
Idaho Civ. Code, § 480, et seq.
(On Behalf of Plaintiff Haukenes and the Idaho Class)..................................................136

COUNT XVIII
Fraud/Fraudulent Concealment
(On Behalf of Plaintiff Haukenes and the Idaho Class)..................................................139

COUNT XIX
Aiding and Abetting Fraud/Fraudulent Concealment

(On Behalf of Plaintiff Haukenes and the Idaho Class)...................................................141

COUNT XX
Breach Of Implied Contract
(On Behalf of Plaintiff Haukenes and the Idaho Class)...................................................143

COUNT XXI
Unjust Enrichment/Restitution
(On Behalf of Plaintiff Haukenes and the Idaho Class)...................................................145

Illinois

COUNT XXII
Violations Of The Illinois Uniform Deceptive
Trade Practices Act ("Illinois DTPA")
815 Ill. Comp. Stat. §§ 510/1, et seq.
(On Behalf of Plaintiff Filipiak and the Illinois Class)...................................................146

COUNT XXIII
Fraud/Fraudulent Concealment
(On Behalf of Plaintiff Filipiak and the Illinois Class)...................................................149

COUNT XXIV
Aiding and Abetting Fraud/Fraudulent Concealment
(On Behalf of Plaintiff Filipiak and the Illinois Class)...................................................152

COUNT XXV
Breach Of Implied Contract
(On Behalf of Plaintiff Filipiak and the Illinois Class)...................................................154

COUNT XXVI
Unjust Enrichment/Restitution
(On Behalf of Plaintiff Filipiak and the Illinois Class)...................................................155

New Jersey

COUNT XXVII
Violations Of The New Jersey Consumer Fraud Act
N.J.S.A. §§ 56:8-1, et seq. ("NJCFA")
(On Behalf of Plaintiff Costello and the New Jersey Class)............................................157

COUNT XXVIII
Fraud/Fraudulent Concealment
(On Behalf of Plaintiff Costello and the New Jersey Class)............................................159

COUNT XXIX
Aiding and Abetting Fraud/Fraudulent Concealment
(On Behalf of Plaintiff Costello and the New Jersey Class)............................................162

COUNT XXX
Breach Of Implied Contract
(On Behalf of Plaintiff Costello and the New Jersey Class)............................................164

COUNT XXXI
Unjust Enrichment/Restitution
(On Behalf of Plaintiff Costello and the New Jersey Class)............................................165

Ohio

COUNT XXXII
Violations Of The Ohio Deceptive
Trade Practices Act ("Ohio DTPA")
O.R.C. 4165.01, et seq.
(On Behalf of Plaintiff Baumann and the Ohio Class) ....................................................167

COUNT XXXIII
Fraud/Fraudulent Concealment
(On Behalf of Plaintiff Baumann and the Ohio Class) ....................................................170

COUNT XXXIV
Breach Of Implied Contract
(On Behalf of Plaintiff Baumann and the Ohio Class) ....................................................172

COUNT XXXV
Unjust Enrichment/Restitution
(On Behalf Of Plaintiff Baumann and the Ohio Class) ...................................................174

II.      The Misappropriation Claims .........................................................................................175

Lanham Act

COUNT XXXVI
Violation Of The Lanham Act Section 43(a), 15 U.S.C. § 1125(a)(1)(A)
(False Association and Trademark Infringement)
(On Behalf of the Lanham Act Class)..............................................................................175

COUNT XXXVII
Violation Of The Lanham Act, 15 U.S.C. § 1125(a)(1)(B)
(False Advertising and Trademark Infringement)
(On Behalf of the Lanham Act Class)...........................................................................177

Colorado

COUNT XXXVIII
Violations of Colorado Consumer Protection Act ("CCPA"),
Colo. Rev. Stat. § 6-1-101, et seq.
(On Behalf of the McHenry Plaintiffs and the Colorado Misappropriation Class).........180

COUNT XXXIX
Common Law Unfair Competition
(On Behalf of the McHenry Plaintiffs and the Colorado  Misappropriation Class)........183

Florida

COUNT XL
Violation of the Florida Deceptive and Unfair Trade Practices Act,
Fla. Stat. §501.201, et seq. ("DUTPA")
(On Behalf of Plaintiffs Ervine and the Florida Misappropriation Class).......................184

COUNT XLI
Common Law Unfair Competition
(On Behalf of Plaintiff Ervine and the Florida Misappropriation Class)........................186

Idaho

COUNT XLII
Violations of the Idaho Consumer Protection Act,
Idaho Civ. Code, § 480, et seq.
(On Behalf of Plaintiff Haukenes and the Idaho Misappropriation Class).....................187

New York

COUNT XLIII
Common Law Unfair Competition
(On Behalf of Plaintiff Hass and the New York Misappropriation Class) ......................190

Ohio

       COUNT XLIV
       Violations Of The Ohio Deceptive
       Trade Practices Act ("Ohio DTPA")
       O.R.C. 4165.01, et seq.
       (On Behalf of Plaintiff Baumann and the Ohio Misappropriation Class) ......................192

       COUNT XLV
       Common Law Unfair Competition
       (On Behalf of Plaintiff Baumann and the Ohio Misappropriation Class) ......................194

PRAYER FOR RELIEF ...........................................................................................................195

JURY DEMAND .....................................................................................................................196

Plaintiffs Charles Costello, Bruce Filipiak, Josh Seldner, Anthony Baumann, Kourtney Ervine, Hans Hass, Iva Haukenes, and Brad and Linda McHenry (collectively, the "Plaintiffs"), by and through their counsel, bring this class action on behalf of themselves and a proposed class of all other similarly situated home service professionals ("HSPs"), against Defendants HomeAdvisor, Inc. ("HomeAdvisor"), IAC/InterActiveCorp ("IAC"), ANGI Homeservices Inc. ("ANGI"), CrowdSteer Inc. ("CrowdSteer"), and John Does 1-11. Plaintiffs make the following allegations based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation undertaken by their counsel; analysis by consultants with expertise in disciplines relevant to this case; information that Plaintiffs have secured from publicly available data; information provided to Plaintiffs' counsel by many hundreds of current and former HSPs who have been part of HomeAdvisor's member network; the accounts of homeowners who have utilized HomeAdvisor's network of HSPs; interviews of former employees of HomeAdvisor and ANGI; and the filings of IAC, ANGI, and Angie's List, Inc. made with the Securities and Exchange Commission ("SEC").  Plaintiffs allege as follows:

## NATURE OF THE CASE

1.     HomeAdvisor is a corrupt enterprise that twisted a lead generation business into a vehicle for greed and abuse.  HomeAdvisor, which was launched in 1998 as ServiceMagic, Inc. and was acquired by IAC in 2004 and rebranded in 2012 as HomeAdvisor, claims that it is an online marketplace for matching HSPs with consumers (homeowners) seeking to have home services performed.  Whereas the service is free to homeowners, revenue is generated primarily from the fees paid by HSPs for memberships and homeowner service requests ("Leads").  On its

1

face, such a matching service seems innocuous enough, but this business model was devised for wrongful, unlawful conduct in furtherance of systemically flawed and deficient processes used to generate illicit revenue from HSPs.

2.      In contrast to fixed-cost membership platforms, like Angie's List[1], where the homeowner pays a fee to have access to a directory of screened and customer-reviewed contractors to use for search and selection purposes, HomeAdvisor's business model turns such conventional behavior upside down by selling memberships to HSPs *plus* charging HSPs the cost of each supposed "qualified" homeowner Lead.  From HomeAdvisor and IAC's perspective, it is a far more profitable model because HomeAdvisor's potential revenue is essentially limitless, as it is predicated on the Lead pipeline that can be filled with bogus Leads.

3.      At bottom, it comes down to supply and demand.  While HomeAdvisor's robust sales force, using false promises of success and misrepresentations of membership conditions, can fulfill the demand by aggressively selling HSP memberships and adding HSPs to the HomeAdvisor network, it is the supply-side, the homeowner Leads, that HomeAdvisor has less ability to control.  HomeAdvisor, unable to resist the motive of greed, vigorously supplements the Lead pipeline with information acquired through a spider web of entities whose primary

---

[1]      In 1995, Angie's List founded what is known as the home services marketplace, an unbiased platform for consumers to research the quality of products or services provided by a variety of companies, most of which were contractors and home improvement companies.  *See* https://www.softwareplatform.net/2016/03/07/angies-list-and-two-sided-market-pricing/ (last visited 4/26/18); https://www.fieldpulse.com/academy/angies-list-home-advisor-thumbtack-yelp-service-contractors/ (last visited 4/26/18).  From 1995 to mid-2016, Angie's List employed a consumer driven business model where homeowners looking for a contractor would pay a membership fee to access a directory of local contractors and reviews from other homeowners. After searching Angie's List's directory and reviews, homeowners could then select and communicate with their chosen contractor.

purposes is to generate Leads for HomeAdvisor.

4.      Defendants' misconduct also goes beyond the generation of systemically flawed leads and infiltrates all aspects of HomeAdvisor's business and interactions with HSPs.

      a.   **Membership Solicitation:** HomeAdvisor uses nefarious means, including abject misrepresentations and threats, to entice, coerce and persuade contractors to become HSPs and to charge them hundreds and thousands of dollars for membership fees, Leads, and add-on services spawned from a sham business model.

      b.   **Deceptive and Fraudulent Sales Practices:** A nihilistic sales force is specially trained and incentivized to hawk HomeAdvisor's defective product to HSPs.    Liars are rewarded; borderline truth tellers are fired. HomeAdvisor's sales representatives are rewarded for lying or concealing material facts about the service to prospective HSPs to sell the memberships and secure the HSP's credit-card information to begin the flow of bogus Leads.  The systemic misconduct among sales personnel includes disregarding and/or changing HSPs' directives concerning profiles and account settings related to services performed, desired geographic service area and maximum Lead spend budgets.  Such sales culture does not end once the HSP becomes a member.  HomeAdvisor call centers are also sites where there was frequent use and sale of illicit drugs, and alcohol consumption by staff members during business hours, further undermining adherence to business ethics and acceptable codes of conduct.

3

c. **Misrepresentation of HomeAdvisor's Services:** HomeAdvisor's scam also involves: charging HSPs for products and services they do not affirmatively seek and agree to receive and, misrepresenting (i) the benefits of membership, (ii) the quality of the Leads, (iii) fees to be charged, (iv) the ease and ability to monitor and adjust budgets, and (v) HSPs' inconsequential recourse with respect to complaints about Leads.

d. **Credit/Termination Requests:** When misrepresentations about HomeAdvisor's services and the Leads become apparent to HSPs, their calls to HomeAdvisor seeking cancellation, refunds and to lodge complaints are avoided, obstructed, and even ignored.   HomeAdvisor's sales representatives deflect Lead quality complaints by making further misrepresentations to complaining HSPs and further are restrained by corporate fiat to the amount and type of credit that can be granted to a particularly vocal HSP.

e. **Misappropriation of Business Opportunities:**   Post-termination, HomeAdvisor exploits terminated HSPs by maintaining their online profiles in order to shamelessly generate and pilfer Leads for its current network of HSPs.   This occurs by homeowners submitting quote requests on the desired HSPs' profile pages, without knowledge that the HSPs are no longer associated with HomeAdvisor, which results in HomeAdvisor diverting away from a former HSP a genuine business opportunity created by a homeowner looking to hire the former HSP.

5.     Through fraudulent business practices, HomeAdvisor's revenues soared.   As of

December 31, 2017, HomeAdvisor had revenues of over $763 million generated off of the backs of hard-working HSPs. In 2017, HomeAdvisor's parent, IAC, orchestrated the acquisition of Angie's List, combining it with HomeAdvisor to form ANGI[2], a public company (collectively referred to herein as "HomeAdvisor"). HomeAdvisor remains predominantly owned and controlled by IAC (87% and 98% of the economic and voting interest, respectively, as of April 30, 2018), and continues to operate as a fraudulent enterprise.

6.      Defendants' wrongful, unlawful conduct as alleged herein consists of: selling and charging HSPs memberships through concealment, fraud and misstatements about the true nature of HomeAdvisor's service; charging HSPs for bogus Leads; charging HSPs for unauthorized mHelpDesk fees; and unlawful and unconscionable dealings with HSPs throughout and subsequent to their HomeAdvisor relationship. Defendants conduct has been corroborated by over 880 HSPs who have contacted Plaintiffs' Counsel and whose experiences with HomeAdvisor are reflected in Appendix I, attached hereto. Defendants' unlawful conduct has caused substantial monetary damages and irreparable, ongoing harm, to HSPs. Such conduct gives rise to:

    (a) unlawful, unfair and fraudulent business acts and practices, and unfair, deceptive, untrue and misleading advertising, by HomeAdvisor and ANGI in violation of the following state laws: California Unfair Competition Law[3] (Count I); California False and Misleading Advertising (Count II); Colorado Consumer Protection Act (Count VII); Florida Deceptive and Unfair Trade Practices Act (Count XII); Idaho Consumer Protection Act (Count XVII); Illinois Uniform Deceptive Trade Practices Act (Count XXII); New Jersey Consumer Fraud Act (Count XXVII); and Ohio Deceptive Trade

---

[2]      As discussed below in ¶¶ 19, 218-226, ANGI and HomeAdvisor are effectively a singular entity and do not operate as separate corporations. As such, any act or conduct asserted with respect to HomeAdvisor should be deemed to apply equally to ANGI.

[3]      IAC is also named as a Defendant for violations of the California Unfair Competition Law (Count I); California False and Misleading Advertising (Count II) and Florida Deceptive and Unfair Trade Practices Act (Count XII).

Practices Act (Count XXXII) (collectively the "Deceptive Business Practices Claims");

(b) fraud and fraudulent concealment (Counts III, VIII, XIII, XVIII, XXIII, XXVIII, and XXXIII) as against HomeAdvisor and ANGI;

(c) claims for aiding and abetting fraud and fraudulent concealment (Counts IV, IX, XIV, XIX, XXIV, and XXIX) as against IAC;

(d) claims for unjust enrichment and restitution by the HSPs (Counts VI, XI, XVI, XXI, XXVI, XXXI, and XXXV) as against HomeAdvisor, IAC, ANGI; and

(e) breaches of implied contract between HSPs and HomeAdvisor (Counts V, X, XV, XX, XXV, XXX, and XXXIV) as against HomeAdvisor and ANGI.

7.      In addition, HomeAdvisor's, ANGI's, CrowdSteer's and John Does' (collectively the "Lanham Act Defendants") deceptive conduct in diverting business from HSPs, which conduct bestows significant financial benefits upon the Lanham Act Defendants, constitutes false association, false advertising, and unfair competition in violation of The Lanham Act, Section 1125(a)(1)(A) (Count XXXVI), and Section 1125(a)(1)(B) (Count XXXVII); unfair competition in violation of the following state laws: Colorado Consumer Protection Act (Count XXXVIII); Colorado Unfair Competition law (Count XXXIX); Florida Deceptive and Unfair Trade Practices Act (Count XL); Florida Unfair Competition law (Count XLI); Idaho Consumer Protection Act (Count XLII); New York Unfair Competition law (Count XLIII); Ohio Deceptive and Unfair Trade Practices Act (Count XLIV); Ohio Unfair Competition law (Count XLV) (collectively the "Misappropriation Claims").

## PARTIES

### The Plaintiffs

8.      Plaintiff Charles Costello ("Costello") is the owner of Costello Home Construction, LLC which specializes in roof repairs and replacements and home remodeling.

6

Plaintiff Costello's principal place of business is located at 116 N. Dorset Ave., Ventnor City, New Jersey. Plaintiff Costello paid for a HomeAdvisor Pro Connect[TM] membership on or about October 13, 2016 and was charged over $15,314 by HomeAdvisor for the membership and Leads. In agreeing to pay for a membership and each Lead, Plaintiff Costello relied on HomeAdvisor's representations concerning its vetted and quality Lead service. HomeAdvisor concealed the true nature of the membership programs, including the quality of the service and Leads, and absent such concealment Plaintiff Costello would not have purchased a membership or agreed to pay for Leads. As a result of the conduct described herein, Plaintiff Costello was injured.

9.     Plaintiff Bruce Filipiak ("Filipiak") is the owner and President of Genesis Construction Services IL, LLC which specializes in renovation projects for kitchens, bathrooms and basements. Plaintiff Filipiak's principal place of business is located at 701 Dorchester Dr., Bolingbrook, Illinois. Plaintiff Filipiak paid for a HomeAdvisor Pro Connect[TM] membership on or about January 4, 2017, and was thereafter charged by HomeAdvisor for approximately 28 Leads. In total, Plaintiff Filipiak has been charged nearly $2,700 for HomeAdvisor's Pro Connect[TM] membership and Leads. In agreeing to pay for a membership and each Lead, Plaintiff Filipiak relied on HomeAdvisor's representations concerning its vetted and quality Lead service. HomeAdvisor concealed that the Leads were illusory, and absent such concealment Plaintiff Filipiak would not have agreed to subscribe to an annual membership or pay for Leads. Plaintiff Filipiak has been injured as a result of Defendants' conduct.

10.     Plaintiff Josh Seldner ("Seldner") is an unlicensed contractor who performs general handyman services. Plaintiff Seldner operates his small side business, referred to by

7

HomeAdvisor as, "All Weather Handyman 365," from his residence in Sacramento, California. After fielding relentless solicitations from HomeAdvisor for eight months, Plaintiff Seldner paid $287.99 for a HomeAdvisor Pro Connect$^{TM}$ membership on August 16, 2017, and was thereafter charged by HomeAdvisor for approximately 26 Leads before being sent to collections on or around November 27, 2017.  Between August 16 and October 5, 2017, Plaintiff Seldner was charged $245.32 for approximately 26 Leads.  In response to Plaintiff Seldner disputing the charges with his credit card company, HomeAdvisor attempted to re-process four charges totaling $529.39 on October 31, 2017, all of which failed.  As a result, HomeAdvisor applied $80.00 in "interest", $20 for each failed transaction for an outstanding balance of $609.39, before sending Plaintiff Seldner to collections for a total amounting to $812.52.  In agreeing to pay for a membership, Plaintiff Seldner relied on HomeAdvisor's representations that he was entitled to receive advertising and marketing services, and that he was not signed up to receive any Lead services.  Had HomeAdvisor disclosed that Plaintiff Seldner was enrolled in Lead services, for which he would be charged for each Lead, Plaintiff Seldner would not have purchased a membership.  As a result of the conduct described herein, Plaintiff Seldner was injured.

11.     Plaintiff Anthony Baumann ("Baumann") is the owner and operator of 1st Choice Roofing Cincy which specializes in roofing, siding, gutters, and insulation work.  Plaintiff Baumann's principal place of business is located at 6926 Tyler Court, Mason, Ohio.  Plaintiff Baumann became a HomeAdvisor Pro Connect$^{TM}$ member in April 2014. Between April 23, 2014 and March 18, 2018 HomeAdvisor charged Plaintiff Baumann $11,743.42 for 222 leads. Plaintiff Baumann relied on HomeAdvisor's representations that the leads were verified, targeted and a cost-effective way to connect with new customers.  After conducting an internet search of

his company in March 2017, Plaintiff Baumann discovered that another website, Roofpricer.com, was running fraudulent advertisements using his company name to divert otherwise legitimate traffic from his website for HomeAdvisor's benefit. Upon submitting the requested information on Roofpricer.com, Plaintiff Baumann was contacted by five other local HSPs that had received his contact information in the form of a Lead sold by HomeAdvisor. HomeAdvisor concealed the true nature of the membership programs, including the quality of the service and Leads, and absent such concealment Plaintiff Baumann would not have agreed to join HomeAdvisor's network of HSPs or pay for Leads.  As a result of the conduct described herein, Plaintiff Baumann was injured.

12.    Plaintiff Kourtney Ervine ("Ervine") is an owner and operator of Glass Act Window Cleaning which specializes in window cleaning and pressure washing services. Plaintiff Ervine's principal place of business is located at 612 Prosperity Farms Road, North Palm Beach, Florida.  In total, Plaintiff Ervine has been charged over $1,500 for HomeAdvisor's Pro Connect$^{TM}$ membership and Leads from August 24, 2016 through approximately August 25, 2017.  Notwithstanding that Plaintiff Ervine cancelled her membership on or about August 25, 2017, HomeAdvisor continues to maintain her company's Online Public Profile in order to improperly divert homeowners who are interested in contacting and potentially conducting business with Glass Act Window Cleaning to HomeAdvisor.  In agreeing to pay for a membership and each Lead, Plaintiff Ervine relied on HomeAdvisor's representations concerning the quality of its Lead service.  HomeAdvisor concealed that the Leads were illusory, and absent such concealment Plaintiff Ervine would not have agreed to subscribe to an annual membership or pay for Leads. As a result of the conduct described herein, Plaintiff Ervine was

injured.

13.     Plaintiff Hans Hass ("Hass") is the owner and operator of Alpine Metal Roofing which specializes in metal roofing, and also installs shingle and rubber, residential and commercial roofing.  Plaintiff Hass' principal place of business is located at 164 River Street, Sidney, New York.  Plaintiff Hass paid for a HomeAdvisor Pro Connect$^{TM}$ membership on or about August 24, 2015.  Before terminating his membership with HomeAdvisor in December 2016, Plaintiff Hass uncovered that another website, Roofing.zone, was running fraudulent advertisements using his company name, and was diverting otherwise legitimate traffic and inquiries from his website for HomeAdvisor's benefit.  Upon submitting the requested information on Roofing.zone, Plaintiff Hass was contacted by other local HSPs that had received his contact information in the form of a Lead sold by HomeAdvisor.  Plaintiff Hass complained to HomeAdvisor about the deceptive and fraudulent conduct which persisted even after canceling his membership.  As a result of the conduct described herein, Plaintiff Hass was injured.

14.     Plaintiff Iva Haukenes ("Haukenes") is an owner of Bergen Certified Inspections, LLC ("Bergen Certified") which specializes in home inspections light commercial surveys. Plaintiff Haukenes' principal place of business is located in Post Falls, Idaho.  Plaintiff Haukenes paid for a HomeAdvisor Pro Connect$^{TM}$ membership on or about February 18, 2017, and was thereafter charged by HomeAdvisor for approximately 4 Leads.  Plaintiff Haukenes relied on HomeAdvisor's representations concerning its vetted and quality Lead service.  HomeAdvisor concealed that the Leads were illusory, and absent such concealment Plaintiff Haukenes would not have agreed to subscribe to an annual membership or pay for Leads. As a result of the conduct described herein, Plaintiff Haukenes was injured.

15.     Plaintiffs Brad and Linda McHenry ("McHenry's" or "McHenry Plaintiffs") are the owners of B&B Carpentry which specializes in residential and commercial remodeling.  The McHenry Plaintiffs' principal place of business is located at 11005 Dover St., Unit 300, Westminster, Colorado.   The McHenry Plaintiffs paid for HomeAdvisor Pro Connect$^{TM}$ memberships on or about March 31, 2016 and on or about June 26, 2017 and were charged over $1,300 by HomeAdvisor for the memberships and Leads.  In agreeing to pay for a membership and each Lead, the McHenry Plaintiffs relied on HomeAdvisor's representations concerning its vetted and quality Lead service.  HomeAdvisor concealed that the Leads were illusory, and absent such concealment, the McHenry Plaintiffs would not have agreed to subscribe to the annual memberships or pay for Leads.  As a result of the conduct described herein, the McHenry Plaintiffs were injured.

16.     Plaintiffs Baumann, Ervine, Hass, Haukenes, and the McHenry Plaintiffs are also referred to collectively as the Misappropriation Plaintiffs.

**The Defendants**

17.     Defendant HomeAdvisor, Inc. is a corporation organized and in existence under the laws of the State of Delaware with its principal place of business located at 14023 Denver West Parkway, Building 64, Suite 200, Golden, Colorado.

18.     Defendant IAC is a corporation organized and in existence under the laws of the State of Delaware with its principal place of business located at 555 West 18th Street, New York, New York.  IAC is a media and Internet company that owns more than 20 operating businesses comprising over 150 brands and products - which included HomeAdvisor until September 29, 2017 when IAC contributed HomeAdvisor to ANGI - and some other recognized brands, such as

Vimeo, About.com, and the Match Group's online dating portfolio, which includes Match, OkCupid, and Tinder.  IAC has been at all relevant times the parent company and/or majority shareholder of HomeAdvisor.

19.     Defendant ANGI is a corporation organized and in existence under the laws of the State of Delaware with its principal place of business located at 14023 Denver West Parkway, Building 64, Golden, Colorado.  ANGI was founded and launched in April 2017 as Halo TopCo, Inc., a wholly owned subsidiary of IAC, to serve as the holding company for HomeAdvisor and Angie's List.  On September 29, 2017, IAC contributed HomeAdvisor to ANGI, a publicly held company.

20.     Defendant CrowdSteer is a company registered in the Cayman Islands with its registered office located at Anderson Square Building, Shedden Road George Town, Grand Cayman KY1-1103, Cayman Islands. CrowdSteer is the owner of the website domain Roofpricer.com.

21.     Defendant John DOE 1 is the owner of the website domain roofingzone.com.

22.     The true names and capacities of the Defendants sued herein as DOES 2 through 11, inclusive, are currently unknown to Plaintiffs, who therefore sue such Defendants by such fictitious names.  Each of the Defendants designated herein as a DOE is legally responsible in some manner for the unlawful acts referred to herein related to creating, acquiring or transmitting bogus Leads; and/or misappropriating HSPs names or likenesses to generate Leads for HomeAdvisor.  Plaintiffs will seek to add to this Complaint the actual names, capacities and roles of the DOE Defendants when such identities become known.

## HOMEADVISOR'S FORMER EMPLOYEES

23.     This Complaint contains allegations based on information provided by the following HomeAdvisor former employees, who are treated herein as Confidential Witnesses.

24.     **Former Employee A:** Former Employee A worked for HomeAdvisor for approximately three years, before leaving HomeAdvisor in November 2012.  Prior to departing, Former Employee A held the position of a customer service manager for a year and a half at HomeAdvisor's headquarters located in Golden, Colorado.

25.     **Former Employee B:**   Former Employee B was a HomeAdvisor sales representative in Colorado Springs, Colorado for approximately ten months before departing HomeAdvisor in October 2016.

26.     **Former Employee C:**   Former Employee C was a HomeAdvisor sales representative at HomeAdvisor's headquarters in Golden, Colorado for approximately five months before leaving HomeAdvisor in October 2016.

27.     **Former Employee D:** Former Employee D was a HomeAdvisor sales representative at HomeAdvisor's headquarters in Golden, Colorado for approximately a year and a half before resigning in June 2016.

28.     **Former Employee E:**   Former Employee E was a HomeAdvisor sales representative at HomeAdvisor's headquarters in Golden, Colorado for approximately seven months before resigning in June 2016.

29.     **Former Employee F:** Former Employee F was a HomeAdvisor Project Advisor in Colorado Springs, Colorado for approximately eight months before leaving HomeAdvisor in March 2017.

30. **Former Employee G:** Former Employee G joined HomeAdvisor in July 2015 and held the position of a Sales Manager in Colorado Springs, Colorado before voluntarily leaving in September 2016.

## JURISDICTION AND VENUE

31. This Court has jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because this is a proposed class action in which: (i) there are 100 or more members of the Class; (ii) there is an amount in controversy that exceeds the sum or value of $5,000,000, exclusive of interest and costs; (iii) the members of the Class are citizens of states different from Defendants; and, (iv) greater than two-thirds of the Class Members reside in states other than the state in which Defendants are citizens.

32. This Court has personal jurisdiction over HomeAdvisor, IAC, and ANGI because they are authorized to do business and are conducting business throughout the United States, including Colorado, and HomeAdvisor's and ANGI's principal executive offices are located in Golden, Colorado.

33. This Court has personal jurisdiction over CrowdSteer because it is conducting business that relates directly to this action in the United States, including Colorado.

34. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District, Defendants are authorized to conduct business in this District, and Defendants regularly conduct and transact business in this District and are therefore subject to personal jurisdiction in this District.

## FACTS

**I.      HOMEADVISOR'S LEAD BUSINESS IS DEFECTIVE, DECEPTIVE AND FRAUDULENT**

35.      HomeAdvisor flipped the transparent, fixed-cost membership model, like Angie's List, on its head by operating a "two-sided home services marketplace[], where both consumers and high-quality service professionals come to be matched to one another." IAC Q4 2014 Management's Prepared Remarks at p. 7 (http://files.shareholder.com/downloads/ IACI/5933712474x0x806723/9E17250F-94E5-42CD-900B-70D1400CDDE7/Managements_ Prepared_Remarks_Q4_2014.pdf); *see also* https://www.softwareplatform.net/2017/05/09/when-business-models-collide-homeadvisor-and-angies-list/ (last visited 7/2/18).   By relieving the homeowner of any financial obligation for using the service and placing HomeAdvisor in the role as the conduit between the homeowner and HSP, the quality and veracity of the Leads HomeAdvisor sells to HSPs are imperative.

36.      HomeAdvisor automatically charges HSPs from roughly $10 to $140 ***per*** Lead, depending on the type of service requested and the location of the request.   It is therefore critical that the Leads are, as HomeAdvisor represents, from serious, project-ready homeowners; that the information reflected in the Lead is accurate; that the Leads are targeted to the services performed by the HSP and within the HSP's geographic reach; and that the Leads are sent to a limited number of HSPs.

37.      However, HomeAdvisor conceals the true nature and genesis of its Leads and, during all relevant times, has misrepresented that Leads are generated and vetted through its patented ProFinder[TM] and ProLeads[TM] systems that are purportedly designed to weed out the casual internet browser from serious, qualified and project-ready homeowners, thereby assuring

the quality of the Leads sold to the HSPs. Specifically, throughout the class period HomeAdvisor

has misrepresented the Leads as follows:

a. "Get in front of **ready-to-hire** homeowners seeking your skills and expertise." *See* http://welcome.homeadvisor.com/membership#Membership (last visited 1/28/18) (emphasis added);

b. "…HomeAdvisor matches you with homeowners actively seeking the services you provide in your area — making it easier than ever to connect with new customers and win more jobs." *Id.*;

c. You'll be charged only for **qualified leads** matching your exact specifications, so you set the budget and the pace. *Id.* (emphasis added);

d. HSPs will receive "**qualified new business opportunities (ProLeads)** to keep [their] pipeline full." *Id.* (emphasis added);

e. HSPs will receive "**highly targeted prospects**", and have the ability to monitor and precisely budget their "spend targets and spend ceilings" on Leads.  See HomeAdvisorPro website, "How it works," at https://pro.homeadvisor.com/how-it-works/ (last visited 4/26/18) (emphasis added);

f. "HomeAdvisor is the number 1 marketplace for **project ready homeowners** to connect with prescreened pros." HomeAdvisor video, https://youtube.com/watch?v=bOxwhpnxU5g (last viewed 4/26/18);

g. homeowners are instantly matched with "up to four local Home Service Professionals who have been background-checked and are qualified and available to do to the job." http://www.abouthomeadvisor.com/iac-relaunches-servicemagic-as-homeadvisor-the-next-generation-of-online-solutions-for-home-improvement-and-repair-projects/ (last visited 4/26/18);

h. "[W]ith HomeAdvisor's **patented pro finder technology you are only matching to _serious homeowners_ in your area**. HomeAdvisor then instantly connects you over the phone, via email….." HomeAdvisor video https://youtube.com/watch?v=bOxwhpnxU5g (last viewed 4/26/18);

i. The "Benefits of Joining" are "You won't have to **waste your time with customers who just window-shop**" and it "**allows you to spend your time with the right "ready-to-buy" customers"**: https://pro.homeadvisor.com/help/faqs/ (last visited 4/26/18) (emphasis added);

j. And "[w]hile you're on the job, HomeAdvisor is finding **qualified** customers for

you" and you "pay a ***nominal*** fee for each lead you match to." *Id.*

k.   "Connect with the ***Targeted Prospects*** You Need to Succeed. Tell us what you do and where, and we deliver prospects that meet your exact needs." https://pro.homeadvisor.com/ (last visited 4/26/18) (emphasis added);

l.   "**How It Works**    Over 30 million homeowners have trusted HomeAdvisor to help them find quality pros with the expertise to turn their home improvement dreams into reality. ***It's just one of the reasons you can depend on us to bring you highly targeted prospects that will grow your business.***" https://pro.homeadvisor.com/how-it-works/ (last visited 4/26/18) (emphasis added);

m.   "Q. How does HomeAdvisor work? A. First we ***find homeowners looking for help completing home projects and collect information about their project***. Our patented ProFinder technology then identifies relevant professionals, taking into account our pros' availability, service type and locations preferences. When we have a match, we send the homeowner's information to the matched pro instantly so that he/she can win the job." *Id.*; and

n.   "There are several ways [homeowners] can find Service Professionals from HomeAdvisor. Profinder, our service where [homeowners] request a referral for a specific task, and ***we refer [homeowners] to up to four Service Professionals***." http://www.homeadvisor.com/servlet/TermsServlet (last visited 4/26/18).

38.   IAC and ANGI made similar representations in press releases and SEC filings about the Leads:

(a)   "Each year more than six million ***project-ready*** homeowners visit HomeAdvisor.com …" http://iac.com/media-room/press-releases/homeadvisor-launches-exclusive-category-sponsorship-program (last visited 4/26/18) (emphasis added); and

(b)   "HomeAdvisor agrees to pay these third parties a fixed fee when visitors from their websites click through to HomeAdvisor website and submit a ***valid*** service request through HomeAdvisor platform, or when visitors submit a ***valid*** service request on the affiliate website and the affiliate transmits the service request to HomeAdvisor…"   https://www.sec.gov/Archives/edgar/data/1705110/000170511017000004/angi-2017309x10q.htm (last visited 4/26/18) and, https://www.sec.gov/Archives/edgar/data/891103/000089110317000003/iac-20161231x10k.htm (last visited 4/26/18)(same).

39.   The "Leads", however, are bogus for several reasons.  The Leads originate from

sources that are neither reliable nor capable of generating the kinds of Leads that HomeAdvisor markets and sells.  HomeAdvisor generates and charges Plaintiffs and HSPs for Leads that are not verified nor are they from targeted, serious, qualified and/or project-ready homeowners. Instead, the HSPs receive and pay far more than "a nominal fee" for Leads that are essentially worthless.

A.     **The Leads That Are Sold to HSPs Are Overwhelmingly Bogus Because The Lead Sources are Incapable of Generating Project Ready, Targeted Leads**

40.     The Leads charged to HSPs are the product of HomeAdvisor's systemically flawed system and process, and are of no value because they are often comprised of:

    a.  wrong or disconnected phone numbers;

    b.  wrong contact information;

    c.  persons who never even heard of HomeAdvisor;

    d.  persons who are not homeowners;

    e.  persons who claim they did not submit a service request and/or are not interested in having the service performed;

    f.  stale Leads, including for projects that homeowners completed months or years prior to the Lead being sent;

    g.  Leads that are over distributed;

    h.  contacts for homes that were listed for sale; and

    i.  contacts for vacant or non-existent residences.

41.     Due to HomeAdvisor's concealment of the materially defective nature and substance of the Leads, and contrary to HomeAdvisor's representations about the Leads (¶37, *supra*), Plaintiffs and the members of the State Classes (defined below) were and continue to be

18

charged for Leads that do not constitute targeted, serious or qualified Leads, and are not Leads from project-ready homeowners.  The Leads sold to the HSPs were generated through processes that flatly contradict HomeAdvisor's representations as to the characteristics and nature of the Leads.

42.     HomeAdvisor, ANGI and IAC utilize various persons and businesses to accomplish the fraud perpetuated on the HSPs.

> ### i. Contrary to HomeAdvisor's Representations, HomeAdvisor Blindly Purchases "Leads" that are Devoid of Oversight and Any Quality Control

43.     HomeAdvisor represents that the qualified, targeted Leads are generated through the HomeAdvisor website, whereby homeowners interested in connecting with a HSP select the requested service and then complete a project inquiry form.  According to HomeAdvisor, upon completion of the form, the homeowner is instantly matched with "up to four local HSPs in HomeAdvisor's network who have been background-checked and are qualified and available to do the job." http://www.abouthomeadvisor.com/iac-relaunches-servicemagic-as-homeadvisor-the-next-generation-of-online-solutions-for-home-improvement-and-repair-projects/ (last visited 7/3/18).

44.     This same process is described and depicted in the webinar provided by HomeAdvisor for its HSPs at https://pro.homeadvisor.com/articles/ videos#web-ha-experiencewww.youtube.com (last visited 7/11/16), and which webinar is also available via https://www.youtube.com/watch?v=FB6oLz6abR0 (last viewed 7/3/18):





45.     The commentary that accompanies the forgoing depiction of the Lead vetting process, is given by Mitch Anderson (who is described as a long-time HomeAdvisor employee working in Sales and Operations), who informs HSPs that the Leads are generated through a process whereby the homeowners "Complete a four page questionnaire prior to being matched with one of our Service Professionals. The information we're going to request of those homeowners includes geographic information, details unique to the job, the job status as well as the time frame for completion and all homeowner contact information." *Id.*

46.     Mitch Anderson also states that a "vast majority of [HomeAdvisor's] homeowners and consumers come to [HomeAdvisor] through homeadvisor.com. We also have the exclusive partnerships with the websites [ ] such as Better Homes and Gardens and This Old House…"

https://pro.homeadvisor.com/articles/videos#web-ha-experiencewww.youtube.com (last visited 7/11/16).

47.      However, in actuality, HomeAdvisor's Lead generation process is systemically flawed in that it does not and cannot generate Leads of targeted, serious, qualified and project-ready homeowners.  Instead, HomeAdvisor employs various methods that result in Plaintiffs and HSPs receiving and paying for a vast majority of Leads that are at best "cold calls" and more likely illusory.

48.      HomeAdvisor maintains a spiderweb of relationships for the primary purpose of generating and acquiring Leads which includes, but is not limited to, an Affiliate Program; an Exclusive Partner Network; and Lead generators.

49.      HomeAdvisor's *Affiliate Program*. which is described as "HomeAdvisor's industry-leading partner program [that] offers aggressive payouts for qualified leads or calls," (https://www.homeadvisor.com/servlet/AffiliateSignupServlet (last visited 7/3/18)), includes CJ Affiliate    f/k/a    Commission    Junction    (http://www.cj.com/)    and    Pepperjam (https://www.pepperjam.com/publishers/gettingstarted).     The Affiliate Program includes businesses that connect ""advertisers" like HomeAdvisor with "publishers" "like bloggers and other businesses.  Publishers then promote HomeAdvisor on their websites and generate leads that are then sent to HomeAdvisor in exchange for a payment to the "publisher."

50.      HomeAdvisor's *Exclusive Partner Network*, as discussed in paragraphs 177-179 *infra*, is another marketing extension that HomeAdvisor uses to run listings for HSPs "on some of the most recognized sites in the home improvement industry, including ThisOldHouse.com, 1-800-Contractor, Realtor.com, and more."

51.     HomeAdvisor also utilizes ***Lead generation companies***, including One Planet Ops, Inc. ("One Planet") f/k/a Reply.com, and HomeImprovement.net to acquire locally-targeted consumer home improvement leads.  Lead generators, such as One Planet, also buy and re-sell leads from other Lead generators, such as The Lead House, LLC, which generates leads which are then ultimately sold to buyers, like HomeAdvisor, through an auction-based system.

52.     HomeAdvisor does not utilize a CAPTCHA or similar first line of defense to "distinguish human from machine input, typically as a way of thwarting spam and automated extraction of data from websites."  Google search;  *see also* http://www.dictionary.com/browse/captcha?s=t ("an online test designed so that humans but not computers are able to pass it, used as a security measure and usually involving a visual-perception task").  Common CAPTCHAs include the following:



53.     The source of Leads is confirmed by filings made by HomeAdvisor in a 2016 lawsuit, filed in federal court in Ohio, captioned *Johansen v. HomeAdvisor, Inc., et al.* Case No. 2:16-cv-00121 (S.D. Ohio).  According to the Declaration of Matt Zurcher, the Senior Vice President of Customer Care at HomeAdvisor (*see*, "Zurcher Decl."), HomeAdvisor purchases

leads from One Planet and HomeAdvisor "***does not control, and has no right to control***, the manner in which One Planet generates or obtains" consumer Leads and that "***HomeAdvisor has no input and does not work with One Planet regarding how One Planet procures or receives***" Leads which are generated, *inter alia*, (i) through the websites of One Planet's operating companies, and (ii) by purchasing lead data from other third parties, referred to as "publishers", including entities such as Lead House, LLC. Zurcher Decl. at ¶¶7, 10.

54.     Former Employee A, one of only two HomeAdvisor customer service managers, from 2010 to 2012, and whose credentials permitted him to view the Lead sources of each Lead confirmed that: HomeAdvisor's third-party affiliate Lead generation agreements were fundamentally flawed; Lead agreements incentivized third-parties to generate Leads ***by any means possible***; HomeAdvisor "knew their affiliates were doing shady things" to generate Leads; and, by approximately July 2011, HomeAdvisor was acquiring more Leads from third-party affiliates than it was generating.

55.     In particular, Former Employee A called HomeAdvisor's Lead agreement with Publishers' Clearing House ("PCH") "disastrous" because a large percentage of Lead credit requests were attributable to Leads associated with PCH.  The creation of a Lead associated with a sweepstakes entry is deficient and not a reliable source for the creation of legitimate, "qualified", "project-ready" Leads, as HomeAdvisor represents to its HSPs.

56.     HomeAdvisor, a sophisticated, multi-million dollar company, tills the internet in order to amass large quantities of Leads that are generated absent any meaningful oversight or without the implementation of even the most simplistic quality control mechanisms.   Such careless and calculated conduct does not result in the generation of legitimate and viable Leads

that justify the expense imposed on HSPs.

### ii. Leads are Concocted Through HomeAdvisor's Internal Departments

57.     HomeAdvisor utilizes its Project Advisor Team ("PA Team") to generate hundreds of thousands of Leads per month.  According to Former Employee F, the PA Team was created for the purpose of generating Leads.  Following the initial distribution and sale of a Lead, the PA Team tries to contact the Leads with the goal to generate additional Leads by either matching the same service request to a new batch of HSPs and/or creating new Leads for other home service projects.

58.     Similarly, a former ServiceMagic outbound consumer lead manager explained that her team would call homeowners looking for contractors with the goal to "up-sell them on additional services" which produced unqualified Leads. The former employee described the process as follows:

> If a client was in need of a plumber, we were taught to envision ourselves in the client's bathroom and imagine all of the other problems there may be based on their initial problem. For example, if the client needed a plumber for a busted pipe, we would ask if they had flooding and needed flooring, tile, drywall, mold abatement, etc....If the client said yes or maybe in the future, the sales rep would put in a lead (which they were making commission on) and that lead would be sent to multiple contractors. The client's phone would then blow up with calls from professionals. Some would often call back and complain that they had more than 4 calling them.

59.     Just like the issues experienced by the HSPs that received and paid for HomeAdvisor's deficient Leads, the PA Team encountered, first-hand, difficulties contacting the Leads.  Former Employee F confirmed that a vast majority of outreach attempts to the Leads are futile.  The Leads are plagued by disconnected phone numbers, wrong or fake numbers, phone

numbers that rang incessantly, and email addresses that bounce back as undeliverable.  When Former Employee F was able to successfully reach the "Lead", he was often told that the person did not request the service; that the person was not familiar with HomeAdvisor; or the person would hang up once he stated that he was calling from HomeAdvisor.

60.     In the instances that Former Employee F was able to successfully reach a Lead and to create a new Lead, the Lead was matched using one of three options: (1) Market Match, (2) Exact Match, or (3) Instant Booking.  Although a maximum of four HSPs are to be selected for a Market Match and only one for the premium Exact Match, Former Employee F states that PA Team members were motivated by sales goals to routinely override the simplistic Lead distribution restrictions. Also, according to Former Employee F, the PA Team had the ability to access the calendars of participating HSPs to book appointments through Instant Booking, the most expensive Lead-type, absent any request from the purported homeowner.

### iii.  HomeAdvisor's Employees Corroborate the Deficient and Fraudulent Nature of the Leads

61.     According to HomeAdvisor former employees, HomeAdvisor engaged in deceptive practices to generate Leads from duplicating and recycling Leads, to repurposing purchased consumer information, all in an effort to increase revenue from Lead fees.

62.     Former Employee F claims that duplicate Leads were prevalent.  According to Former Employee F, he routinely saw the *exact* same Lead coming through the system from different affiliate channels, but the system would not flag the Lead as a duplicate; therefore, each record of the same Lead was treated as a unique Lead that was then sent to four or more HSPs.

63.     Former Employee E stated that he learned that Leads supplied to his HSPs were also being distributed through other Lead generation sites, such as http://homeimprovement.net/.

And that he believed HomeAdvisor was replicating or accepting replicated Leads because there were duplicates of the *exact* same Leads – including the same grammar, punctuation, and even grammatical errors, and the only variations were the name or service location.

64. Former Employee B recalls that her sales manager informed her that HomeAdvisor was buying contact information supplied by attendees at home shows and converting the information into phony Leads.

65. Former Employee E routinely received calls from dissatisfied HSPs who said the "Leads were complete trash" or that the "Leads were bogus."

66. HomeAdvisor's former and current employees have also spoken out on online forums about the systemically bogus Leads.  As a post by an author identified as a former HomeAdvisor sales employee confirms:  "I personally believe they have a program running in the back ground [sic] to send contractors fake leads.  I was working with a contractor in California and I personally looked into EVERY lead HA sent him.  7 out of 10 were completely fabricated and I personally could not find the so called lead in internet searches (like google & yahoo)     or     even     in     the     phone     book…"     *See* https://web.archive.org/web/20161025191438/http://www.complaintslist.com/2016/homeadvisor -statement-from-an-x-ha-sales-employee/ (last visited 5/14/18).

67. The foregoing unfair, deceptive and fraudulent conduct in characterizing and generating the Leads constitutes fraud and fraudulent concealment (Counts III, VIII, XIII, XVIII, XXIII, XXVIII, and XXXIII ), supports claims for unjust enrichment and restitution by the HSPs (Counts VI, XI, XVI, XXI, XXVI, XXXI, and XXXV), breaches the implied contract between HSPs and HomeAdvisor (Counts V, X, XV, XX, XXV, XXX, and XXXIV), and constitutes

unlawful, unfair and fraudulent business acts and practices, and unfair, deceptive, untrue and misleading advertising, by HomeAdvisor in violation of the state laws (Counts I, II, VII, XII, XVII, XXII,  XXVII and XXXII).

**B.**    **Use of Purported Monthly Lead Budgets to Deceive and Cheat HSPs**

68.    HomeAdvisor misrepresents HSPs' ability to control the volume of Leads they will receive.  For example, HomeAdvisor told HSPs they could "modify spend targets any time," thereby giving HSPs "full control of [the] budget" through the user-friendly system.  *See* HomeAdvisorPro, "Solutions for Every Business," at https://pro.homeadvisor.com/how-it-works/ (last visited 4/26/18).

69.    Because HomeAdvisor automatically charges HSPs' credit cards and deducts funds from their checking accounts, the ability of HSPs to set monthly spend caps and establish budgets is material.  HomeAdvisor knows and prays on that importance by misrepresenting to the HSPs that they can control the amount of Leads they receive and set budgets, including by stating the following on its website:



*See* https://pro.homeadvisor.com/how-it-works/ (last visited 4/26/18).

70.    In reality, HomeAdvisor routinely ignores and surpasses HSPs' monthly Lead budgets.

71.     HomeAdvisor's former employees confirm that this was accomplished by using several tactics.  One tactic entails the use of HomeAdvisor's two categories of "Targeted Leads", (1) "Market Match" Leads, and (2) "Exact Match" Leads:

   a.  **Market Match**: "Consumers ***come to HomeAdvisor.com*** and give us detailed info about their project.  We match that info with your work and area preferences, and connect you with homeowners that match your needs."

   b.  **Exact Match**: "Get your name out there on the most searched internet sites and business directories.  We do more to promote your business online than anyone.  And, you'll only pay for leads when a consumer views your business profile and then decides they want to connect with you."

*See* https://www.homeadvisor.com/rfs/enroll/spPostEnrollLeadsDetails.jsp (last visited 4/26/18) (emphasis added).   HomeAdvisor represents that these two Lead categories are generated differently, resulting in a premium Lead fee for the so-called Exact Match Leads.

72.     Each of HomeAdvisor's Targeted Leads categories have their own separate budgets, yet HomeAdvisor trains its sales representatives to establish *only* one monthly spend ceiling to the less expensive Market Match Leads, resulting in HSPs having <u>no budget</u> for Exact Match Leads.  This pattern and practice demonstrates Defendants' deception to charge HSPs hundreds or thousands of dollars above the HSPs' anticipated maximum monthly Leads budget.

73.     Also, if by chance an HSP questions the application of a budget to both Lead categories, Former Employee C said that sales representatives would impose "required" minimum budgets on the HSP (*e.g.* setting monthly minimum budgets to $400 for Market Match Leads and $200 for Exact Match Leads).

74.     Additionally, HomeAdvisor conceals that if an HSP freezes their Leads *at any time* during the course of the month, the monthly Leads budget resets, thereby allowing HomeAdvisor to impose the maximum monthly Leads budget *during each interval* that the Lead

28

service is interrupted.

75.    Rather, HomeAdvisor represents to HSPs that they "have *full control* over the type and volume of business opportunities" received from HomeAdvisor, but HomeAdvisor omits to mention that turning the "leads off" impact HSPs' Lead budgets.

> ⌄ How much control do I have over the leads I receive?
>
> With Pro Leads, you have full control over the type and volume of business opportunities you receive from HomeAdvisor. That means that you turn your leads off when you're too busy to take new jobs and ask for more leads when your schedule's light.

Source: http://welcome.homeadvisor.com/membership (last visited 4/26/18).

76.    *Plaintiff Filipiak.* On or about January 5, 2017, during a live orientation session with a HomeAdvisor representative concerning use of HomeAdvisor's system, Plaintiff Filipiak's monthly Lead Budget was set at $1,000 per month.  Plaintiff Filipiak immediately informed the HomeAdvisor representative that he did not want a monthly budget that was higher than $300-$500.   The HomeAdvisor representative assured Plaintiff Filipiak that the $1,000 monthly budget was a placeholder and Plaintiff Filipiak could adjust his desired monthly budget whenever he wanted.   At no point did the HomeAdvisor representative inform Plaintiff Filipiak that every time the Lead budget is adjusted, the monthly Lead budget resets.  Despite Plaintiff Filipiak having lowered his monthly Lead budget on two separate occasions during the month of January, HomeAdvisor charged him for 28 Leads at a cost of over $2,400 for January.

## C.    Concealment of Lead Fee Schedules to Deceive HSPs

77.    HomeAdvisor automatically charges HSPs' credit cards and deducts funds from their checking accounts for Leads.  The HSPs' ability to know the magnitude of the charges is therefore material.  However, information about the Lead fees is concealed from the HSPs and HSPs are misled about Lead fees, which can range from under $10 to more than $140 per Lead.

78.    While the amount that HomeAdvisor charges per Lead is purportedly determined by the service requested and location, HomeAdvisor does not publish nor distribute any Lead fee schedule to HSPs.  Instead, HomeAdvisor tells prospective members to contact HomeAdvisor.

> ˅ How much do leads cost?
>
> Individual lead prices vary based on service type and location. You'll be charged only for qualified leads matching your exact specifications, so you set the budget and the pace.
>
> To learn how much leads will cost your business please email or call us at 855-801-6255.

*See* http://welcome.homeadvisor.com/membership (last visited 4/26/18).

79.    HomeAdvisor purposefully conceals material information regarding the huge range in Lead fees to avoid losing potential sales.  Former Employee C said that HomeAdvisor told sales representatives to falsely state to HSPs that no Lead fee schedules were available. HomeAdvisor trained its sales representatives to instead offer a Lead fee range or, better yet, an average Lead fee, if pressed, when, according to Former Employee B, they had access to Lead fee schedules.

80.    ***Plaintiff Ervine.*** In fact, when Plaintiff Ervine confronted a HomeAdvisor representative about Lead fees surpassing the $14 to $18 range she relied upon when joining HomeAdvisor, the representative stated that Plaintiff Ervine must have heard wrong because HomeAdvisor would never tell a HSP the rates it charges for Leads.

81.    As a result of HomeAdvisor's refusal to provide HSPs with accurate and material Lead fee information, the cost of each Lead is concealed until the charge for the Lead is automatically applied.

### D.    HSPs Nationwide were Defrauded into Buying Memberships and Unlawfully Charged for Bogus Leads

82.    Each of the named Plaintiffs was a victim of HomeAdvisor's deceitful practices

employed to generate unqualified and unverified Leads that were charged to Plaintiffs and HSPs.

83.     After two years of being harassed by pushy and forceful HomeAdvisor sales representatives and being bombarded by HomeAdvisor advertisements sent to his personal email, **Plaintiff Filipiak** signed up for a HomeAdvisor membership in January 2017. Within hours, HomeAdvisor inundated Plaintiff Filipiak with Leads; after the first week, he received 13 Leads ranging in price from $18.16 to $141.96, for a total cost of over $890.  Despite Plaintiff Filipiak having lowered his monthly Lead budget in January on two separate occasions until it reached $0, HomeAdvisor charged him for 28 Leads at a cost of **over $2,400** in January, irregardless of his monthly $1,000 Lead budget.

84.     Only two Leads sent to Plaintiff Filipiak resulted in a job, and the remaining Leads consisted of: a mortgage broker looking for contractors to attend a class on renovation loans; people who did not own a house; unanswered phone numbers; phone numbers that cut-off without the opportunity to leave messages; and persons stating that they were not interested in the requested service, notwithstanding that he was told there was a unfulfilled need for HSPs in Plaintiff Filipiak's service area.   Even for the four "instant booking" Leads, which were supposedly from homeowners who scheduled a direct appointment with Plaintiff Filipiak through HomeAdvisor's website, two never answered the door or phone calls and the other two Leads stated they were not the homeowner indicated on the Lead form and they were not looking for the services offered by Plaintiff Filipiak. After less than a month with HomeAdvisor, on or about February 5, 2017, Plaintiff Filipiak called HomeAdvisor to cancel his membership and request a refund of his membership fee.  HomeAdvisor refused to refund his membership fee and Plaintiff Filipiak froze his Lead services.

85.     On or about August 16, 2017, after eight months of persistent solicitation from HomeAdvisor, **Plaintiff Seldner** agreed to join HomeAdvisor's HSP network.  Plaintiff Seldner agreed to pay $287.99 for the membership in exchange for, what he thought was strictly, advertising and marketing for his small, side-job, handyman business.  Over the course of the eight months that HomeAdvisor aggressively pursued Plaintiff Seldner, he reiterated how he was only interested in advertising and that Leads were not practical for his business.  HomeAdvisor sales representative confirmed that Leads were an add-on service and that Plaintiff Seldner was under no obligation to receive Leads; however, a Leads budget was a required field in the happenstance he decided to use the service, so the representative told Plaintiff Seldner that it was set to $100.

86.     Within the month, Plaintiff Seldner received approximately 22 Leads, and was charged **over $440**.  Plaintiff Seldner contacted HomeAdvisor to complain and to demand a refund.  The representative said she would credit the account (notably, only $109.95 was issued in Lead credits) and freeze the Leads, which unbeknownst to Plaintiff Seldner automatically turned on within two weeks.  When the Leads reactivated he received four more Leads within two days and incurred additional charges of nearly $85. Plaintiff Seldner called HomeAdvisor sales representative to complain, but after several calls went unanswered, he finally spoke to a HomeAdvisor manager and requested a refund for the Leads and that the Leads be turned off. The manager said that HomeAdvisor does not refund money, and advised Plaintiff Seldner to cancel to service completely if he was not interested in receiving Leads.   Plaintiff Seldner responded that since he paid for the annual membership he was entitled to receive the promised advertising and marketing, but that he did not want to receive Leads, to which the manager

indicated that his Leads would be permanently frozen.

87.     On or about April 23, 2014, ***Plaintiff Baumann*** paid a quarterly membership fee to join HomeAdvisor Pro network on the representations that he was to receive targeted Leads, and that the service would be a "reliable and cost-effective way to connect with new customers." From April 23, 2014 through March 2, 2018, Plaintiff Baumann received over 220 Leads ranging in cost from $9.18 to $145.45 each which totaled nearly $11,745.   Plaintiff Baumann experienced issues with the Leads shortly after joining HomeAdvisor, but by after the first year Plaintiff Baumann noticed a drastic decrease in Lead quality.   Plaintiff Baumann encountered systemic issues concerning the validity of the Leads including, *inter alia*:

  a.  Phones that rang incessantly, or phone numbers with no voicemails set up or automated voicemails;

  b.  Disconnected phone numbers;

  c.  Individuals stating that they did not submit a request or were not interest in having the service performed;

  d.  Individuals listed on the Leads were not the homeowners;

  e.  Addresses for vacant lots; and

  f.  Email addresses that would be kicked back as undeliverable.

88.     Dissatisfied with the quality of the Leads and difficulty in obtaining credit for deficient Leads, Plaintiff Baumann began freezing the Lead service.   Plaintiff Baumann was reluctant to cancel his HomeAdvisor account because he relied upon the online profile that he worked to build on HomeAdvisor's directory for marketing and referral purposes.   However, Plaintiff Baumann grew tired of constantly monitoring his HomeAdvisor account and freezing his Leads since he could not permanently deactivate the Lead service.   As a result, every so

often, the Leads would turn on before Plaintiff Baumann had an opportunity to freeze them again resulting in the issuance of and being charged for more bogus Leads.  Eventually Plaintiff Baumann canceled his HomeAdvisor account.  Meanwhile HomeAdvisor continues to pursue him for outstanding charges in the amount of $227.90 and has threatened to send him to collections.

89.     When **Plaintiff Ervine** agreed to become a HomeAdvisor HSP in August 2016, the Leads charged to her were to be only from homeowners who were ready to hire, to be provided to only one or two HSPs, and cost between $14 and $18 for residential Leads and $18 and $20 for commercial Leads. Within the first month, she was charged over $325 for approximately 15 Leads, all of which were residential leads with the charges ranging from $14 to approximately $30 per Lead.  Plaintiff Ervine immediately encountered problems with the Leads, which consisted of unanswered phone numbers, persons stating that the requested service had already been completed, Leads outside of her geographical area, and even Leads with fictitious contact information.  Plaintiff Ervine was also informed by homeowners on several occasions that she was not the first or second HomeAdvisor HSP to contact them, and in one case was at least the **sixth HomeAdvisor HSP** to contact the homeowner.

90.     Further, despite having frozen her Leads, in December 2016 Plaintiff Ervine received a Lead for a job that had already been completed, and from March to July 2017, HomeAdvisor continued to send and charged her for four more Leads totaling over $110. Ultimately, Plaintiff Ervine sought out and received credits for these Leads.

91.     After Plaintiff Ervine terminated her membership account, HomeAdvisor continued to send Plaintiff Ervine coercive and misleading text messages purporting to be

"Leads."  The six text messages were a ruse designed by HomeAdvisor to try to fraudulently induce Plaintiff Ervine to reactivate her HomeAdvisor membership:  First, none of the text messages came from phone numbers within Plaintiff Ervine's geographic region (originating from California, Minnesota, Oklahoma, Tennessee, Texas and Wisconsin); Second, the text messages instructed Plaintiff Ervine to reply by email, not phone, to the purported homeowners' spouse; and Third, on their face, the text messages have no indicia of credibility as a "Lead", as depicted in the following 3 examples:





92.     When ***Linda McHenry***, President of B&B Carpentry, agreed to become a HomeAdvisor HSP on or about March 31, 2016, and paid $287.99 for a HomeAdvisor Pro

Connect™ membership, a HomeAdvisor sales representative represented that B&B Carpentry would be charged for qualified and verified Leads and HomeAdvisor would provide a refund for any bad Leads. Immediately, HomeAdvisor bombarded the McHenry Plaintiffs with Leads, and within three days of signing up, the McHenry Plaintiffs' $700 monthly Lead budget was met. The Leads charged to the McHenry Plaintiffs were not quality, project-ready Leads; instead they consisted of unanswered phone numbers, persons that missed appointments, Leads outside of the McHenry Plaintiffs' geographical area or scope of service, Leads with fictitious contact information, and Leads that were over distributed. Less than one week after signing up with HomeAdvisor, Plaintiff Linda McHenry froze the Lead service and continued to freeze the Leads on a monthly basis until HomeAdvisor membership terminated.

93. After the McHenry Plaintiffs terminated their membership, HomeAdvisor began aggressively pursuing them in an effort to convince them to rejoin HomeAdvisor, including through emails claiming that HomeAdvisor, in response to feedback from HSPs, implemented new features including: Improved Customer Service, Easier Credit Requests, More Targeted Connections, and $100 in free Lead credits.

94. In addition to the barrage of emails, HomeAdvisor repeatedly pressured and harassed the McHenry Plaintiffs with relentless phone calls. On or about June 26, 2017, *Plaintiff Brad McHenry* spoke with a HomeAdvisor sales representative and explained that he was reluctant to rejoin HomeAdvisor because, based on his prior experience, HomeAdvisor was operating a fraudulent business model of selling to multiple contractors bogus Leads that were not from project-ready homeowners. The sales representative acknowledged that this is the main complaint that HomeAdvisor receives from other HSPs, but promised that HomeAdvisor had

recognized the problems with the Leads, improved the quality of the Leads and would be more responsive to requests to refund bogus or unverified Leads.

95.    Based on these representations, Plaintiff Brad McHenry agreed to resign-up for a HomeAdvisor Membership and was charged $347.98.   Nevertheless, the Leads subsequently sold to the McHenry Plaintiffs quickly demonstrated that nothing had changed with HomeAdvisor's business model or Leads.   Plaintiff Brad McHenry paid over $440 for the subsequent Leads, but those Leads suffered from the same deficiencies that the McHenry Plaintiffs experienced during their previous HomeAdvisor membership.   As a result, less than one-month after re-signing up for HomeAdvisor, the McHenry Plaintiffs cancelled their membership again.

96.    Immediately after ***Plaintiff Haukenes*** launched her home inspection business website, HomeAdvisor bombarded her with email and phone call solicitations, including emails stating that HomeAdvisor would provide "Targeted Leads focused on the types of jobs you want, in the locations you request."   On February 18, 2017, Plaintiff Haukenes spoke to a HomeAdvisor sales representative who stated that the Leads would come from real people, would only be for the services that Plaintiff Haukenes' provides (which was important since Plaintiff Haukenes specified she was a home inspector and ***did not*** offer roof repair), and the Leads would only be from the exact geographical areas Plaintiff Haukenes specified, because HomeAdvisor sales representative initially offered Leads that were several hours away.

97.    Based upon these representations, Plaintiff Haukenes paid $287.99 for a HomeAdvisor Pro Connect$^{TM}$ membership, and was charged a total of $73.32 for four Leads between March 8, 2017 and March 12, 2107 (she was charged between $14 and $22 per Lead).

Plaintiff Haukenes immediately encountered problems with the Leads, which contained non-existent addresses, fictitious phone numbers, Leads for roof repairs, and Leads outside her geographic service area (one was from Las Vegas, NV, located more than 1,100 miles from her office, and contained a fake telephone number).

98.     When ***Plaintiff Costello*** spoke with a HomeAdvisor sales representative on or about October 7, 2016, about HomeAdvisor's Membership Programs and the nature and quality of the Leads, HomeAdvisor sales representative told Plaintiff Costello that HomeAdvisor did not use any third parties to generate its Leads, that the Leads were vetted and verified, and that the Leads were real homeowners looking for roof replacements.  HomeAdvisor sales representative assured Plaintiff Costello that if a Lead was not from a real homeowner seeking a roof replacement, HomeAdvisor would credit any bogus Lead.  In addition, Plaintiff Costello was advised that there were 74 Leads in his area looking for roofing contractors.  Based upon these representations, Plaintiff Costello paid $287.99 for a HomeAdvisor Pro Connect$^{TM}$ membership.

99.     Despite setting his Lead budget at $1,000 a month, four days after signing up with HomeAdvisor, Plaintiff Costello had not received a single Lead.  When Plaintiff Costello followed up with HomeAdvisor customer care about the lack of Leads he was informed, in direct contradiction to the representation during the sales call that there were 74 Leads ready and waiting, that the lack of Leads was due to a seasonal slow-down.  The HomeAdvisor customer care representative suggested that Plaintiff Costello increase his Lead budget to $10,000 a month to ensure a steady flow of Leads during the seasonal slump.  Once Plaintiff Costello increased his Lead budget to $10,000 and began receiving Leads, it immediately became apparent that the Leads were not the vetted homeowners that the HomeAdvisor sales representative had promised.

Plaintiff Costello received Leads that consisted of unanswered phone numbers; people that were not the homeowners; requests for services that Plaintiff Costello does not perform; and Leads with fictitious contact information.  Specifically, Plaintiff Costello received Leads that consisted of:

    a.   Leads with profane language for the name;

    b.   Contact information for children;

    c.   A 13-year old submitting his name to win an Itunes gift card;

    d.   homeowners that informed HomeAdvisor that they never filled out a request for service and no longer wanted to be harassed by calls from HomeAdvisor HSPs;

    e.   Scammers that sent text messages containing profanity and sexual statements; and

    f.   A Lead with an inactive phone number, a fake address and symbols in the comment section.

100.    The foregoing conduct illustrates HomeAdvisor's willful, deceptive conduct that it systemically and pervasively sold Leads that fell far short of the quality represented by HomeAdvisor.  The foregoing misconduct and Plaintiffs' experiences have been corroborated by over 880 former and current HSPs who have communicated with Plaintiffs' Counsel to convey their similar experiences with HomeAdvisor. Appendix I contains the HSPs' first-hand accounts, of which the following is just a sample:

> "I signed up for HomeAdvisor lead generation program, only to find out that I was being scammed. Leads that led me to nowhere, leads that led me to (literally) a vacant lot, leads that had no one to talk to, leads that were clearly from someone who was paid to fill out false and unexisting requests, leads that led me to no one answering the phone, because there's no one there to answer and etc. HomeAdvisor is a company that must stop the way they conduct their business, making the lives of entrepreneurs even more difficult to survive" Appendix I at Entry No. 206.

101.    The wrongful, unlawful conduct of acquiring, selling and charging HSPs for memberships and Leads through concealment, fraud and misstatements about the true defective and bogus nature of HomeAdvisor business and charging HSPs for bogus Leads constitutes unlawful, unfair and fraudulent business acts and practices, and unfair, deceptive, untrue and misleading advertising, in violation of the state laws (Counts I, II, VII, XII, XVII, XXII, XXVII, and XXXII), constitutes fraud and fraudulent concealment (Counts III, VIII, XIII, XVIII, XXIII, XXVIII, and XXXIII), supports claims for unjust enrichment and restitution by the HSPs (Counts VI, XI, XVI, XXI, XXVI, XXXI, and XXXV), and breaches the implied contract between HSPs and HomeAdvisor (Counts V, X, XV, XX, XXV, XXX, and XXXIV).

## II.    THE TREATMENT OF HSPS IS DECEITFUL, UNLAWFUL AND UNCONSCIONABLE

102.    Defendants HomeAdvisor, IAC, and ANGI churn HSPs, because, in their view, there is an unending supply of unknowing and uninformed HSPs.[4]   At each step of the process, Defendants act willfully and with an intent to deceive.   The fraud is perpetuated on home service providers and contractors who do not have the monetary resources and time to seek refunds, credits and other recourse.

### A.    The Sales and Account Management Processes Are Fraudulent and Deceitful

103.    HomeAdvisor's unlawful and unconscionable conduct begins with the solicitation

---

[4]    IAC acknowledged in a May 1, 2017 presentation titled "HomeAdvisor + Angie's List: Accelerating Category Leadership," that HomeAdvisor has only penetrated 3% of the HSP market.    According to this presentation, roughly 90% of HSPs secure jobs offline. https://www.sec.gov/Archives/edgar/data/1491778/000110465917028923/a17-12195_5425.htm (last visited 7/5/18). During IAC's Q3 2017 Earnings Call, ANGI's CEO, Chris Terrill, acknowledged that HomeAdvisor was trying to capture more small HSPs when he declared that HomeAdvisor was accelerating the growth of its sales force in an effort to pursue the untapped HSPs.

process, commonly through cold calling by HomeAdvisor's salesforce.  The salesforce uses search engine marketing, trade associations and affiliate marketing channels to identify potential Service Professionals, including, *inter alia*, local plumbers, painters, electricians, handymen, and home improvement and maintenance personnel.

104.   HomeAdvisor acquires contact information for prospective HSPs through three sources: (1) independent identification (*e.g.*, phonebook, internet searches, etc.); (2) "phone-in" inquiries from interested Service Professionals, referred to internally as "Hot Leads" according to Former Employee B, or; (3) most commonly, HomeAdvisor's algorithm-generated prospect list, as described by Former Employee D.

105.   HomeAdvisor generally conducts orientations for training classes comprised of 10-person teams every couple of weeks.  During the two-week training sessions, HomeAdvisor briefly educates new sales representatives about HomeAdvisor's product, but primarily focuses on the sales pitch and overcoming objections.

106.   Former Employee E said that other sales representatives could be overheard "blatantly lying to Service Professionals" just to make the sale.  Similarly, Former Employee B claimed that "the more crooked you are internally, the more they [management] will turn their head as long as you are making the sale."

107.   During the telephonic sales call, sales representatives routinely recited and guaranteed the following selling points, as confirmed by former HSPs and Former Employees B, D and E:

- Leads are qualified, project-ready, serious homeowners in your area;

- All of the Leads come from individuals who have completed a 3-page

questionnaire on HomeAdvisor's website ;

- There is no contract and that the service can be cancelled at any time;

- The HSP will speak to the homeowner or decision maker of the residence and not a renter;

- The address is for an actual residence;

- The Leads will meet the HSP's profile criteria, and if not, Lead credits would be issued; and

- The HSP will have full control over the lead flow and ability to monitor costs.

108.   HSPs do not execute any written contract or written agreement with HomeAdvisor.  Nor are HSPs required to click on an "I agree" box after being presented with any terms and conditions.  In fact, HomeAdvisor provides no terms and conditions prior to an HSP signing up for HomeAdvisor membership.

109.   Once HomeAdvisor secures a payment source (credit card or debit account number) from the HSP, the Membership Program fee is charged or debited, and the barrage of Leads and charges begins.

110.   Further, by many accounts of Former Employees and HSPs (*see e.g.,* Appendix I at Entry Nos 220, 300, 348, 392, 411, 611 and 697 and Appendix II), HomeAdvisor employs and encourages aggressive, deceptive and fraudulent sales practices to exponentially grow the number of paying HSPs within its network and generate revenue from Lead fees.

111.   HomeAdvisor sales representatives threaten to harm prospective HSPs' reputations via the posting of baseless, bad reviews if they refuse to join HomeAdvisor. According to Former Employee B, "it was unbelievable how we would bully the contractors to

42

sign them up.   I would constantly hear sales reps beating them [prospective Service Professionals] up over the phone.  Sales reps would belittle the contractors and tell them if they don't sign up that they were going to be out of business."

112.   This conduct has been further confirmed by HSPs who have contacted Plaintiffs' Counsel.  For example:

a.   According to an HSP from Wisconsin said, "We are not a member.  Just being harassed to become a member…For almost 2 years HomeAdvisor has continuously called the cell phone of the owner [ ] as well as the main office number. We have blocked the number from our office but the calls come in to the cell phone from different numbers making it impossible to completely block. We've asked to not be contacted. We've asked to be taken off their call list but to no avail they call. We get emails and when we try to 'Unsubscribe' we get routed to their website and aren't able to unsubscribe because the site states 'You are not subscribed to any emails at this time.'" Appendix I at 876.

113.   The former sales representatives uniformly agreed that absent the fraud, deception and coercion, they often believed that they could not ethically sell the service to prospective HSPs. Former Employee D said, "If I told Service Professionals the truth about the service they would often decline the service."   As a result, Former Employee D was criticized by her sales manager for allegedly talking prospective HSPs out of the service by overeducating them about the service and warning them about the potential to overdraw accounts.  Former Employee D was coached to talk less about the service, be more aggressive, and close deals more quickly. Former Employee B was also coached to talk less about the product and she was instructed never

to let a prospect off the phone before processing the payment.  Former Employee B's sales manager would say, "Slam them. Get their credit card and get that payment."

114.   Attached as Appendix II is a compilation from HomeAdvisor's current and former employees who have posted on the job site Glassdoor.com, which corroborate and confirm HomeAdvisor's aggressive, deceptive and unconscionable sales practices of sales representatives being "encouraged to stretch the truth" and "taught and expected to bend and omit the truth.  For example, you're expected to tell every prospect that there are a certain amount of leads available in their city even though it's usually not true." *See* Appendix II, and https://www.glassdoor.com/Reviews/Employee-Review-HomeAdvisor-RVW8965054.htm   (last visited 4/26/18).

115.   To encourage and perpetuate its fraudulent scheme, HomeAdvisor designed its commission structure to bestow significant financial benefits to HomeAdvisor employees who employ deceptive sales practices.  The commission structure creates an incentive to sign up HSPs at whatever cost.

116.   Sales representatives are encouraged to manipulate HSPs' Lead criteria in order to make a sale.  For example, in order to sell the Lead generation services to a prospect, the sales software requires there to be a minimum number of Leads available in the HSP's selected service area.  According to Former Employee C, if there were not enough Leads that met the HSP's criteria, his sales manager would instruct sales representatives to disregard the HSP's specified criteria by expanding the target geographic region (*e.g.*, increase the HSP's desired service area from a radius of 20 miles to 100 miles) or supplement the HSP's list of services offered, for jobs

not performed by the HSP, until the Lead minimum was satisfied.[5] According to Former Employee G, to qualify as a premium sale there needed to be $100 in Leads available.  If that threshold was not met, sales representatives were instructed to expand the service area, to the whole state if necessary, or add additional services to satisfy the requirement.

117.    Also, based upon information provided by Former Employees C, D, E and G, HSPs' Lead services must remain activated for the first 24-hours after purchasing a membership in order for the sales representative to receive a commission on the membership.  A retention bonus could then be earned by sales representatives for HSPs that kept their Leads activated for the first month of the membership.  Moreover, sales representatives were also eligible for a residual commission for HSPs who kept the Lead service activated for a majority of the membership.  According to Former Employee G the amount of commission a sales representative can receive is also directly tied to the monthly spend targets for a HSPs account.

118.    If an HSP limited or terminated its membership and Leads, sales representatives also faced termination.  As Former Employee B said, "It's a horrific environment.  We were treated like expendable pieces of crap." Another post by an author identified as a then-current HomeAdvisor sales representative titled "Look elsewhere" and dated January 26, 2015 states: "If you don't sell you're fired. If you DO [sic] and the contractor decides to turn off their leads before 24 hours, you could get fired. You have to lie to contractors and tell the [sic] what they want To [sic] hear and not what will actually benefit them." *See* https://www.glassdoor.com/Reviews/HomeAdvisor-Reviews-E11291_P19.htm?sort.sortType=OR&sort.ascending=false (last visited 4/26/18).

---

[5] *See* "Not worth the trouble, time, or free food." https://www.glassdoor.com/Reviews/Employee -Review-HomeAdvisor-RVW15464580.htm (entry dated June 13, 2017) (last visited 4/26/18).

119.     Former Employee C offered this experience as an example of the foregoing: The day before he left on vacation he received a voicemail from a newly signed up HSP who wished to terminate her membership.  Since her call was within 72 hours of signing up, she was entitled to be reimbursed the membership fee.  However, rather than process this request, lose a sale for HomeAdvisor, and lose the commission, Former Employee C's sales manager advised, "[Bleep] it bro.  You're on vacation.  Forget about it, and say you didn't get the voicemail before you left."  Her cancellation request was not processed within 72 hours.  The below post by a HSP from April 4, 2016 describes similar treatment:



*See*     http://www.complaintsboard.com/complaints/home-advisor-service-magic-scam-c639368.html (last visited 4/26/18).

120.     A former HomeAdvisor sales employee had the following to say: "Brad Foster [sic] is the VP of Denver Sales and he encourages an environment to where his managers [ ] will train  the  new  employees  to  LIE  to  contractors  just  to  get  a  sale…".   *See* http://www.complaintslist.com/2016/homeadvisor-statement-from-an-x-ha-sales-employee/  (last visited 11/30/17).

121.     Accounts from HomeAdvisor's former employees paint a picture of call centers that are lifted right out of the movie *The Wolf of Wall Street* (Paramount Pictures (2013)).  Alcohol and drug use on HomeAdvisor sales floors are open and notorious.  This environment,

described below, further cultivated the unethical and deceptive sales techniques that is cultivated

at HomeAdvisor:

    a.   "If you are not friends with a manager and you do not drink everyday and smoke marijuana forget it. Lots of illegal drug activity in the parking lot and drugs being sold on the sales floor.  No advancement unless you are buddies with a manager – meaning you party with them. Managers are not exempt from selling and purchasing illegal drugs.  I have seen my manager buy in the parking lot." ("Marketing Consultant", entry dated December 20, 2015);

    b.   "… I witnessed extremely unprofessional behavior during mandatory happy hour in the office (clothing being removed, sexual conduct, etc)." ("Brutal", entry dated February 11, 2016);

    c.   "You can drink and do drugs……Drugs everywhere, sexual harassment, overlooked. Lies to sp's [service professionals] is encouraged by managers.  Managers favor reps that give them drugs.  Doing illegal practices regarding customers secure information." ("A complete mess!!! Be warned do not work for this employer", entry dated April 28, 2016);

    d.   "3 people were arrested within the month I worked there in the parking lot." ("Marketing Consultant", entry dated August 17, 2016);

    e.   "Absolutely horrible. Drug problem rampant all over the office, everyone is smoking pot and getting high selling and distributing drugs and pills." ("Not worth the trouble, time or free food", entry dated June 13, 2017);

    f.   "Unhealthy drug environment" ("Online Marketing Consultant", entry dated April 11, 2016);

    g.   "Drug test would wipe out half of the current sales staff." ("Inside Sales", entry dated May 15, 2016); and

    h.   "Everyone is on drugs (Seen employees snorting substances and smoking pot in the parking lot.)" ("A call center that represents a worthless product", entry dated May 5, 2017).

*See*   https://www.glassdoor.com/Reviews/Employee-Review-HomeAdvisor-RVW8965054.htm (last visited 4/26/18).

    122.   This sales culture and these practices were employed with the full knowledge, and

at the direction, of the individuals tasked with running HomeAdvisor's sales force.

**B.      Fraud and Deceit Inflicted on HSPs Seeking Recourse**

123.    HomeAdvisor has adopted uniform internal procedures to deny and discourage refunds when HSPs seek reimbursement for membership fees and bogus Leads, and to prevent HSPs from terminating their memberships.

124.    HomeAdvisor has a strict no cash refund policy for membership fees and for bogus Leads. *See* Appendix I at Entry Nos. 23, 84, 113, 184, 246, 532 and 570.  As a result, the only recourse left for HSPs is to request a "Lead credit" for bogus Leads.  However, a Lead credit, even when secured, amounts to no recourse at all because HomeAdvisor is just "crediting" the HSP by replacing one deficient Lead with another deficient Lead.

125.    HomeAdvisor has also erected multiple barriers to deter and prevent HSPs from seeking and receiving Lead credits. HSP credit requests for bogus Leads are routinely denied. HomeAdvisor even implemented an *ad hoc* policy requiring the HSP to submit credit requests within 24 hours violating HomeAdvisor's Lead Credit Guidelines which state that, "[c]redits must be requested by you within 30 days of the date that the charge was incurred." *See* https://pro.homeadvisor.com/terms/lead-credit-guidelines/ (Last visited 4/26/18).

126.    Rather, customer service representatives cap HSP credit requests at approximately 15% of the total Leads received, irrespective of the HSP being entitled to receive credit for other bogus Leads.

127.    Furthermore, HomeAdvisor implemented discriminatory practices that favored HSPs that were more lucrative for HomeAdvisor.  According to Employee E, it was known on the sales floor that the issuance of Lead credits was influenced by the size of the HSP's account

48

with HomeAdvisor. The former sales representative said, "The more the Service Professional spent with HomeAdvisor, the more likely HomeAdvisor would issue a Lead credit."

128.     Plaintiffs' experiences confirm HomeAdvisor's deficient process for reviewing credit requests and issuing appropriately owed credit.   For example, when **Plaintiff Haukenes** tried to receive credits for fake Leads, HomeAdvisor refused to provide a credit for any of the Leads.  Even when Plaintiff Haukenes informed HomeAdvisor that the city clerk for the town of Worley, Idaho confirmed that the address in one of the Leads did not exist, HomeAdvisor refused to credit the Lead and told Plaintiff Haukenes to continue to try and contact the Lead. Notwithstanding that Plaintiff Haukenes spent hours of lost time (worth approximately $1,500) to contact the fraudulent Leads and dispute the Lead charges with HomeAdvisor, she was not issued any refund. On March 14, 2017, Plaintiff Haukenes canceled her HomeAdvisor membership and instructed her credit card company to reject any charges from HomeAdvisor.

129.     Within two weeks of activating his HomeAdvisor membership, one of **Plaintiff Costello's** employees contacted HomeAdvisor customer care to inquire about the process of requesting Lead credits for homeowner Leads who claimed that they did not submit a request or were not interested in new roofing.  HomeAdvisor customer care fraudulently responded that:

> HomeAdvisor does not have the ability to obtain a customer's [sic] information without them first entering our site or calling us with an interest in the service you provide.  Unless the information provided by a customer is bogus (wrong name, phone number or disconnected phone number), we are unable to provide a credit for the situation.

130.     Plaintiff Costello submitted credit requests for all of the bogus Leads he received, but HomeAdvisor rejected the overwhelming majority of these credit requests.  So long as the telephone number in a Lead matched the individual identified in a Lead, HomeAdvisor would

reject Plaintiff Costello's credit requests without following up with the Lead to determine if the individual actually submitted the Lead or requested roofing work.  Despite HomeAdvisor's initial denials, Plaintiff Costello continued to pursue the rejected credit requests with HomeAdvisor.  During these conversations, HomeAdvisor stated that the Leads it was selling to Plaintiff Costello came from a third party affiliate site that produced bad Leads.  However, HomeAdvisor continued to refuse to refund or credit the bogus Leads, asserting – contrary to its public statements, advertising and its own website – that it doesn't sell Leads, it sells information.

131.   After less than a month with HomeAdvisor, on or about February 5, 2017, **Plaintiff Filipiak** called HomeAdvisor to cancel his membership and request a refund of his membership fee.  HomeAdvisor refused to refund his membership fee and Plaintiff Filipiak froze his Lead services.

132.   The experiences of the HSPs who have contacted Plaintiffs' Counsel also demonstrate the flagrant systemic abuse of the HSPs with respect to the handling of HSPs' credit requests:

   a.   "I demanded, and was told I'd receive, a credit for each of these leads and closed my membership. HomeAdvisor did *not* credit my leads…." Appendix I at Entry No. 882,

   b.   "I had called about a charge for a lead and they were suppose[d] to credit my account back but after a month still no credit. At that time I cancelled my account with them. I called back after a month, when the woman said she wasn't authorized to credit my account I asked to speak to a manager after waiting someone finally answered. I was told that they could not give me a refund but a credit towards another lead, I said my account was cancelled and was not renewing it." Appendix I at Entry No. 510,

   c.   "Then they've sent us crap leads and keep taking money out of our checking account for these bogus leads.  When we ask for credit they deny the credit.  We are struggling to make a living and this big company is taking advantage of us.  When we told them

that we were dissatisfied with the leads and quality of their practices they told us that if we wanted out we could get out but we would NOT receive any refund for anything." Appendix I at Entry No. 251.

*See* Appendix I for additional HSP experiences with HomeAdvisor's refusal to provide refunds and denial of credits.

133.     HomeAdvisor's response to and processing of HSPs' termination requests suffers from the same deficient and fraudulent practices as those employed in the handling of credit requests.  After being denied Lead credits that Plaintiffs McHenry and Ervine were rightfully entitled to receive, Plaintiffs McHenry and Ervine sought to terminate their memberships, but their requests to cancel were persistently met with resistance from HomeAdvisor.

134.     After the ***McHenry Plaintiffs'*** attempts to obtain Lead credits for the bad Leads were rejected by HomeAdvisor, they contacted HomeAdvisor to cancel their membership. However, HomeAdvisor made such efforts exceedingly difficult; when they called to cancel the membership, HomeAdvisor would place the calls on hold indefinitely and would hang up on the McHenry Plaintiffs.  After numerous phone calls amounting to countless hours that spanned multiple days, it was not until the McHenry Plaintiffs called HomeAdvisor under the pretense of opening a new account  that they were able to eventually cancel their membership.

135.     When ***Plaintiff Ervine*** contacted HomeAdvisor to cancel her membership HomeAdvisor refused.  Instead, HomeAdvisor informed Plaintiff Ervine that she had two months left on her membership and to call back at the end of the two month period at which time HomeAdvisor automatically renewed her membership by trying to charge $287.99 to the credit card on file.  When Plaintiff Ervine called HomeAdvisor to cancel the automatically renewed membership and request a refund, she was told that HomeAdvisor never issues refunds and if she

wanted to dispute the charge any further, she would have to retain a lawyer.   Ultimately, HomeAdvisor refunded the fraudulent charges after Plaintiff Ervine filed a complaint with the BBB.

136.   In the below excerpt from an intake received by Plaintiffs' Counsel on July 4, 2018,  an Indiana HSP describes HomeAdvisor's fraudulent and deceptive practices that he experienced from the point of solicitation to his request for cancelation:

I have been hammered with calls since inquiring about Home Advisor back in 3/2017. In looking at ways to use various channels to keep workflow coming in and keep crews busy and productive I finally decided to try it when receiving a call in early June from an alias phone number which was HA's usual method of calling (most times disguised at [ ] in Indiana). When signed up it became very clear within a week that this was a HUGE mistake on my part. The person signing me up was more interested in securing my bank info than setting me up with the correct services that I provide as an excavating contractor. I found out the hard way that these fees were coming out of my account if I hit the I am interested button to just see the details. It took about a week before noticing the fees were withdrawn from my account for junk leads that didn't even fall into my category along with the details a majority of the time that said customer did not provide any details which I now believe was a setup lead from HA to hit you for more money. I also would get leads that gave an address where the owner wanted a new driveway and when looking on Google Earth the house was an older home in the city with a zero-lot line home with 5' from house wall to property line fences on both sides and the garage was on the alley with no other access. They supplied many junk leads. On June 25th I stopped all leads from coming in. However, HA still sent leads via e-mail to tempt you to open so you would be charged so there was no activity from then up until the present (7/4/18). On 7/3/2018 after my office manager accessed our bank account balance, we found that even more charges in the hundreds were levied and drawn out on June 2nd despite all the credits that were returned to the account from fraudulent leads I received in the few weeks I was with HA. We called to discuss getting a refund on that money and as usual they are happy to give us credits for future crap leads. This is the scam. They take out American currency immediately but offer the worthless free lead credits for later. Don't buy off on this. They have weekly billing cycles that conveniently do not credit before they draw your money out. This becomes an ongoing scam. Not getting anywhere with this "account specialist" (definition is someone that offers no help but frequently apologizes for the situation) and not being able to work out a solution to receiving a cash deposit back into our account, I told him to just immediately cancel our account and further explained to "old deaf ears" what I thought of the company he works for. He said he would close the account and send an email to that effect. It has been a day and still no email confirming the cancelation. In the one day since I told them I have received and

offer for more free leads if I continue. All I can say is "are you kidding me"? They hit me for just under a thousand dollars in the short time I was there and do feel somewhat dumb for taking that leap. The service also cost me another two thousand for the remote I threw at the TV when I saw another Home Advisor commercial. Appendix I at 338.

## III. HOMEADVISOR IMPOSES UNAUTHORIZED MHELPDESK CHARGES ON HSPS

137. On September 3, 2014, IAC announced that HomeAdvisor had acquired a majority stake in mHelpDesk, a startup, cloud-based field service software for small to mid-size businesses. mHelpDesk's software purportedly helps businesses schedule appointments, track work orders and invoices, and manage tasks on a smartphone. HomeAdvisor's Chief Executive Officer Chris Terrill advised that the software will be made available to HomeAdvisor's 80,000 HSPs. *See* https://www.bloomberg.com/news/articles/2014-09-03/iac-s-homeadvisor-buys-stake-in-mHelpDesk-startup.

138. Moreover, IAC affirmatively stated in its Annual Report on Form 10-K for the Fiscal Year Ended 12/31/2016, that certain HomeAdvisor membership programs are *integrated* with mHelpDesk.

139. Until recently, information about mHelpDesk, however, was absent from the publicly-available information provided online by HomeAdvisor and IAC in connection with the descriptions of HomeAdvisor's services.

140. HSPs are not adequately informed during the membership purchasing process that they will be automatically enrolled in and charged for mHelpDesk following a one-month free trial.

141. Former Employee E confirmed that sales representatives were incentivized to represent mHelpDesk as a complimentary membership feature because sales representatives

53

received an $80 "kicker" or bonus for signing HSPs up for the service.

142.    As a result of the compensation structure, sales representatives would not present mHelpDesk as an option, and would not inform the HSPs that there was an additional fee for the service.

143.    Therefore, HSPs are left to discover that, in addition to their annual membership fee and per Lead fee, Defendants automatically charged their credit card or debited their checking account $59.99 - $99.00 a month for mHelpDesk.

144.    Defendants did not notify or seek prior authorization from HSPs before activating and charging for mHelpDesk.

145.    The HSPs that have contacted Plaintiffs' Counsel have recounted their experiences with the deceptive practices utilized by HomeAdvisor to bill HSPs for mHelpDesk. Specifically, one HSP from Washington stated:

> "I wanted to cancel mHelp desk, which I did not want to sign up for and never used. A refund request was refused. When I asked to hear the recording in which I supposedly agreed to sign up for mHelp desk I was told that it is an internal quality thing and they "don't get on the phone". I view this an intentionally layering the system such that the customer is unable to verify what was said on the phone and therefore the customer is powerless to argue their case. A refund was refused and credit for more leads was given after 15 minutes of arguing. I don't want the lead credit. I want a refund for that charge which I did not agree too because I do not intend to continue using the unethical lead generation service."

Appendix I at Entry No. 858.  Additional experiences with HomeAdvisor's fraudulent charging of MHelpDesk are detailed in Appendix I at Entry Nos. 177, 464, 465,603 and 689.

146.    As a result of HomeAdvisor's unfair, deceptive and fraudulent business practices, HSPs and Plaintiffs have suffered substantial and an ascertainable loss of money.  Defendants have operated a scheme designed to bestow significant financial benefits upon themselves to the

detriment of Plaintiffs and the Classes.  Had Defendants not concealed and falsely characterized the true nature of the membership programs and the Leads, Plaintiffs and the HSPs would not have paid collectively millions of dollars for the membership programs, Leads and mHelpDesk.

## IV.   HOMEADVISOR RELIES ON OTHER BUSINESSESES TO HELP CONCEAL AND FURTHER THE FRAUD

147.    HomeAdvisor accomplishes the wrongful and unlawful conduct of selling and charging HSPs memberships and charging for bogus Leads by relying on the aid of third-parties, in addition to the Lead sources/generators described above.  HomeAdvisor relies on the Better Business Bureau ("BBB") and the Debt Collection Agencies to help conceal and further the fraudulent scheme.

### A.    The Better Business Bureau

148.    Former and current HSPs victimized by HomeAdvisor's practices have submitted a plethora of complaints to the BBB. As of July 6, 2018, HomeAdvisor received 1,313 complaints through the BBB in the last 3 years, including 502 complaints in the preceding 12 months.  Here is HomeAdvisor's BBB complaint type summary:

| Complaint Type | Total Closed Complaints |
| --- | --- |
| Advertising/Sales Issues | 220 |
| Billing/Collection Issues | 526 |
| Delivery Issues | 13 |
| Guarantee/Warranty Issues | 10 |
| Problems with Product/Service | 544 |
| **Total Closed Complaints** | **1313** |

*See* https://www.bbb.org/denver/business-reviews/contractor-referral/homeadvisor-in-lakewood-co-22000608/reviews-and-complaints (last visited 7/6/18).

149.   Since July 2015, 604 consumers (94%) have reported a negative experience with HomeAdvisor to the BBB, whereas only 28 customers (4.3%) have reported a positive experience with HomeAdvisor during that same time period.   Below is HomeAdvisor's BBB customer reviews summary:



*See*  https://www.bbb.org/denver/business-reviews/contractor-referral/homeadvisor-in-lakewood-co-22000608/reviews-and-complaints?section=reviews (last visited 7/6/18).

150.   Former Employee A, who almost exclusively dealt with complaints that had been filed with the BBB, confirmed that HomeAdvisor could retain its positive rating as long as it could show that it affirmatively reached out to complainants in an attempt to resolve the issue(s), but that a resolution was not required to close a complaint.

151.   Whatever the reasons may be for HomeAdvisor being able to maintain an A-rating, it has nothing to do with the bona fides of the HSP complaints or the utter failure of HomeAdvisor to effect necessary changes to its fraudulent business practices.

**B.    Debt Collection Agencies**

152.   Faced with the futility of stopping the bogus Lead charges and inability to terminate their memberships, HSPs are forced to cancel the credit and debit cards to avoid incurring additional authorized and erroneous charges.  *See* Appendix I at Entry Nos. 30, 37, 110

and 141. In response, HSPs are sent by HomeAdvisor to debt collection agencies.

153. HomeAdvisor has associated with at least two debt collection agencies, CMI Credit Mediators, Inc. ("CMI") and McCarthy, Burgess & Wolff ("MBW"), (collectively with any John Doe debt collection agencies the "Debt Collection Agencies") to collect monies from HSPs for the bogus Leads.

154. HomeAdvisor also initiates collection actions against HSPs who have successfully won a chargeback from their financial institution. A chargeback occurs if HomeAdvisor fails to produce evidence sufficient to support the charge and the financial institution rejects HomeAdvisor charge and credits the HSP's account. When HSPs win a chargeback, despite the fact that a financial institution has found the charge to be invalid, HomeAdvisor pursues the HSP through the Debt Collection Agencies.

155. *Plaintiff Costello* filed a dispute related to HomeAdvisor Lead charges with Discover card. Discover card challenged HomeAdvisor to provide evidence of the validity of the Leads or a contract that supported its new assertion that it was selling information, not Leads. After HomeAdvisor failed to provide the requested information, Discover card reversed the charges on Plaintiff Costello's card. As a result, on May 6, 2017, HomeAdvisor sent Plaintiff Costello's account to CMI to initiate collections. CMI is currently trying to pursue Plaintiff Costello for a fraudulent debt in the amount of $21,519.60 which consists of $15,453.81 in bogus Lead charges, $914.52 in interest and a $5,151.27 collection charge for CMI.

156. Similarly, after *Plaintiff Seldner* incurred additional unauthorized charges for Leads he did not agree to receive, he contacted his credit card company which issued a chargeback of $529.39 to HomeAdvisor. On October 31, 2017 HomeAdvisor tried to re-process

the four separate charges that were reversed totaling $529.39. All four charges were rejected, resulting in HomeAdvisor applying $20 "interest" penalties on each charge, for a total outstanding balance of $609.23. Plaintiff Seldner received an email the same day from HomeAdvisor titled, "Final Account Notice – Avoid being sent to Collections" that reflected a balance of $609.39. On November 27, 2017, Plaintiff Seldner received another email from HomeAdvisor which indicated that his account had been sent to an outside collection agency and that additional fees and possibly interest would be added to the balance. The following day he received an email from CMI which stated that Plaintiff Seldner now owed $812.52. In response to another email received from CMI on January 7, 2018, Plaintiff Seldner filed a complaint with the Consumer Financial Protection Bureau about CMI. Currently, CMI is pursuing Plaintiff Seldner for $819.73.

157. Likewise, when a HSP threatens to file a complaint against HomeAdvisor with a state Attorney General, HomeAdvisor backs off or instructs the Debt Collection Agency to cease collection actions and the HSPs complaint is resolved. Together, the Debt Collection Agencies and HomeAdvisor utilize their moniker or "debt collector" to browbeat HSPs into remaining with HomeAdvisor.

158. In response to HomeAdvisor's refusal to credit *Plaintiff Haukenes* for the bogus Leads, on March 14, 2017 she canceled her HomeAdvisor membership and instructed her credit card company to reject any charges from HomeAdvisor. Visa then reversed two charges for $287.99 and $73.32 on Plaintiff Haukenes credit card. On April 12, 2017, HomeAdvisor attempted to process the two reversed charges, but both failed, resulting in the assessment of $20 "interest" penalties on both charges. That same day, HomeAdvisor sent Plaintiff Haukenes an

email titled "Final Account Notice – Avoid being sent to Collections" alleging that she now owed HomeAdvisor $401.31.  The notice threatened that if Plaintiff Haukenes did not pay the balance that her account would be sent to an outside collection agency, and additional collection fees and/or litigation fees would be assessed, and a negative report would be made against her credit.  This harassment continued for more than two months until Plaintiff Haukenes responded to HomeAdvisor's baseless threats by filing complaints with the Idaho Attorney General.  In response to the complaint filed with the Idaho Attorney General, HomeAdvisor promptly "wiped her entire balance" and ceased any further collection efforts.

## VII.   THE LANHAM ACT DEFENDANTS UNLAWFULLY DIVERT BUSINESS FROM HSPs.

159.   The sharp increase in the number of HSPs in HomeAdvisor's network translates to increased revenue through membership and Leads fees.  But, in order for HomeAdvisor to maximize revenue from Lead fees, the quantity of Leads needs to grow with HomeAdvisor's ever-increasing number of HSPs.  To do so, Defendants devised schemes that unlawfully co-opt, use and exploit the identities of current and former HSPs to divert legitimate business away from the HSPs to HomeAdvisor, including: (i) Online Public Profiles, (ii) HomeAdvisor Premier Online Directory, (iii) the Exclusive Partner Network, (iv) Exact Match Listings, and (v) Website Hijacking.

### A.   Online Public Profiles

160.   In marketing and selling the membership programs, HomeAdvisor promotes the Online Public Profiles and online listings as membership benefits.

161.   Without informing the HSPs, the Lanham Act Defendants, seize the HSPs' online listings that appear on HomeAdvisor's website, Partner's Networks and search engines.  The

Lanham Act Defendants employ hijacking websites to intercept and divert business opportunities away from the intended HSP to HomeAdvisor.  The Lanham Act Defendants accomplish this by: 1) manipulating internet traffic to route homeowners away from their preferred HSP and directing them, to a HomeAdvisor related domain; 2) creating the illusion for the homeowner that they are contacting their chosen HSP; and 3) making false or misleading representations about the HSPs.

162.    HomeAdvisor's procurement of information and content about the businesses of HSPs, which begins at the enrollment stage, is the foundational information that the Lanham Act Defendants utilize in creating and leveraging the repertoire of online listings and impersonation websites that generate Leads for HomeAdvisor.

163.    Once a HSP completes the enrollment process with HomeAdvisor and the Online Public Profile, the profile becomes active and looks nearly uniform to Plaintiff Ervine's Online Public Profile, shown here.



*See* https://www.homeadvisor.com/rated.GlassActWindowCleaning.58137807.html (last visited 7/16/18).

164.    What HomeAdvisor does not disclose to HSPs is when the Online Public Profile is activated the HSP's internet presence is seized by HomeAdvisor.  From the moment of activation, numerous HomeAdvisor affiliated websites, using the HSP's name, will populate the top search results whenever a homeowner searches for the HSP's business.  As a result, the organically grown, word of mouth business generated by the HSP without HomeAdvisor's assistance or service is directed to HomeAdvisor.

165.    For example, Plaintiffs' Counsel received an intake from a HSP from Texas who reported that after signing up with HomeAdvisor his Google analytics report showed that all traffic to his website stopped.  When the HSP googled the name of its business, the only results that appeared were for HomeAdvisor. Appendix I at Entry No. 778.

166.    In fact, when a Michigan HSP confronted a HomeAdvisor sales representative

61

about this issue, HomeAdvisor sales representative openly acknowledged that if the HSP were to sign up with HomeAdvisor, the HSP's organically generated internet business would be evaporated.  *See* https://www.youtube.com/watch?v=sGwQFFP07S0 (last visited 4/26/18).

167.   When a homeowner visits HomeAdvisor's website, they are able to view HSP Online Profile Pages, similar to Plaintiff Ervine's above.  While the HSP's contact information reflected on the Online Profile Page is accurate, the "Get a Quote" button does not result in a direct submission to the desired HSP.  The "Get a Quote" button opens a separate and distinct pop-up window, like the one shown below.

168.   The "Get a Quote" pop-up is deceptive because it does not inform the homeowner that the information will not be received directly by the desired HSP that the homeowner selected to communicate with regarding their project, but instead will go directly to HomeAdvisor.  By running interference with homeowners' attempts to contact desired HSPs, HomeAdvisor converts the contact information associated with the quote request into a Lead and

sells it back to the HSP, or other HSPs in the network.

169.    After evaluating the HSP's status, if any of the following situations apply, HomeAdvisor will not direct the homeowner to his or her chosen HSP but instead will distribute the Lead to several competing HSPs:

>   (a) if the HSP does not participate in Lead services (*i.e.*, Basic Membership Program participants);
>
>   (b) the HSP has temporarily suspended their Lead services; or
>
>   (c) the HSP has terminated their HomeAdvisor membership.

170.    At no point does HomeAdvisor disclose the fact that it will interfere with HSPs' web presence.  While the homeowner attempting to contact a particular HSP is deceived, so too is the HSP.   HomeAdvisor does not inform the homeowner that their request for a quote from a specific HSP may be supplied to four or more other HSPs instead of the selected HSP, and meanwhile the HSPs receiving and being charged for the Lead are under the impression that the homeowner specifically requested the quote from them.  The lack of transparency and behind-the-scenes games diminishes any potential value derived from the service from the standpoint of the homeowners and the HSPs.

**B.    HomeAdvisor Premier Online Directory**

171.    Similarly, HomeAdvisor misuses its Premier Online Directory to redirect customers away from specific HSPs.

172.    Through this directory, homeowners are able to browse the directory of HSPs by choosing a type of service from the list of 80+ services and entering the applicable zip code.



*See* https://www.homeadvisor.com/c.html (last visited 5/16/18).

173.    Upon clicking "Browse Reviews" a list of HSPs matching the search criteria populates. The list contains the truncated versions of the HSPs' Online Public Profiles and commonly includes a "Get a Quote" button.  When users click that button either on the search results page, or on the selected HSP's Online Public Profile, the user is asked to submit their contact information.

174.    HomeAdvisor misrepresents the nature of the directory to HSPs.  For example, in a presentation titled, "How to Use HomeAdvisor to Connect with Consumers," published on December 9, 2016, Scott Weigel, HomeAdvisor's Vice President of Business Development, explained that the Premier Online Directory (f/k/a/ LiveDirectory) gave homeowners the ability to *choose "which pros to send their information to."*



*See*   https://www.slideshare.net/SurefireSocial/how-to-use-homeadvisor-to-connect-with-consumers (last visited 4/26/18).

175.    In fact, HomeAdvisor receives the information supplied by homeowners, who believe they are submitting their information directly to the HSP of their choice.

176.    HomeAdvisor takes the homeowner's submission and turns it into a Lead that HomeAdvisor then sells to other HSPs, at HomeAdvisor's sole discretion, irrespective of the homeowner's desire to connect with the HSP that they had selected.

C.    **Exclusive Partner Network**

177.    HomeAdvisor also touts HomeAdvisor's Exclusive Partner Network as another marketing extension that will benefit HSPs by exposing their business to more than 12 million homeowners every month by automatically placing their business listing on top home improvement sites such as:



*See* http://welcome.homeadvisor.com /exclusive-partner-network (last visited 7/5/18).



*See* https://www.homeadvisor.com/pro-sign-up/pricing-plans/ (last visited 4/26/18)

178.    What HomeAdvisor does not reveal about the Exclusive Partner Network is that HomeAdvisor uses the Network to interject itself in the word of mouth market to steal business developed by the HSPs.

179.    Once a HSP is listed with the Exclusive Partner Network, internet search engines will give these Exclusive Partners priority treatment over the HSPs, thereby burying the HSP's real website behind a list of HomeAdvisor affiliated domains.  As a result, homeowners who learned of the HSP through word of mouth, reputation or local advertising are likely to click on one of these HomeAdvisor affiliated websites thinking they are contacting the HSP directly. HomeAdvisor will then either sell that Lead to the HSP at a substantial charge or, even worse, sell it to several of the HSP's competitors.

**D.**    **Exact Match Listings**

180.    The Pro and Pro Plus membership programs include two categories of Leads –
Market Match and Exact Match Leads.  HomeAdvisor represents that Exact Match Leads are
generated exclusively through click-throughs to the HSP's Exact Match listing and online profile
page which appear on HomeAdvisor.com and elsewhere on the Internet, or submission of service
requests via telephone calls to a HSP's "Exact Match Number," which is a HomeAdvisor
telephone number that is unique to the HSP's Exact Match listings.

181.    HomeAdvisor characterizes Exact Match listings as a free customized online
profile used to promote the HSP's business online by getting their "name out there on the most
searched        internet        sites        and        business        directories."        See
https://www.homeadvisor.com/rfs/enroll/spPostEnrollLeadsDetails.jsp  (last  visited  4/26/18).
HSPs provide HomeAdvisor the content for the listing (including the business logo, description
and  contact  information),  but  HomeAdvisor  replaces  the  HSP's  phone  number  with  a
HomeAdvisor operated Exact Match Number. By doing such, HomeAdvisor intercepts calls
from homeowners in order to generate Exact Match Leads, which are then distributed to the HSP
at a premium Lead fee charge.

182.    However, prior to distributing the Lead, HomeAdvisor evaluates the HSP's status
in the HomeAdvisor network. If the HSP has temporarily suspended the Lead services or has
terminated their HomeAdvisor membership, HomeAdvisor will make false and misleading
statements about the HSP's business, including lack of availability, the business is no longer in
service, or that the HSP does not work in a specific geographic area.  HomeAdvisor will then
distribute the Lead to other HSPs in its network, often at the premium Lead fee irrespective of

the fact that the Lead no longer qualifies as an Exact Match.

183.    The  impact of these practices is highlighted by the following posts:

(a)    From        Consumer        Affairs       on      September       25,       2014,
https://www.consumeraffairs.com/homeowners/homeadvisor.html?page=519       (last      visited
4/26/18).



(b)    From       "Handyman       Startup"       on      November       12,      2013,
http://www.handymanstartup.com/home-advisor-pro-review-what-you-need-to-know/       (last
visited 4/26/18).

184.    Furthermore,  when  HSPs  terminate  and/or  do  not  renew  their  membership,

HomeAdvisor does not remove the HSP's Exact Match listing within a reasonable amount of

time from its affiliate websites.  According to Former Employee A, former HSPs' listings often remain active for 300-500 days post termination.  During such time, HomeAdvisor continues fielding proactive phone calls from homeowners seeking to contact the HSP on the listing.  Since that HSP is no longer active, HomeAdvisor distributes and charges other active HSPs for the redirected Exact Match Lead.

185.    Despite terminating her HomeAdvisor membership at the beginning of September 2017, HomeAdvisor continued to use ***Plaintiff Ervine's*** public profile in violation of the Lanham Act and Florida law.  HomeAdvisor is utilizing Plaintiff Ervine's Online Public Profile and business name to confuse homeowners into thinking that Plaintiff Ervine, through her business, Glass Act Window Cleaning, is affiliated with HomeAdvisor and will receive the Lead request if the consumer selects the "Get a Quote" button on HomeAdvisor's website. In fact, when a consumer clicks the "Get a Quote" button on Plaintiff Ervine's Online Public Profile, the below window appears stating "Request a Quote from Glass Act Window Cleaning" and "Send a custom message to Glass Act Window Cleaning."



*See* https://www.homeadvisor.com/rated.GlassActWindowCleaning.58137807.html (last visited 5/16/18).

69

186.   Although, the ***McHenry Plaintiffs*** cancelled their HomeAdvisor membership in July of 2017, HomeAdvisor continues to use the McHenry Plaintiffs' business name and trademark in violation of the Lanham Act and Colorado law.



*See* https://www.homeadvisor.com/rated.BBCarpentry.65620492.html (last visited on 7/16/18)

187.   Similarly, more than 7 months after canceling her HomeAdvisor membership, HomeAdvisor continued to maintain ***Plaintiff Haukenes'*** Online Public Profile in order to use her business name and likeness to direct business away from Plaintiff Haukenes to HomeAdvisor.



*See* https://www.homeadvisor.com/rated.BergenCertified.62508119.html (last visited 12/11/2017).

188.    Sometime thereafter, HomeAdvisor removed and replaced Plaintiff Haukenes' Online Public Profile with the below Online Public Profile.  The revised and currently active[6] Online Public Profile reflects the name and mailing address of Plaintiff Haukenes' home inspection company, and the identical business description as the one reflected above; however, the phone number that appears below the mailing address is not and has never been associated with Bergen Certified Inspection.  And the remaining business information that appears under the headings "Quick Facts" and "Service Area" are either inaccurate or incomplete.

---

[6]    Active as of the filing of this Complaint.



*See* https://www.homeadvisor.com/sp/jasons-floor-covering (last visited 7/12/18).

189.    Furthermore, the current posting denigrates the public's perception of Plaintiff Haukenes' business by proclaiming, in the form of an "alert" denoted with an exclamation point and bold red font, that Plaintiff Haukenes' "business is not a screened and approved member of HomeAdvisor."

*See*, *id.*

190.    Strategically placed immediately below this "alert" appears a large box soliciting visitors who are viewing HomeAdvisor's falsified and unauthorized Online Public Profile for Plaintiff Haukenes to receive quotes from "3 <u>Prescreened</u> Home Inspection Pros" (emphasis added).  Upon submission of the requested information, a Lead is generated that is then sold to active HSPs in HomeAdvisor's network, who are essentially Plaintiff Haukenes' competition. HomeAdvisor's unlawful use of Plaintiff Haukenes' business, coupled with the insertion of the "alert" and link to get quotes from Plaintiff Haukenes' competition is a none too subtle act of retaliation against the terminated HSP, and attempt to intercept potential business opportunities and divert them to active HSPs in order to generate more Leads and revenue for HomeAdvisor.



*See*, *id.*

### E.    <u>Website Hijacking</u>

191.    The Lanham Act Defendants also use various browser hijacking website domains. These website domains, such as RoofPricer.com and Roofing.zone, use the company names of current and former HomeAdvisor HSPs to redirect legitimate internet traffic and searches away from the HSP's business to HomeAdvisor's impersonation websites.  This conduct confuses

consumers and hijacks legitimate traffic and business opportunities away from the HSPs' businesses.

192.     For example, in March 2017, when searching for **Plaintiff Baumann's** company, 1st Choice Roofing Cincy, the below search result populated which prominently displayed, "1st Choice Roofing Deals – Get Best Prices Estimates Fast".  However, the website URL was not associated with Plaintiff Baumann's business, but rather RoofPricer.com, a website owned and operated by CrowdSteer.



Source: Screenshot as of 3/20/17.

193.     Upon clicking on such misleading website links, users are directed to websites that often consist of a single page that reflects the business name of current or former HSPs and often reflect some special offer, such as: Save up to 40%!   This deceptive information is then followed by a form asking for users to submit their contact information to "see price estimates."

194.    The below screenshot reflects the information displayed by RoofPricer.com in conjunction with Plaintiff Baumann's company name, and a fictitious deal.

Source: Screenshot as of 3/20/17.

195.    Upon submitting the requested information, no estimates are displayed and, unbeknownst to users, HomeAdvisor obtains the information.   Once within HomeAdvisor's possession, the user information is converted into a Lead that is then distributed, under HomeAdvisor's sole discretion, to other HSPs who are charged upon receipt of the Lead.

196.    This precise scheme was confirmed by Plaintiff Baumann, who, upon submission of the completed form on the website reflecting his company name, was contacted by five local HomeAdvisor roofing HSPs who stated they had received Plaintiff Baumann's contact information, in the form of a Lead, from HomeAdvisor.   Plaintiff Baumann contacted HomeAdvisor about the misleading website and to request that the five HSPs who were charged approximately $80 each be credited for the Lead.   HomeAdvisor declined to issue any credits,

even in this instance, and said that each HSP would have to request the credit themselves. HomeAdvisor also confirmed that it purchases Leads from RoofPricer.com.

197.   **Plaintiff Hass** had a similar experience to Plaintiff Baumann. On November 2, 2016, Plaintiff Hass was reviewing his company's online presence by Googling "Alpine Roofing" and "Alpine Roofing Sidney", among other related search terms.   In the populated search results, below, Alpine Metal Roofing's website was sandwiched between the top ranking "Alpine Roofing Offers" Google ad by www.roofing.zone/Alpine and Alpine Metal Roofing's Online Public Profile on HomeAdvisor.com.



Source: Screenshot as of 12/30/16.

198.   Upon clicking on the top search result, Roofing.zone, users are asked to input details about the roofing project, and that upon submission of the form users will receive instant and free quotes from 2-5 roofers.



199.    Upon completion of the form, Plaintiff Hass was contacted by other HomeAdvisor roofing HSPs who had received Plaintiff Hass' contact information in the form of a Lead from HomeAdvisor and for which each were charged approximately $70.  Immediately Plaintiff Hass contacted HomeAdvisor online customer support and sent follow up emails containing screenshots of the website hijacking, but HomeAdvisor failed to take any action absent promises to the contrary.

200.    In early December 2016 Plaintiff Hass canceled his HomeAdvisor membership

and requested that the deceptive Google ads be removed.  At that time, HomeAdvisor assured Plaintiff Hass that the issue would be reviewed.  Later that month, on December 30, 2016, Plaintiff Hass received an email from HomeAdvisor informing him that he would begin receiving Leads as of that day.  Before calling HomeAdvisor, Plaintiff Hass Googled his company and found that the same fraudulent Roofing.zone ad was still active.  Upon speaking to HomeAdvisor's customer service representative, Plaintiff Hass was told that his account had not been shut down entirely, but that it would be closed, and that HomeAdvisor would follow up with him about the website hijacking.

201.    Once again, HomeAdvisor took no steps to rectify Plaintiff Hass' complaints and was essentially silent until Plaintiff Hass sent an email on January 12, 2017 in which he threatened to take measures to expose HomeAdvisor's deceitful business practices.  In response, HomeAdvisor issued Plaintiff Hass a credit card refund in the amount of $881.27 on February 1, 2017, but provided no further explanation or clarification concerning the website hijacking.

202.    HomeAdvisor's and CrowdSteer's misappropriation of HSPs' names and use of website hijacking to divert Leads away from HSPs was the subject of prior litigation in an action captioned *Rosati's Window Co., L.L.C. v. Remodelrepairreplace,com et. al.,* Case No. 2:15-cv-02711-JLG-TPK (U.S.D.C. S.D. Ohio) ("*Rosati Action*").  The *Rosati Action* alleged that HomeAdvisor and CrowdSteer violated the Lanham Act and Ohio state law by misappropriating the name of Rosati's Window Co., L.L.C. ("Rosati") and using it on the websites RemodelRepairReplace.com and Rosati.windowcosts.com to divert internet users away from Rosati to sell to Rosati's competitors.  According to the *Rosati Action*, the website RemodelRepairReplace.com included ServiceMagic's Terms of Service.

78

203.   As is evidenced by the following statements from HSPs nationwide, HSPs are again victims of another scheme devised by the Lanham Act Defendants, built on the backs of HSPs by utilizing the company names and likenesses of both the current and former HSPs, to bestow significant financial benefits upon themselves to the detriment of HSPs.

a. A power-washing contractor in Maryland stated: "My biggest concern is that they [HomeAdvisor] have my business advertised with a 1800 number that goes to them and then they tell people that I am either not in service or do not work in that area. (I have even called that number and pretended to be a customer calling for Clean Power Wash and they told me that clean power wash wasn't available and didn't match the request for power washing) That is a gross misappropriation of my businesses reputation and strong profile on HomeAdvisor. They end up using my profile to sell leads for their company to other companies and I don't even get a shot at those calls. I have reported the issue several times and they initially told me I had to become a paid member instead of on a per lead basis (that is how I have been since day [sic]" Appendix I at Entry No. 391.

b. A driveway sealing and repair contractor in New Jersey reported the following: "I was off Homeadvisor's network for a few months and yet my page and information was still up. People were able to visit my contractors profile but there was a different number that was put in place. If a homeowner was trying to call my business, they would get in touch with homeadvisor instead which really confused a lot of my potential clients trying to get in touch with me." Appendix I at Entry No. 514.

c. A residential remodeling and repair contractor in Connecticut reported: "It's been two months since we cancelled our account and our company's information is still on HomeAdvisor website. We can still log into the account (even though it says "past-due") And our HomeAdvisor profile comes up as a the top google hit when just searching our company name. Anyone looking for us on google would find HomeAdvisor first, which we no longer wish to be affiliated with." Appendix I at Entry No. 145.

d. An HSP posted an article on his website on March 15, 2017 in which he states: "They [HomeAdvisor] steal your business and sell it back to you. When you set up a profile with HomeAdvisor, it shows up on Google. Customers searching for your business find your HomeAdvisor profile and request an estimate through HomeAdvisor, who then charge you a high price for that lead. Even though the customer was searching for your business       in       the       first       place." *See*

http://paintingbusinesspro.com/homeadvisor-pro-reviews-complaints/ (last visited on 4/26/18).

e.  An HSP posted an un-dated article on his website in which he highlights HomeAdvisor's "very controversial" business and describes as a prominent issue with contractors that "contractor's [sic] and handymen have found out the hard way that HomeAdvisor actively builds links in their business's name pointing back to HomeAdvisor." Several HSPs commented on the article voicing similar concerns regarding HomeAdvisor "using our name to generate traffic to their website".

> **Brad**
> May 6, 2017
>
> We have this same issue with home advisor. They are still using our name to generate traffic to their website. When we did use them, we constantly got charged for exact match leads and the home owners would tell us they got contacted by many contractors, way more than 3 per lead. I can assure you. As well as all the lies customer service and ha sales reps tell you. Anything to get you to pay more. My advice if you do use home advisor is to use a pre paid credit card and only put money on it when you want them to wipe it because they will no matter what you were told when you signed up with them

> **Dan**
> April 9, 2014
>
> I'm the owner of an AC company in the Phoenix area, after realizing home advisor uses your company name to attract business, I dropped them, they are still using my company information without my permission, and also have a CPM. (Google ad campaign ) using my company information, basically I am competing with Home Advisor for my own name, we are a $1mill company with 35% of our customers coming directly from google, do the math on that! If you are using home advisor, what ever you currently generate from online or organic searches, home advisor gets that same dollar amount using your name! Think about that! We track every lead! I

*See* http://www.handymanstartup.com/home-advisor-pro-review-what-you-need-to-know/ (last visited on 5/16/18).

204.   An HSP posted a review on sitejabber.com on July 14, 2017 titled "Illegal Activity" in which he states: "I joined HomeAdvisor in an attempt to enhance my business. Within 5 days I was sent 9 leads. Of the 9 only 2 were legit. 3 were suspect and 4 were discovered to be out right fraudulent. When confronting HomeAdvisor they refused to credit the account. I disputed all charges with the cc company and canceled the card to prevent further charges. Now they won't remove my business from their search engines." *See* https://www.sitejabber.com/reviews/www.homeadvisor.com#68 (last visited on 4/26/18).

205.    The Lanham Act Defendants' deceptive conduct in diverting business from HSPs through the unlawful use of (i) Online Public Profiles, (ii) HomeAdvisor Premier Online Directory, (iii) the Exclusive Partner Network, (iv) Exact Match Listings, and (v) Website Hijacking, which conduct is wantonly executed with the objective to bestow significant financial benefits upon the Lanham Act Defendants, constitutes false association, false advertising, and unfair competition in violation of the Lanham Act, Section 1125(a)(1)(A) (Count XXXVI), and Section 1125(a)(1)(B) (Count XXXVII); unfair competition in violation of the following state laws: Colorado Consumer Protection Act (Count XXXVIII); Colorado Unfair Competition law (Count XXXIX); Florida Deceptive and Unfair Trade Practices Act (Count XL); Florida Unfair Competition law (Count XLI); Idaho Consumer Protection Act (Count XLII); New York Unfair Competition law (Count XLIII); Ohio Deceptive and Unfair Trade Practices Act (Count XLIV); Ohio Unfair Competition law (Count XLV).

## VII.   IAC AND ANGI EXERT OPERATIONAL CONTROL OVER, AND PROFIT FROM, HOMEADVISOR

206.    Barry Diller is IAC's founder and currently its Chairman and Senior Executive. Mr. Diller touts his "unique business model" for IAC which is to "[b]uy digital businesses, fold them into a conglomerate and then spin [them] out …." *See, The New York Times*, DealBook, "Barry Diller's Business Model Bears Fruit", 11/23/2015, http://www.nytimes.com/2015/11/24/business/dealbook/barry-dillers-business-model-bears-fruit.html?_r=0 (last visited 4/26/18).   Mr. Diller runs IAC as a "sort of 'central flywheel' to create, buy and finance companies to later be spun out."  Since the mid-2000s, IAC has been "a minifactory of spinoffs. 'I'm really an anti-conglomerateur,' Mr. Diller said." *Id.*

207.    IAC is like a business incubator.  It acquires, develops and spins off media and

internet businesses including Expedia, TripAdvisor, HSN, LendingTree.com and the Match Group.  Irrespective of the competitive "home service-related lead generation" landscape, IAC was interested in acquiring HomeAdvisor "for a number of reasons including [HomeAdvisor's] market leading position and brand and [HomeAdvisor's] *business model*, which *complements the business models of [IAC's] other businesses*."  From the time IAC acquired Service Magic in 2004, through its rebranding of Service Magic as HomeAdvisor in 2012, until the Transaction (defined below, *see* ¶218), IAC was the parent company and majority shareholder of HomeAdvisor.  During that period, HomeAdvisor was referred to as an operating business, segment and wholly owned subsidiary of IAC in IAC's SEC filings and press releases, and in the statements by its officers.

### A.      IAC Led the Fraud to Achieve Record Growth for HomeAdvisor

208.    It was IAC's capital investment during the Class Period that enabled HomeAdvisor to develop and implement the fraudulent business model.  From 2013 to 2016, IAC made capital contributions to HomeAdvisor of nearly one-quarter billion dollars for marketing and to increase HomeAdvisor's salesforce, and IAC reported that, under its direction and control, HomeAdvisor had been transformed from an unprofitable business to one that IAC touted as its fastest-growing and most profitable segment. (IAC Q1 2016 Shareholder Letter, 5/4/16  http://files.shareholder.com/downloads/IACI/5508803805x0x889889/8E4DCC2D-13E3-4535-BB85-70C6D3CBD05C/Q1_2016_Shareholder_Letter.pdf (last visited 4/26/18)).

209.    For example, in its Q2 2013 earnings call on July 31, 2013, IAC declared 2013 a transition year for HomeAdvisor, and highlighted IAC was "working on rolling out *some alternate business models to help make the business stickier with our service professionals*."

210.    With IAC at the helm, IAC reported in subsequent quarters that its actions had, indeed, made things "stickier" -- for HSPs:

(a)    During the April 30, 2014 Q1 2014 earnings call, IAC was able to report its "first quarter of double-digit revenue growth since the first quarter of 2012, and its first quarter of double-digit EBITDA growth since the third quarter of 2012. Additionally…active [HSPs] grew 15% year-over-year".[7]

(b)    During the October 29, 2014, Q3 2014 earnings call, IAC, and its CFO Kip reported that HomeAdvisor's revenue increased 20% versus the prior year, and that *the number of paying HSPs was up nearly 30% year-on-year in the third quarter*.[8]

(c)    During the February 4, 2015, Q4 2014 earnings call, IAC reported that HomeAdvisor was profitable, with almost $300 million in revenue, and with growth expected to continue in the 20%-30% range in 2015.[9]

(d)    During the Q3 2015 earnings call on October 27, 2015, Kip highlighted and confirmed that HomeAdvisor's growth is tied to the HSPs:  "so we just got [sic] crossed 100,000 service professionals last week, which is a huge milestone for us and we crossed it faster than we thought";  "the engagement and *spend from the average service professional is up significantly* year-over-year ……and *it is those guys [the HSPs] who are supplying the revenue* and fulfilling the customers and that the SP network is the biggest driver."[10]

211.    In IAC's Q3 2016 shareholder letter, dated November 2, 2016, Mr. Levin hyped HomeAdvisor's record quarter: "HomeAdvisor also had another record quarter with domestic revenue growing 39% and *a new record Adjusted EBITDA, up nearly 80% year over year*…[T]he [HSP] network was up nearly 50% year over year again…To put this growth in perspective, since we offered to acquire Angie's List in Q3 of last year, *we have added a net*

---

[7]    Source:    http://seekingalpha.com/article/2177683-iac-interactive   corp-management-discusses-q1-2014-results-earnings-calltranscript? part= single (last visited 4/26/18).
[8]    Source:    http://seekingalpha.com/article/2611655-iac-interactivecorp-iaci-q3-2014-results-earnings-call-transcript?part=single (emphasis added) (last visited 4/26/18).
[9]    Source:    https://seekingalpha.com/article/2884126-iac-interactivecorp-iaci-q4-2014-earnings-call-transcript?part=single (last visited 4/26/18).
[10]    Source:   http://seekingalpha.com/article/3609106-iac-interactivecorp-iaci-ceo-joey-levin-q3-2015-results-earnings-call-transcript?part=single (emphasis added) (last visited 4/26/18).

*number of service professionals roughly equivalent to the size of Angie's [List's] entire network*."[11]

212.    HomeAdvisor's record growth continued through the fourth quarter of 2016.  In IAC's Q4 2016 Shareholder Letter, dated February 1, 2017, IAC's Joey Levin declared: "Once again, HomeAdvisor crushed it. Revenue was up 35% and Adjusted EBITDA more than doubled again from the prior year. For the full year 2016, we accelerated domestic revenue growth and more than doubled margins for the segment."[12]

213.    Consequently, HomeAdvisor's growth has been exponential year-to-year:

| HomeAdvisor Year Ended | Paying HSPs | Revenue | % Revenue Increase Over Prior Year |
|---|---|---|---|
| December 31, 2017 | 181,000 | $763,386,000 | 48% |
| December 31, 2016 | 143,000 | $498,890,000 | 38% |
| December 31, 2015 | 102,000 | $361,201,000 | 27% |
| December 31, 2014 | 85,000 | $283,541,000 | 18% |
| December 31, 2013 | 80,000 | $239,417,000 | (not reported) |

214.    Even after the announcement of the Transaction, IAC continued to push HomeAdvisor's growth.  In IAC's Q1 2017 shareholder letter, IAC stated:

> We are going to continue to press investment in HomeAdvisor notwithstanding the merger.  With 38% domestic revenue growth and domestic Adjusted EBITDA more than tripling in Q1, we want to invest into strength.  In Q2 we will increase our consumer marketing expenditures with a new creative campaign that launched a few weeks ago to strong early returns […].  We previously mentioned we might target $100 million of TV spend in 2017, up from our previous target of $85 million.  In this quarter, we will start down that path, increasing our TV marketing spend 75% year-over-year and expecting returns to hold.[13]

---

[11]    Source:http://files.shareholder.com/downloads/IACI/2419670841x0x915248/8A 989FB7-9FBD-4267-971A-7652B3932415/Q3_2016_Shareholder_Letter.pdf (emphasis added) (last visited 4/26/18).

[12]    Source:http://files.shareholder.com/downloads/IACI/5508803805x0x926086/0A31793B -5A86-48CA-9D49-D0B450F90787/Q4_2016_Shareholder_Letter.pdf (last visited 4/26/18).

[13]    Source: http://files.shareholder.com/downloads/IACI/5414898856x0x940699/55F46F1C-B81A-4B9F-8DDE-34F51EB6580D/Q1_2017_Shareholder_Letter.pdf (last visited 4/26/18).

**B.** **IAC Not Only Financed The Fraudulent Business Model of HomeAdvisor, IAC Actively Controlled HomeAdvisor's Business Operations.**

215.   IAC was not a hands-off parent company, rather it has operated HomeAdvisor as if it were a department within IAC.  In fact, IAC has publicly acknowledged that its executives are intimately involved in operating HomeAdvisor's business.  For example, in April 2016, IAC announced that its Executive Vice President and Chief Financial Officer, Jeffrey Kip, who had been in this position since March of 2012, would be succeeded by Glenn Schiffman as CFO, but would "remain with the Company and oversee the international expansion of HomeAdvisor business."  (*IAC Appoints Glenn H. Schiffman as Chief Financial Officer*, PR Newswire, 4/7/16). IAC's rationale for transitioning Mr. Kip's role was that Mr. Kip had been "a key contributor in HomeAdvisor's success." Mr. Kip's LinkedIn profile currently has him listed at the Chief Executive Officer of HomeAdvisor International.    https://www.linkedin.com/in/jeffkip/ (last visited 7/6/18).

216.   IAC's control and influence over HomeAdvisor's business strategies and operations are also supported by IAC's letters to its shareholders.  For example, for 2016, IAC established the following priorities for HomeAdvisor:

- "Grow brand awareness, primarily through marketing"
- "Add SPs [HSPs], primarily through our sales force"
- "Innovate the product, primarily through Instant Connect and Instant Booking, especially on mobile"
- "Expand internationally, where we've moved Jeff Kip to bring a renewed focus on the opportunity"

(IAC Q1 2016 Shareholder Letter, 5/4/16, http://ir.iac.com/static-files/2d426593-84cd-44c6-acda-a1ab4f539e7c).

85

217.     Similarly, for 2017, IAC established the following priorities for HomeAdvisor:

- Product Innovation through real-time data on HSP's location and availability
- Increase contact and follow up with homeowners and HSPs before and after a job
- Increase brand awareness through increased television and online spending
- Add larger HSPs with bigger budgets
- Expand internationally, through the acquisitions and organic growth

(IAC Q4 2016 Shareholder Letter, 2/1/17, http://ir.iac.com/static-files/db867c9d-3c27-4999-9f8b-403fb4cb796a) (emphasis added).

218.     On May 1, 2017, IAC announced that it had entered into a transaction with Angie's List whereby HomeAdvisor and Angie's List would become a wholly owned subsidiary of a new publicly traded company called ANGI Homeservices Inc. (the "Transaction").  Under the terms of the Transaction, IAC agreed to contribute HomeAdvisor to ANGI in exchange for shares of Class B shares of common stock of ANGI.  Angie's List agreed to become a wholly owned subsidiary of ANGI in exchange for each Angie's List shareholders receiving the right to elect to receive one share of Class A common stock of ANGI or $8.50 per share in cash.  As a result of the Transaction, IAC would own between approximately 87 % and 90% of the new company's equity value and 98% of the total voting power. The Transaction closed on September 29, 2017.  The following diagram depicts the steps of the Transaction and the resulting structure of ANGI:



219.    The Transaction documents demonstrate that IAC exerted operational control over HomeAdvisor and its business.  Not only is HomeAdvisor not a party to any of the Transaction documents, but under the conduct of business section of the Agreement and Plan of Merger dated as of May 1, 2017 ("Merger Agreement"), IAC acknowledged that it directed HomeAdvisor's business operations.  Specifically, paragraph 5.1 (c) of the Merger Agreement states:

> IAC covenants and agrees that **it shall conduct the HomeAdvisor Business** in the ordinary course of business in all material respects, and shall use reasonable best efforts to preserve intact HomeAdvisor Business's present lines of business, maintain its rights, franchises and permits and preserve relationships with employees, customers and suppliers. (emphasis added).

220.    In the Contribution Agreement by and between IAC and ANGI dated as of September 29, 2017 ("Contribution Agreement"), IAC acknowledged that it had full control of

HomeAdvisor's business and asset.   Under Section 2.01 of the Contribution Agreement, IAC agreed to:

> implement a separation of HomeAdvisor Business and the Remaining Business and to cause HomeAdvisor Business to be transferred to NewCo and the Remaining Business to be held by IAC and its Subsidiaries

221.    In Section 2.03 of the Contribution Agreement, IAC agreed to:

> cause HomeAdvisor Assets to be contributed, assigned, transferred, conveyed and delivered, directly or indirectly, to NewCo, and NewCo agrees to accept all of HomeAdvisor Assets and all of the rights, title and interest in and to all of HomeAdvisor Assets owned, directly or indirectly, by IAC

222.    The closing of the Transaction did not terminate IAC's involvement in HomeAdvisor's business.   In addition to owning 98% of ANGI's voting power and designating 80% of ANGI's board members, IAC and ANGI entered into a Services Agreement whereby IAC agreed to continue to perform certain services for ANGI.   While the specific services were not publicly disclosed, Section 3.01 of the Services Agreement acknowledges that, with respect to the specific services, IAC's involvement in HomeAdvisor business will not change:

> the [IAC Service Providers] shall be required to perform the Services only in a manner, scope, nature and quality as provided by or within IAC that is similar in all material respects to the manner in which such Services were performed in the twelve (12) months immediately prior to the Effective Date

223.    In addition, HomeAdvisor employees are still directed, managed and/or employed by IAC. According to IAC's career website page (http://iac.com/careers/overview), individuals interested in joining the "IAC team" have the option to explore the jobs available at IAC's 20 plus operating businesses.   The jobs available through IAC's operating businesses also include IAC benefits, such as the "IAC Retirement Plan" and health benefits.   IAC is responsible for the Form 5500 filings for both the retirement savings plan and the health and welfare benefit plan.

HomeAdvisor does not make any such filings. *See* http://iac.com/careers/overview(last visited on 4/26/18).

224.    Even after the close of the Transaction, IAC continues to treat HomeAdvisor executives and employees as IAC employees and incentivize them to operate HomeAdvisor and ANGI in a manner that would inure to IAC's benefit.   In connection with the Transaction HomeAdvisor executives and employees received IAC denominated equity awards.   These IAC denominated equity awards are options and performance-based restricted stock units that will vest as shares of IAC common stock and are directly tied to the value of IAC's stock price, which directly benefits from the ongoing fraudulent conduct alleged herein.   Upon exercise of these IAC denominated equity awards, ANGI is required to issue additional shares to IAC as reimbursement.   As of December 31, 2017, the equity awards amounted to 1.4 million IAC shares, a value of more than $207 million.

225.    The rationale behind IAC's unrelenting pursuit of Angie's List is apparent -- it creates another immediate source of HSPs for HomeAdvisor to fill its pipeline to perpetuate the fraudulent and deceptive practices alleged herein. The combined HSP network will consist of "HomeAdvisor's network of more than 156,000 and Angie's List's network of more than 55,000, collectively up 24 percent year-over-year as of the first quarter of 2017."[14]

---

[14]    *See*    http://files.shareholder.com/downloads/IACI/4395746033x0x940172/6F7C5443-697C-40B6-A024-6B8BD657989E/IAC_s_HomeAdvisor_to_Combine_with_Angie_s_List_050117_FINAL.PDF (last visited 4/26/18).



226.    As a result of the Transaction, ANGI became the entity in charge of operating HomeAdvisor's Business. HomeAdvisor's CEO, Chris Terrill, became the CEO of both ANGI and HomeAdvisor, both of which are headquartered in the same building.  In fact, ANGI's website describes HomeAdvisor and Angie's List as two of ANGI's ten brands.

227.    Furthermore, five key IAC executives comprise the 10-member Board of Directors of ANGI:  Joey Levin as Chairman of the Board, Glenn Schiffman (IAC's Chief Financial Officer), Mark Stein (IAC EVP and Chief Strategy Officer), Chris Terrill, and Gregg Winiarski (EVP, General Counsel and Secretary of IAC), all of whom were nominated to ANGI's Board of Directors because of the "unique knowledge and experience regarding ANGI and its businesses that he has gained through his [roles] with IAC. . ." *See* https://www.sec.gov/Archives/edgar/data/1705110/000104746918003353/a2235441zdef14a.htm (last visited 5/16/18).

228.    IAC has always steered HomeAdvisor's business and continues to do so well after the close of the Transaction.  Joey Levin's discussion of ANGI in the Q1 2018 Shareholder Letter to IAC shareholders is written in the voice of management actively operating ANGI and

not in the voice of the CEO of ANGI's largest investor.  For example, Mr. Levin acknowledges IAC's control over ANGI's business when he stated:

> a. *...our* big operational focus is still the integration of Angie's List, which we acquired late last year and combined with our HomeAdvisor;
>
> b. *We have* also taken significant costs out of the combined business;
>
> c. *We initially believed we* had the capacity to absorb most of the incremental customers coming in from Angie's List;
>
> d. ...*our marketing spend* will be lower while we aggressively push on resolving our supply constraint; and
>
> e. *We have plans* to accelerate capacity expansion in the second half of the year.

*See* http://ir.iac.com/static-files/165fea50-d0d2-4715-906c-265f782f29c2 (last visited 5/11/18).

229.    Therefore, IAC's and ANGI's control over HomeAdvisor and its business supports claims for aiding and abetting fraud/fraudulent concealment (Counts IV, IX, XIV, XIX, XXIV, and XXIX), unjust enrichment and restitution (Counts VI, XI, XVI, XXI, XXVI, XXXI, and XXXV) and violations of California and Florida state law (Counts I and XII).

## CLASS ACTION ALLEGATIONS

230.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Class Action Complaint.

231.    Plaintiffs bring this action, both individually and as a class action, on behalf of themselves and all similarly situated individuals, pursuant to Federal Rule of Civil Procedure 23.

**I.      Class Action Allegations for The Deceptive Business Practices Claims**

232.     For Plaintiffs' state common law fraud, aiding and abetting fraud, breach of

implied contract, unjust enrichment and statutory claims under California law ("California Class"), Colorado law ("Colorado Class"), Florida law ("Florida Class"), Idaho law ("Idaho Class"), Illinois law ("Illinois Class"), New Jersey law ("New Jersey Class"), and Ohio law ("Ohio Class"), (collectively the "State Classes"), plaintiffs seek to certify the following State Classes:

### California Class (represented by Plaintiff Josh Seldner)

All persons and entities who reside in California who, since July 13, 2014, paid for a HomeAdvisor home service professional membership (including for HomeAdvisor's Pro Connect$^{TM}$, Total Connect$^{TM}$, and/or for the predecessor or subsequent HomeAdvisor home service professional membership programs), and/or paid for homeowner contact and service requests ("Leads") and/or mHelpDesk.

### Colorado Class (represented by Plaintiffs Brad and Linda McHenry)

All persons and entities who reside in Colorado who, since July 13, 2015, paid for a HomeAdvisor home service professional membership (including for HomeAdvisor's Pro Connect$^{TM}$, Total Connect$^{TM}$, and/or for the predecessor or subsequent HomeAdvisor home service professional membership programs), and/or paid for homeowner contact and service requests ("Leads") and/or mHelpDesk.

### Florida Class (represented by Plaintiff Ervine)

All persons and entities who reside in Florida who, since July 13, 2014, paid for a HomeAdvisor home service professional membership (including for HomeAdvisor's Pro Connect$^{TM}$, Total Connect$^{TM}$, and/or for the predecessor or subsequent HomeAdvisor home service professional membership programs), and/or paid for homeowner contact and service requests ("Leads") and/or mHelpDesk.

### Idaho Class (represented by Plaintiff Haukenes)

All persons and entities who reside in Idaho who, since July 13, 2014, paid for a HomeAdvisor home service professional membership (including for HomeAdvisor's Pro Connect$^{TM}$, Total Connect$^{TM}$, and/or for the predecessor or subsequent HomeAdvisor home service professional membership programs), and/or paid for homeowner contact and service requests ("Leads") and/or mHelpDesk.

### Illinois Class (represented by Plaintiff Filipiak)

All persons and entities who reside in Illinois who, since July 13, 2013, paid for a

HomeAdvisor home service professional membership (including for HomeAdvisor's Pro Connect[TM], Total Connect[TM], and/or for the predecessor or subsequent HomeAdvisor home service professional membership programs), and paid for homeowner contact and service requests ("Leads") and/or mHelpDesk.

### New Jersey Class (represented by Plaintiff Costello)

All persons and entities who reside in New Jersey who, since July 13, 2012, paid for a HomeAdvisor home service professional membership (including for HomeAdvisor's Pro Connect[TM], Total Connect[TM], and/or for the predecessor or subsequent HomeAdvisor home service professional membership programs), and/or paid for homeowner contact and service requests ("Leads") and/or mHelpDesk.

### Ohio Class (represented by Plaintiff Baumann)

All persons and entities who reside in Ohio who, since July 13, 2012, paid for a HomeAdvisor home service professional membership (including for HomeAdvisor's Pro Connect[TM], Total Connect[TM], and/or for the predecessor or subsequent HomeAdvisor home service professional membership programs), and/or paid for homeowner contact and service requests ("Leads") and/or mHelpDesk.

233.   Plaintiffs may seek to certify additional classes and/or subclasses and reserve the right to modify or amend the definition of the proposed State Classes before the Court determines whether certification is appropriate.

234.   Excluded from the State Classes are: Defendants, any entity in which any Defendant has a controlling interest, and each Defendant's officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries, and assigns; governmental entities; and, any judge or magistrate presiding over this action, as well as their immediate family members.

235.   Defendants' practices and omissions were applied uniformly to all members of the State Classes, so that the questions of law and fact are common to all members of the State Classes.

236.    All members of the State Classes were and are similarly affected by the wrongful and deceptive practices of Defendants, and the relief sought herein is for the benefit of Plaintiffs and members of the State Classes.

237.    All members of the State Classes similarly relied on HomeAdvisor's deceptive representations and practices and such reliance resulted in harm to each State Class Member.

238.    Based on HomeAdvisor's, IAC's and ANGI's public statements, it is apparent that the State Classes consist of many thousands of members, the identities and contact information of whom is readily ascertainable from HomeAdvisor's records, therefore rendering joinder impractical and impossible.

239.    Questions of law and fact common to the Plaintiffs and State Classes exist that predominate over the questions affecting only individual members of the State Classes.  The common legal and factual questions include, *inter alia*:

(a)    Whether HomeAdvisor and ANGI employed a deceptive course of conduct of charging members of the Classes for Leads that were not qualified business opportunities or were not from targeted, serious, or project-ready homeowners.

(b)    Whether HomeAdvisor and ANGI concealed and misrepresented to HSPs material information about the nature, quality and source of the Leads.

(c)    Whether HomeAdvisor and ANGI used systemically flawed and deficient processes to generate Leads that were not of the nature and quality of the Leads advertised to HSPs.

(d)    Whether HomeAdvisor and ANGI sold bogus Leads to HSPs.

(e)    Whether HomeAdvisor and ANGI charged the HSPs for Leads that were not qualified business opportunities.

(f)    Whether HomeAdvisor and ANGI charged Plaintiffs and the members of the Classes for Leads that were sent to more than four HSPs.

(g)     Whether HomeAdvisor and ANGI charged HSPs for mHelpDesk without knowledge or consent of the HSPs.

(h)     Whether HomeAdvisor and ANGI systemically disregarded the parameters and limits placed by HSPs on the type and number of Leads to be charged to HSPs.

(i)     Whether HomeAdvisor and ANGI employed tactics preventing HSPs from canceling their membership and receipt of Leads, and from disputing or receiving meaningful credit or refunds for bogus Leads.

(j)     Whether IAC aided and abetted HomeAdvisor's and ANGI's fraudulent and deceptive conduct.

(k)     Whether HomeAdvisor's, ANGI's and IAC's conduct violates consumer protection statutes and other laws as asserted herein;

(l)     The amount of revenues and profits Defendants received and/or the amount of monies imposed on or lost by the members of the State Classes as a result of Defendants' conduct.

(m)    Whether the members of the State Classes are threatened with irreparable harm and/or are entitled to injunctive and other equitable relief and, if so, what is the nature of such relief.

(n)     Whether the members of the State Classes are entitled to payment of damages plus interest thereon.

240.    The claims asserted by Plaintiffs in this action are typical of the claims of the members of the State Classes, as the claims arise out of the same wrongful and unlawful course of conduct by Defendants, including HomeAdvisor's deceitful business practices with respect to HomeAdvisor Leads and its membership services. Plaintiffs and the other members of the State Classes have sustained economic injuries arising from Defendants' conduct, and the relief sought is common to each member of the Class.

241.    Plaintiffs will fairly and adequately represent and protect the interests of the members of the State Classes, and do not have interests antagonistic to the interests of any other

member of the State Classes.

242.   Plaintiffs have retained counsel competent and experienced in the prosecution of class actions, in particular consumer protection class actions.

243.   Certification of the State Classes is appropriate under Federal Rule of Civil Procedure 23 because questions of law or fact common to the respective members of the State Classes predominate over questions of law or fact affecting only individual members of the State Classes.  This predominance makes class litigation under Fed. R. Civ. P. 23 superior to any other method available for a fair and efficient decree of the claims.

244.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Plaintiffs and the members of the State Classes have all suffered and will continue to suffer harm and damages as a result of Defendants' unlawful and wrongful conduct.  Absent a class action, most members of the State Classes would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law.  Because of the relatively small size of the damages of each member of the State Classes, it is highly likely that Plaintiffs or any other member of the State Classes would not be able to protect their own interest and afford to seek legal redress for Defendants' misconduct, because the cost of litigation through individual lawsuits might exceed expected recovery.  Therefore, absent a class action, members of the State Classes will continue to incur damages and Defendants' misconduct will continue without remedy.

245.   Certification also is appropriate because Defendants acted, or refused to act, on grounds generally applicable to the Plaintiffs and the State Classes, thereby making appropriate the relief sought on behalf of the State Classes as a whole.  Further, given the large number of

HSPs subscribed to HomeAdvisor, allowing individual actions to proceed in lieu of a class action would run the risk of yielding inconsistent and conflicting adjudications.  Treatment of common questions of law and fact in this action is a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants, and will promote consistency and efficiency of adjudication.

## II.        Classes Action Allegations for The Misappropriation Claims

246.    For the Misappropriation Plaintiffs' claims under the Lanham Act Section 43(a), 15 U.S.C. § 1125(a)(1)(A), (Count XXXVI) and Lanham Act Section 43(a), 15 U.S.C. § 1125(a)(1)(B), (Count XXXVII), the Misappropriation Plaintiffs seek to certify the following national class (the "Lanham Act Class"):

**Lanham Act Class**

All persons and entities who since July 13, 2015, did not have an active home service professional membership (including for HomeAdvisor's Pro Connect$^{TM}$, Total Connect$^{TM}$, and/or for the predecessor or subsequent HomeAdvisor home service professional membership programs) and whose names, likeness or trademark appeared on HomeAdvisor's website or any HomeAdvisor affiliate website.

247.      The Misappropriation Plaintiffs also seek to certify classes for their state common law unfair competition and statutory claims under Colorado law ("Colorado Misappropriation Class"), Florida law ("Florida Misappropriation Class"), Idaho law ("Idaho Misappropriation Class"), New York law ("New York Misappropriation Class"), and Ohio Law ("Ohio Misappropriation Class") (collectively the "State Misappropriation Classes"):

**Colorado Misappropriation Class (represented by the McHenry Plaintiffs)**
All persons and entities during the Class Period who reside in Colorado, since July 13, 2015, and did not have an active home service professional membership (including for HomeAdvisor's Pro Connect$^{TM}$, Total Connect$^{TM}$, and/or for the predecessor or subsequent HomeAdvisor home service professional membership

97

programs) and whose names, likeness, or trademark appeared on HomeAdvisor's website or in relation with any HomeAdvisor affiliate website.

### Florida Misappropriation Class (represented by Plaintiff Ervine)
All persons and entities during the Class Period who reside in Florida, since July 13, 2014, and did not have an active home service professional membership (including for HomeAdvisor's Pro Connect[TM], Total Connect[TM], and/or for the predecessor or subsequent HomeAdvisor home service professional membership programs) and whose names, likeness or trademark appeared on HomeAdvisor's website or in relation with any HomeAdvisor affiliate website.

### Idaho Misappropriation Class (represented by Plaintiff Haukenes)
All persons and entities during the Class Period who reside in Idaho, since July 13, 2016, and did not have an active home service professional membership (including for HomeAdvisor's Pro Connect[TM], Total Connect[TM], and/or for the predecessor or subsequent HomeAdvisor home service professional membership programs) and whose names, likeness or trademark appeared on HomeAdvisor's website or in relation with any HomeAdvisor affiliate website.

### New York Misappropriation Class (represented by Plaintiff Hass)
All persons and entities during the Class Period who reside in New York, since July 13, 2015,  and did not have an active home service professional membership (including for HomeAdvisor's Pro Connect[TM], Total Connect[TM], and/or for the predecessor or subsequent HomeAdvisor home service professional membership programs) and whose names, likeness or trademark appeared on HomeAdvisor's website or in relation with any HomeAdvisor affiliate website.

### Ohio Misappropriation Class (represented by Plaintiff Baumann)
All persons and entities during the Class Period who reside in Ohio, since July 13, 2016, and did not have an active home service professional membership (including for HomeAdvisor's Pro Connect[TM], Total Connect[TM], and/or for the predecessor or subsequent HomeAdvisor home service professional membership programs) and whose names, likeness or trademark appeared on HomeAdvisor's website or in relation with any HomeAdvisor affiliate website.

248.    The Misappropriation Plaintiffs may seek to certify additional classes and/or subclasses and reserve the right to modify or amend the definition of the proposed Lanham Act and State Misappropriation Classes before the Court determines whether certification is appropriate.

249.    Excluded from the Lanham Act and State Misappropriation Classes are: the

Lanham Act Defendants, any entity in which any Lanham Act Defendant has a controlling interest, and each Lanham Act Defendants' officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries, and assigns; governmental entities; and, any judge or magistrate presiding over this action, as well as their immediate family members.

250. The Lanham Act Defendants' practices were applied uniformly to all members of the Lanham Act and State Misappropriation Classes, so that the questions of law and fact are common to all members of the Lanham Act and State Misappropriation Classes.

251. All members of the Lanham Act and State Misappropriation Classes were and are similarly affected by the wrongful and unfair practices of the Lanham Act Defendants, resulting in harm to of the Members of the Lanham Act and State Misappropriation Classes, and the relief sought herein is for the benefit of the Misappropriation Plaintiffs and members of the Lanham Act and State Misappropriation Classes.

252. Based on HomeAdvisor's, IAC's and ANGI's public statements, it is apparent that the Lanham Act and State Misappropriation Classes consists of many thousands of members, the identities and contact information of whom is readily ascertainable from HomeAdvisor's records, therefore rendering joinder impractical and impossible.

253. Questions of law and fact common to the Misappropriation Plaintiffs and Lanham Act and State Misappropriation Classes exist that predominate over the questions affecting only individual members of the Lanham Act and State Misappropriation Classes. The common legal and factual questions include, *inter alia*:

(a) Whether the Lanham Act Defendants' online advertisements and maintenance of terminated HSPs' profiles on HomeAdvisor websites are part of a pattern and practice to divert or hijack business away from Plaintiffs and the Lanham Act and State Misappropriation Class

Members in violation of Section 43(a) of the Lanham Act.

(b)     Whether the Lanham Act Defendants' offers to connect homeowners to HSPs who are no longer affiliated with HomeAdvisor violates 15 U.S.C. § 1125(a)(1)(A) of the Lanham Act.

(c)     Whether the Lanham Act Defendants' false representations that Plaintiffs and the Lanham Act and State Misappropriation Class Members were unable to accept new business opportunities violated 15 U.S.C. § 1125(a)(1)(B) of the Lanham Act.

(d)     Whether the conduct alleged herein constitutes unfair competition.

(e)     Whether the Lanham Act Defendants' conduct violates consumer protection statutes, and other laws as asserted herein.

(f)     The amount of revenues and profits the Lanham Act Defendants received and/or the amount of monies imposed on or lost by the members of the Lanham Act and State Misappropriation Classes as a result of the Lanham Act Defendants' conduct.

(g)     Whether the members of the Lanham Act and State Misappropriation Classes are threatened with irreparable harm and/or are entitled to injunctive and other equitable relief and, if so, what is the nature of such relief.

(h)     Whether the members of the Lanham Act and State Misappropriation Classes are entitled to payment of damages plus interest thereon.

254.     The claims asserted by the Misappropriation Plaintiffs in this action are typical of the claims of the members of the Lanham Act and State Misappropriation Classes, as the claims arise out of the same wrongful and unlawful course of conduct by the Lanham Act Defendants, including the Lanham Act Defendants' deceptive conduct in misappropriating the names, trademarks or likenesses to divert business from the members of the Lanham Act and State Misappropriation Classes to HomeAdvisor. The Misappropriation Plaintiffs and the other members of the Lanham Act and State Misappropriation Classes have sustained economic injuries arising from the Lanham Act Defendants' conduct, and the relief sought is common to each member of the Lanham Act and State Misappropriation Classes.

255.     The Misappropriation Plaintiffs will fairly and adequately represent and protect the interests of the members of the Lanham Act and State Misappropriation Classes, and do not have interests antagonistic to the interests of any other member of the Lanham Act and State Misappropriation Classes.

256.     The Misappropriation Plaintiffs have retained counsel competent and experienced in the prosecution of class actions, in particular consumer protection class actions.

257.     Certification of the Lanham Act and State Misappropriation Classes is appropriate under Federal Rule of Civil Procedure 23 because questions of law or fact common to the respective members of the Lanham Act and State Misappropriation Classes predominate over questions of law or fact affecting only individual members of the Lanham Act and State Misappropriation Classes.  This predominance makes class litigation under Fed. R. Civ. P. 23 superior to any other method available for a fair and efficient decree of the claims.

258.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  The Misappropriation Plaintiffs and the members of the Lanham Act and State Misappropriation Classes have all suffered and will continue to suffer harm and damages as a result of the Lanham Act Defendants unlawful and wrongful conduct. Absent a class action, most members of the Lanham Act and State Misappropriation Classes would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law.  Because of the relatively small size of the damages of each member of the Lanham Act and State Misappropriation Classes, it is highly likely that the Misappropriation Plaintiffs or any other member of the Lanham Act and State Misappropriation Classes would be able to protect their own interest and afford to seek legal redress for the

Lanham Act Defendants' misconduct, because the cost of litigation through individual lawsuits might exceed expected recovery.  Therefore, absent a class action, members of the Lanham Act and State Misappropriation Classes will continue to incur damages and the Lanham Act Defendants' misconduct will continue without remedy.

259.    Certification also is appropriate because the Lanham Act Defendants acted, or refused to act, on grounds generally applicable to the Plaintiffs and the Lanham Act and State Misappropriation Classes, thereby making appropriate the relief sought on behalf of the Lanham Act and State Misappropriation Classes as a whole. Further, given the large number of HSPs subscribed to HomeAdvisor, allowing individual actions to proceed in lieu of a class action would run the risk of yielding inconsistent and conflicting adjudications. Treatment of common questions of law and fact in this action is a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants, and will promote consistency and efficiency of adjudication.

## CAUSES OF ACTION

**I.**     **The Deceptive Business Practices Claims**

**California**

### COUNT I
**Violation of the California Unfair Competition Law,**
**Cal. Bus. & Prof. Code §§ 17200, *et seq.***
**(On Behalf Plaintiff Seldner and the California Class)**

260.    Plaintiff Seldner repeats and realleges the allegations above as if fully set forth herein.

261.    Plaintiff Seldner brings this claim on behalf of himself and the California Class.

262.    HomeAdvisor is named as a Defendant in this Count by virtue of its conduct

summarized as follows and set forth in greater detail at ¶¶ 35-214.

263.    ANGI is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 5, 19, 36-158, 218-229.

264.    IAC is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 18, 38, 102, 206-229.

265.    California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*, proscribes acts of unfair competition, including "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."

266.    HomeAdvisor's, ANGI's and IAC's conduct, as described herein, was and is in violation of the UCL.  HomeAdvisor, ANGI and IAC have engaged in "unfair" business practices, ways and/or acts by, among other things, falsely representing the quality and nature of the Leads; failing to disclose the cost of mHelpDesk; and misrepresenting the availability of refunds and/or credits.

267.    HomeAdvisor, ANGI and IAC have engaged in unfair competition and unfair, unlawful or fraudulent business practices by their conduct, statements, and omissions described above.  In addition, HomeAdvisor, ANGI and IAC have engaged in unfair competition by engaging in fraud and deceit.

268.    The acts engaged in by HomeAdvisor, ANGI and IAC are fraudulent and show a pattern of untruthful statements, false representations, concealment, intent to mislead, and a conspiracy to defraud that were all part of a scheme to mislead.

269.    These acts and practices have deceived Plaintiff Seldner and are likely to deceive the public.  HomeAdvisor's, ANGI's and IAC's violations of the UCL caused injuries to Plaintiff

Seldner and members of the California Class.

270.    The injuries suffered by Plaintiff Seldner and members of the California Class are greatly outweighed by any potential countervailing benefit to consumers or to competition.  Nor are the injuries that Plaintiff Seldner and the California Class members should have or could have reasonably avoided.

271.    HomeAdvisor's, ANGI's and IAC's representations and acts as set out above induced Plaintiff Seldner and other similarly situated members of the California Class to pay the amounts charged by HomeAdvisor, ANGI and IAC allowing them to collect sums never agreed to by customers. Plaintiff Seldner reserves the right to identify additional violations by HomeAdvisor, ANGI and IAC as may be established through discovery.

272.    As a direct and legal result of its unlawful, unfair, and fraudulent conduct described above, Defendants have been unjustly enriched.  Specifically, HomeAdvisor, ANGI and IAC have been unjustly enriched by the receipt of large sums of ill-gotten gains from the deceptive and excess monthly charges they have levied on customers.

273.    Pursuant to California Business and Professions Code section 17203, Plaintiff Seldner seeks an order of this court:

(a)    Compelling HomeAdvisor, ANGI and IAC to make restitution to Plaintiff Seldner and the California Class for all funds unlawfully, unfairly, or fraudulently obtained by HomeAdvisor, ANGI and IAC as a result of their violations of California Business and Professions Code section 17200 *et seq.*;

(b)    Declaring that HomeAdvisor, ANGI and IAC have violated the provisions of California Business & Professions Code section 17200, and California Business and Professions

Code section 17500, and any other statutory violations; and

(c)     Enjoining and restraining HomeAdvisor, ANGI and IAC from charging and collecting additional unauthorized charges from customers.

274.    In prosecuting this action for the enforcement of important rights affecting the public interest, Plaintiff Seldner seeks to recover attorney fees under (i) section 1021.5 of the Code of Civil Procedure and/or (ii) the "common fund" doctrine available to a prevailing plaintiff who wins restitutionary relief for the general public.

**COUNT II**
**False and Misleading Advertising,**
**Cal. Bus. & Prof. Code §§ 17500,** *et seq.*
**(On Behalf Plaintiff Seldner and the California Class)**

275.    Plaintiff Seldner repeats and realleges the allegations above as if fully set forth herein.

276.    HomeAdvisor is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 35-214.

277.    ANGI is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 5, 19, 36-158, 218-229.

278.    IAC is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 18, 38, 102, 206-229.

279.    Plaintiff Seldner brings this claim on behalf of himself and the California Class for violations of the California Business & Professions Code § 17500, which states, in relevant part:

> It is unlawful for any . . . corporation . . . with intent directly or indirectly
> to or to perform services to induce the public to enter into any obligation
> relating thereto, to make or disseminate or cause to be made or

105

disseminated before the public in this state, or to make or disseminate or cause to be made or disseminated from this state before the public in any state, in any newspaper or other publication, or any advertising device, or . . . any other manner or means whatever, including over the Internet, any statement . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading, . . . or . . . not to sell that personal property or those services. . . as so advertised.

Cal. Bus. & Prof. Code § 17500.

280.    HomeAdvisor, ANGI and IAC caused to be made or disseminated through California and the United States, through advertising, marketing and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to HomeAdvisor, ANGI and IAC, to be untrue and misleading to Plaintiff Seldner and the other members of the California Class.

281.    HomeAdvisor, ANGI and IAC have violated § 17500 because their misrepresentations and omissions regarding the nature and quality of the membership programs, including the nature and quality of the Leads, the inclusion of mHelpDesk in the membership programs and the prices charged for mHelpDesk, and their policies and practices relating to Lead generation and dissemination to HSPs detailed in this Complaint were material and likely to deceive a reasonable consumer.

282.    Plaintiff Seldner and the other members of the California Class have suffered an injury in fact, including the loss of money or property, as a result of HomeAdvisor's, ANGI's and IAC's unfair, unlawful, and/or deceptive practices.    In choosing to buy a membership program or Leads from HomeAdvisor, ANGI and IAC, Plaintiff Seldner and the other members of the California Class relied on the misrepresentations and/or omissions of HomeAdvisor, ANGI and IAC with respect to the price they would pay, the nature and quality of the Leads sold

by HomeAdvisor and ANGI, and HomeAdvisor's and ANGI's adherence to the parameters and limits the HSPs established for their membership program.  Had Plaintiff Seldner and the other members of the California Class known the true facts, they would not have agreed to buy a membership program or Leads from HomeAdvisor, ANGI and IAC, remained HomeAdvisor customers, and/or paid as much for a membership program or Leads.  Accordingly, Plaintiff Seldner and the other members of the California Class overpaid and did not receive the benefit of their bargain.

283.   All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of HomeAdvisor's, ANGI's and IAC's business.  HomeAdvisor's, ANGI's and IAC's wrongful conduct is part of a pattern or generalized course of conduct that was perpetuated and repeated, both in the State of California and nationwide.

284.   Plaintiff Seldner, on behalf of himself and the California Class, seeks restitution, and injunctive relief under §§ 17500, *et seq*.

### COUNT III
**Fraud/Fraudulent Concealment**
**(On Behalf of Plaintiff Seldner and the California Class)**

285.   Plaintiff Seldner repeats, realleges, and incorporates by reference each of the foregoing allegations as though fully set forth herein.

286.   HomeAdvisor is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 35-214.

287.   ANGI is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 5, 19, 36-158, 218-229.

288.   HomeAdvisor and ANGI concealed and made misrepresentations of material facts

concerning the nature and quality of the membership programs– including that the Leads were not from serious, project-ready homeowners and were sent to more than four HSPs – and the inclusion of the mHelpDesk in the membership programs and the monthly fees charged for mHelpDesk.  Specifically, HomeAdvisor and ANGI knew (or should have known) that the membership programs were not of the nature and quality that was advertised and that Leads and mHelpDesk were part of the membership programs for additional fees. HomeAdvisor and ANGI concealed material facts and/or made the material misrepresentations in order to boost the sales of Membership Programs and Leads.

289.    HomeAdvisor and ANGI knew that Plaintiff Seldner and California Class Members relied upon such material representations about the membership programs, and HomeAdvisor and ANGI omitted material information and/or made such material representations about the benefits of the membership programs to induce Plaintiff Seldner and members of the California Class to act.  Moreover, to pay for the membership program, the HSPs were required to provide either a checking/savings account from which HomeAdvisor and ANGI can automatically debit all membership fees and Lead fees, or a credit card on which HomeAdvisor and ANGI can automatically charge such fees.  Then, *on a weekly basis,* HomeAdvisor and ANGI automatically charged the HSPs for each Lead sent. The fee for each Lead is automatically charged to the HSPs' credit cards and/or debited from his/her/its debit accounts.  Consequently, the viability, accuracy, seriousness, qualified nature and limited distribution of each Lead are material to the HSPs.

290.    The representations about the membership programs and the omissions about the Leads were material to Plaintiff Seldner, such that, had Plaintiff Seldner known that the

representations were false and HomeAdvisor and ANGI had omitted material information, Plaintiff Seldner would not have purchased a membership program and provided HomeAdvisor and ANGI with the means to charge their credit card and/or debit their bank accounts. But Plaintiff Seldner and the California Class did not know the true facts, and relied upon the material representations and omissions made by HomeAdvisor.

291.    Plaintiff Seldner and the members of the California Class had no way of knowing that HomeAdvisor's and ANGI's representations were false and gravely misleading, or that HomeAdvisor and ANGI had omitted imperative details. Plaintiff Seldner and the members of the California Class did not, and could not, unravel HomeAdvisor's deception on their own.

292.    HomeAdvisor and ANGI knew their statements were false, and intended that Plaintiff Seldner and the members of the California Class would rely upon the false representations.

293.    HomeAdvisor and ANGI concealed and failed to disclose to Plaintiff Seldner and members of the California Class that, despite their affirmative representations about the services, including the membership programs and Leads, they would charge Plaintiff Seldner and the members of the California Class for unqualified Leads and mHelpDesk. HomeAdvisor and ANGI concealed these material facts with the intention that Plaintiff Seldner and the members of the California Class would act.

294.    As a result of HomeAdvisor's and ANGI's fraudulent representations and omissions, Plaintiff Seldner and the members of the California Class were induced into the purchase of goods and/or services that they otherwise would not have purchased, or would have paid less, and have suffered injury, harm and damages as described herein.

295. HomeAdvisor's and ANGI's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff Seldner s' and the California Class' rights and well-being to enrich HomeAdvisor and ANGI. HomeAdvisor's and ANGI's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**COUNT IV**
**Aiding and Abetting Fraud/Fraudulent Concealment**
**(On Behalf of Plaintiff Seldner and the California Class)**

296. Plaintiff Seldner repeats, realleges, and incorporates by reference each of the foregoing allegations as though fully set forth herein.

297. IAC is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 18, 38, 102, 206-229.

298. HomeAdvisor and ANGI committed fraud resulting in injury to Plaintiff Seldner and the California Class, as alleged herein. IAC's conduct alleged herein enabled, substantially assisted, encouraged, and was a substantial factor in the commission of such fraud.

299. As a result of its control over HomeAdvisor's business operations, IAC knew or was aware that HomeAdvisor and ANGI concealed and made misrepresentations of material facts concerning the nature and quality of the membership programs including that the Leads were not from serious, project-ready homeowners and were sent to more than four HSPs. Specifically, IAC knew (or should have known) that the membership programs were not of the nature and quality that HomeAdvisor and ANGI advertised and that Leads and mHelpDesk were part of the membership programs for additional fees. IAC aided and abetted HomeAdvisor's and ANGI's concealment of material facts and/or material misrepresentations in order the boost the

sales of Membership Programs and Leads.

300.     As a result of its control over HomeAdvisor's business operations, IAC knew or was aware that Plaintiff Seldner and California Class Members relied upon such material representations about the membership programs, and that HomeAdvisor and ANGI omitted material information and/or made such material representations about the benefits of the membership programs to induce Plaintiff Seldner and members of the California Class to act. Moreover, to pay for the membership programs, the HSPs were required to provide either a checking/savings account from which HomeAdvisor and ANGI can automatically debit all membership fees and Lead fees, or a credit card on which HomeAdvisor can automatically charge such fees.   Then, *on a weekly basis,* HomeAdvisor and ANGI automatically charged the HSPs for each Lead sent. The fee for each Lead is automatically charged to the HSPs' credit cards and/or debited from his/her/its debit accounts.  Consequently, IAC knew, or was aware, that the viability, accuracy, seriousness, qualified nature and limited distribution of each Lead are material to the HSPs.

301.     As a result of its control over HomeAdvisor's business operations, IAC had actual knowledge, or should have known, of measures it could have taken to prevent HomeAdvisor and ANGI from utilizing fraudulent misrepresentations and omissions to sell the membership programs and Leads and to provide HSPs with accurate information but nevertheless chose to maintain policies that enabled and assisted the fraud.

302.     Before and during the commission of the fraud, IAC intended to aid and abet, and did substantially assist, HomeAdvisor and ANGI in the fraud perpetrated on Plaintiff Seldner and the California Class by making statements about the quality of the Leads in regulatory filings and

concealing material information about the quality and nature of the membership programs.

303.    IAC's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff Seldner's and the California Class' rights and well-being to enrich IAC.

## COUNT V
### Breach Of Implied Contract
### (On Behalf of Plaintiff Seldner and the California Class)

304.    Plaintiff Seldner repeats, realleges and incorporates by reference each of the foregoing allegations as though fully set forth herein.

305.    HomeAdvisor is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 35-214.

306.    Plaintiff Seldner and the members of the California Class paid money to HomeAdvisor in exchange for membership programs, including Leads and mHelpDesk.

307.    An implied contract was created between HomeAdvisor and the HSPs whereby HomeAdvisor was to provide Plaintiff Seldner and HSPs marketing tools and, if desired, Leads that were from targeted, serious, qualified and/or project-ready homeowners.

308.    Plaintiff Seldner and the members of the California Class paid an annual fee to join a HomeAdvisor membership program and were charged hundreds and thousands of dollars for Leads.

309.    The sale of HomeAdvisor's Lead services was misrepresented to Plaintiff Seldner and the members of the California Class.   Furthermore, HomeAdvisor's Leads and Lead generation process are systemically flawed, and are not comprised of targeted, serious, qualified and project-ready homeowners.

310.    The Leads were not of the nature and quality of the Leads that were represented and required, yet HomeAdvisor sent to and charged the HSPs for such Leads.  HomeAdvisor did not generate Leads for the HSPs that were targeted and from serious, qualified or project-ready homeowners. Also, HomeAdvisor charged HSPs for Leads that have been sent to more than four HSPs and for mHelpDesk without knowledge or consent of the HSPs.    Furthermore, HomeAdvisor systemically disregarded the parameters and limits placed on the type and number of Leads to be charged to HSPs.   Finally, HomeAdvisor employed tactics that prevent HSPs from canceling their membership and Leads, and from disputing the propriety of a Lead in order to secure a refund.

311.    Accordingly, HomeAdvisor has breached the implied contract that was formed between it and Plaintiff Seldner and members of the California Class.

312.    As a result, Plaintiff Seldner and members of the California Class have been harmed and/or injured have incurred economic damages as a proximate and direct result of the breach by HomeAdvisor.

**COUNT VI**
**Unjust Enrichment/Restitution**
**(On Behalf of Plaintiff Seldner and the California Class)**

313.    Plaintiff Seldner repeats, realleges and incorporates by reference each of the foregoing allegations as though fully set forth herein.

314.    HomeAdvisor is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 35-214.

315.    IAC is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 18, 38, 102, 206-229.

316.     ANGI is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 5, 19, 36-158, 218-229.

317.     As the intended and expected result of their conscious wrongdoing, HomeAdvisor, ANGI and IAC have profited and benefited from Plaintiff Seldner's and the California Class' purchase of the membership programs and payment for the Leads and mHelpDesk.

318.     HomeAdvisor, ANGI and IAC have voluntarily accepted and retained these profits and benefits, with full knowledge and awareness that, as a result of HomeAdvisor's, ANGI's and IAC's misconduct alleged herein, Plaintiff Seldner and the California Class were not receiving services of the quality, nature, fitness, or value that had been represented by HomeAdvisor, ANGI and IAC, and that a reasonable consumer would expect.

319.     HomeAdvisor, ANGI and IAC have been unjustly enriched by their fraudulent and deceptive conduct and withholding of benefits to Plaintiff Seldner and the California Class, at the expense of these parties.

320.     Equity and good conscience militate against permitting HomeAdvisor, ANGI and IAC to retain these profits and benefits, and permitting HomeAdvisor, ANGI and IAC to do so would be unjust and inequitable because of HomeAdvisor's, ANGI's and IAC's misrepresentations and misconduct against Plaintiff Seldner and members of the California Class, as alleged herein.

321.     Because HomeAdvisor's, ANGI's and IAC's retention of the non-gratuitous benefit conferred upon them by Plaintiff Seldner and the members of the California Class is unjust and inequitable, HomeAdvisor, ANGI and IAC must pay restitution to Plaintiff Seldner

and members of the California Class, as ordered by the Court.

**Colorado**

## COUNT VII
### Violations of Colorado Consumer Protection Act ("CCPA"),
### Colo. Rev. Stat. § 6-1-101, *et seq*.
### (On Behalf of Plaintiffs Brad and Linda McHenry and the Colorado Class)

322.    Plaintiffs Brad and Linda McHenry repeat and reallege the allegations above as if fully set forth herein.

323.    HomeAdvisor is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 35-214.

324.    ANGI is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 5, 19, 36-158, 218-229.

325.    Plaintiffs Brad and Linda McHenry bring this claim on behalf of themselves and the Colorado Class.

326.    Plaintiffs Brad and Linda McHenry are informed and believe, and thereon allege, that HomeAdvisor and ANGI engaged in extensive marketing, advertising and selling, including, but not limited to, electronic media, television, internet and direct marketing through their agents, to promote and sell the membership programs and ProLeads.

327.    HomeAdvisor and ANGI characterized the Leads as:  from targeted, serious, qualified and project ready homeowners; qualified new business opportunities (Pro Leads) to keep your pipeline full; from 'ready-to-buy' customers; targeted prospects and highly targeted prospects; from project ready homeowners; from homeowners actively seeking the services; from qualified homeowners; from serious homeowners; and being sent only to up to four HSPs. *See supra* ¶¶ 57, 58, 214.  But, the Leads are not as HomeAdvisor and ANGI represented or of

the quality and nature of what Plaintiffs Brad and Linda McHenry and the Colorado Class paid for because HomeAdvisor and ANGI maintain and employ systemically flawed and deficient processes to generate Leads, and send and charge HSPs for Leads that were not of such nature and quality.

328.    In addition, HomeAdvisor and ANGI concealed and omitted material information about: (a) the nature of the membership programs; (b) the Leads, including the true source and nature of the Leads, in that, *inter alia*, the Leads were generated through methods that could not and did not provide the Leads as advertised; and, (c) that substantial monthly fees would be charged to the HSPs for mHelpDesk.

329.    HomeAdvisor and ANGI also systemically disregarded the parameters and limits placed on the type and number of Leads to be charged to HSPs.

330.    HomeAdvisor and ANGI employed tactics that prevented or discouraged HSPs from canceling their membership and Leads, and from disputing the propriety of a Lead in order to secure a refund.

331.    HomeAdvisor and ANGI had knowledge that the Leads and their practices and services were contrary to what the HSPs had paid over $763 million for in 2017 alone.

332.    HomeAdvisor's and ANGI's failure to disclose and instead to conceal the foregoing facts was intended to and induced the McHenry Plaintiffs and the members of the Colorado Class to pay millions of dollars for membership programs, including Leads and mHelpDesk.

333.    This cause of action is brought on behalf of Plaintiffs Brad and Linda McHenry and all similarly situated members of the Colorado Class, pursuant to COLO. REV. STAT. § 6-

1-105(e), (g), (i), (l), (n) and (u), which provide, in pertinent part, that "a person engages in a deceptive trade practice when, in the course of such person's business, vocation, or occupation, such person —

\* \* \*

(e) Knowingly makes a false representation as to the characteristics, ingredients, uses, benefits, alterations, or quantities of goods, food, services, or property or a false representation as to the sponsorship, approval, status, affiliation, or connection of a person therewith;

\* \* \*

(g) Represents that goods, food, services, or property are of a particular standard, quality, or grade, or that goods are of a particular style or model, if he knows or should know that they are of another;

\* \* \*

(i) Advertises goods, services, or property with intent not to sell them as advertised;

\* \* \*

(l) Makes false or misleading statements of fact concerning the price of goods, services, or property or the reasons for, existence of, or amounts of price reductions;

\* \* \*

(n) Employs "bait and switch" advertising, which is advertising accompanied by an effort to sell goods, services, or property other than those advertised or on terms other than those advertised and which is also accompanied by one or more of the following practices:

\* \* \*

(III) Requiring tie-in sales or other undisclosed conditions to be met prior to selling the advertised goods, property, or services;

\* \* \*

(u) Fails to disclose material information concerning goods, services, or property which information was known at the time of an advertisement or sale if such failure to disclose such information was intended to induce the consumer to enter into a transaction.

334.    In addition, C.R.S. § 6-1-105(3) provides: "The deceptive trade practices listed in this section are in addition to and do not limit the types of unfair trade practices actionable at common law or under other statutes of this state."

335.    HomeAdvisor's and ANGI's deceptive practices occurred in the course of HomeAdvisor's  business, vocation or occupation.

336.     HomeAdvisor's and ANGI's misconduct significantly impacts the public as actual

or potential consumers of HomeAdvisor's and ANGI's services described herein.  The deceptive

marketing, advertising and selling through electronic media, television, internet and direct

marketing were directed to the market generally resulting in deception of actual and prospective

purchasers.

337.     The wrongdoing alleged herein has a significant public impact.  Among other

things: as of December 31, 2017, HomeAdvisor's network of HSPs consisted of approximately

181,000 paying Service Professionals in the United States, who provided services ranging from

home repairs to larger home remodeling projects to thousands of homeowners nationwide;

HomeAdvisor and ANGI are sophisticated and have superior bargaining power over the HSPs, as

well as the homeowners, who are affected by the deceptive and false practices challenged herein;

and, the wrongdoing has impacted HSPs, causing them substantial monetary damages, and has

the significant potential to do so in the future.

338.     HomeAdvisor's and ANGI's deceptive practices caused damage to Plaintiffs Brad

and Linda and all Colorado Class Members.  Because of HomeAdvisor's and ANGI's unfair,

deceptive and fraudulent business practices, Plaintiffs Brad and Linda McHenry and the

Colorado Class Members suffered and continue to suffer injuries by way of monetary loss.

339.     In all respects, the foregoing constitutes deceptive trade practices by

HomeAdvisor and ANGI. HomeAdvisor and ANGI committed deceptive acts and practices, and

omitted material information, which have a capacity, tendency, and/or likelihood to deceive or

confuse reasonable HSPs in that such consumers had a good faith basis for believing that (a) the

Leads were generated, marketed, distributed and charged to the HSPs in a reliable and honest

manner; (b) they would not be charged for mHelpDesk; and (c) they would be able to control the Leads, as well as suspend or cancel receipt of and being charged for the Leads.  Instead, the McHenry Plaintiffs and the members of the Colorado Class were and were likely to be deceived by HomeAdvisor, as set forth herein.

340.    Plaintiffs Brad and Linda McHenry therefore seeks an order of this Court:

a.      Enjoining HomeAdvisor and ANGI from continuing to engage, use, or employ any unfair and/or deceptive business acts or practices related to their marketing, distribution, taking of monies for, and the management of Leads, Membership Programs, mHelpDesk, Lead management, requests for refunds, and requests for suspension or cancellation of involvement in a Membership Program, Leads and mHelpDesk, in such manner as set forth in detail above;

b.      Requiring HomeAdvisor and ANGI to cease business practices that generate and charge for unqualified Leads;

c.       Enjoining HomeAdvisor and ANGI from representing that the Leads are qualified and of similar nature and quality, when they are not;

d.      Requiring HomeAdvisor and ANGI to cease charging for mHelpDesk without written, clear confirmation of a HSP's knowledge of the service and attendant charges, and his/her/its acceptance of such service and charges; and

e.      Enjoining HomeAdvisor and ANGI from initiating and proceeding with any collection action against Plaintiffs and the members of the Class.

341.    Plaintiffs Brad and Linda McHenry and the members of the Colorado Class may be irreparably harmed and/or denied an effective and complete remedy if such an order is not

granted. The unfair and/or deceptive acts and practices of HomeAdvisor and ANGI, as described

above, present a serious threat to the McHenry Plaintiffs and the members of the Colorado Class.

**COUNT VIII**
**Fraud/Fraudulent Concealment**
**(On Behalf of Plaintiffs Brad and Linda McHenry and the Colorado Class)**

342.     Plaintiffs Brad and Linda McHenry repeat, reallege, and incorporate by reference

each of the foregoing allegations as though fully set forth herein.

343.     HomeAdvisor is named as a Defendant in this Count by virtue of its conduct

summarized as follows and set forth in greater detail at ¶¶ 35-214.

344.     ANGI is named as a Defendant in this Count by virtue of its conduct summarized

as follows and set forth in greater detail at ¶¶ 5, 19, 36-158, 218-229.

345.     HomeAdvisor and ANGI concealed and made misrepresentations of material facts

concerning the nature of the membership programs, including the nature and quality of the Leads

– namely that the Leads were not from serious, project-ready homeowners and were sent to more

than four HSPs – and the inclusion of the mHelpDesk in the membership programs and the

monthly fees charged for mHelpDesk. Specifically, HomeAdvisor and ANGI knew (or should

have known) that the membership programs were not of the nature that was advertised, including

that nature and quality of the Leads and that mHelpDesk was included in the membership

programs for an additional monthly fee. HomeAdvisor and ANGI concealed material facts

and/or made the material misrepresentations in order to boost the sales of membership programs

and Leads.

346.     HomeAdvisor and ANGI knew that the McHenry Plaintiffs and Colorado Class

Members relied upon such material representations about the Leads, and HomeAdvisor and

120

ANGI omitted material information and/or made such material representations to induce the McHenry Plaintiffs and members of the Colorado Class to act, *i.e.* to pay for a Membership Program to get access to the Leads.  Moreover, to pay for the Leads, the HSPs were required to provide either a checking/savings account from which HomeAdvisor and ANGI can automatically debit all Membership Fees and Lead fees, or a credit card on which HomeAdvisor and ANGI can automatically charge such fees.   Then, *on a weekly basis,* HomeAdvisor and ANGI automatically charged the HSPs for each Lead sent. The fee for each Lead is automatically charged to the HSPs' credit cards and/or debited from his/her/its debit accounts. Consequently, the viability, accuracy, seriousness, qualified nature and limited distribution of each Lead are material to the HSPs.

347.    The representations about the Leads and the omissions about the Leads were material to the McHenry Plaintiffs, such that, had the McHenry Plaintiffs known that the representations were false and HomeAdvisor had omitted material information, the McHenry Plaintiffs would not have purchased a Membership Program and provided HomeAdvisor and ANGI with the means to charge their credit card and/or debit their bank accounts.  But the McHenry Plaintiffs and the Colorado Class did not know the true facts, and relied upon the material representations and omissions made by HomeAdvisor and ANGI.

348.    Plaintiffs Brad and Linda McHenry and the members of the Colorado Class had no way of knowing that HomeAdvisor's and ANGI's representations were false and gravely misleading, or that HomeAdvisor and ANGI had omitted imperative details. Plaintiffs Brad and Linda McHenry and the members of the Colorado Class did not, and could not, unravel HomeAdvisor's and ANGI's deception on their own.

349.     HomeAdvisor and ANGI knew their statements were false, and intended that the McHenry Plaintiffs and the members of the Colorado Class would rely upon the false representations.

350.     HomeAdvisor and ANGI concealed and failed to disclose to the McHenry Plaintiffs and members of the Colorado Class that, despite their affirmative representations about the membership programs, including the Leads, they would charge the McHenry Plaintiffs and the members of the Colorado Class for unqualified Leads and mHelpDesk.  HomeAdvisor and ANGI concealed these material facts with the intention that the McHenry Plaintiffs and the members of the Colorado Class would act.

351.     As a result of HomeAdvisor's and ANGI's fraudulent representations and omissions, the McHenry Plaintiffs and the members of the Colorado Class were induced into the purchase of goods and/or services that they otherwise would not have purchased, or would have paid less, and have suffered injury, harm and damages as described herein.

352.     HomeAdvisor's and ANGI's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of the McHenry Plaintiffs' and the Colorado Class' rights and well-being to enrich HomeAdvisor and ANGI. HomeAdvisor's and ANGI's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**COUNT IX**
**Aiding and Abetting Fraud/Fraudulent Concealment**
**(On Behalf of Plaintiff Brad and Linda McHenry and the Colorado Class)**

353.     Plaintiffs Brad and Linda McHenry repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

354.    IAC is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 18, 38, 102, 206-229.

355.    HomeAdvisor and ANGI committed fraud resulting in injury to the McHenry Plaintiffs and the Colorado Class, as alleged herein.  IAC's conduct alleged herein enabled, substantially assisted, encouraged, and was a substantial factor in the commission of such fraud.

356.    As a result of its control over HomeAdvisor's business operations, IAC knew or was aware that HomeAdvisor and ANGI concealed and made misrepresentations of material facts concerning the nature of the membership programs, including the nature and quality of the Leads – namely that the Leads were not from serious, project-ready homeowners and were sent to more than four HSPs. Specifically, IAC knew (or should have known) that the membership programs were not of the nature that HomeAdvisor and ANGI advertised, including the nature and quality of the Leads and the inclusion of and cost associated with mHelpDesk.  IAC aided and abetted HomeAdvisor's and ANGI's concealment of material facts and/or material misrepresentations in order to boost the sales of Membership Programs and Leads.

357.    As a result of its control over HomeAdvisor's business operations, IAC knew or was aware the McHenry Plaintiffs and Colorado Class Members relied upon such material representations about the Leads, and HomeAdvisor and ANGI omitted material information and/or made such material representations to induce the McHenry Plaintiffs and members of the Colorado Class to act, *i.e.* to pay for a membership program to get access to the Leads. Moreover, to pay for the Leads, the HSPs were required to provide either a checking/savings account from which HomeAdvisor and ANGI can automatically debit all Membership Fees and Lead fees, or a credit card on which HomeAdvisor can automatically charge such fees.   Then, *on*

*a weekly basis,* HomeAdvisor and ANGI automatically charged the HSPs for each Lead sent. The fee for each Lead is automatically charged to the HSPs' credit cards and/or debited from his/her/its debit accounts.  Consequently, IAC knew, or was aware, that the viability, accuracy, seriousness, qualified nature and limited distribution of each Lead are material to the HSPs.

358.    As a result of its control over HomeAdvisor's business operations, IAC had actual knowledge, or should have known, of measures it could have taken to prevent HomeAdvisor and ANGI from utilizing fraudulent misrepresentations and ommissions to sell Memberships and Leads and to provide HSPs with accurate information but nevertheless chose to maintain policies that enabled and assisted the fraud.

359.    Before and during the commission of the fraud, IAC intended to aid and abet, and did substantially assist, HomeAdvisor and ANGI in the fraud perpetrated on the McHenry Plaintiffs and the Colorado Class by making statements about the quality of the Leads in regulatory filings and concealing material information about the quality and nature of the Leads.

360.    IAC's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of the McHenry Plaintiffs' and the Colorado Class' rights and well-being to enrich IAC.

## COUNT X
### Breach Of Implied Contract
### (On Behalf of Plaintiffs Brad and Linda McHenry and the Colorado Class)

361.    Plaintiffs Brad and Linda McHenry repeat, reallege and incorporate by reference each of the foregoing allegations as though fully set forth herein.

362.    HomeAdvisor is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at paragraphs ¶¶ 35-214.

363.   Plaintiffs Brad and Linda McHenry and the members of the Colorado Class paid money to HomeAdvisor in exchange for Leads.

364.   An implied contract was created between HomeAdvisor and the HSPs whereby HomeAdvisor was to send and charge the McHenry Plaintiffs and HSPs for Leads that were from targeted, serious, qualified and/or project-ready homeowners.

365.   The McHenry Plaintiffs and the members of the Colorado Class paid an annual fee to join a HomeAdvisor Membership Program and paid hundreds and thousands of dollars for Leads.

366.   The Leads, as well as HomeAdvisor's Lead generation process, however, are systemically flawed and HomeAdvisor does not and cannot generate Leads of targeted, serious, qualified and project-ready homeowners.

367.   The Leads were not of the nature and quality of the Leads that were required, yet HomeAdvisor sent to and charged the HSPs for such Leads.   HomeAdvisor did not generate Leads for the HSPs that were targeted and from serious, qualified or project-ready homeowners. Also, HomeAdvisor charged the McHenry Plaintiffs and the members of the Colorado Class for Leads that have been sent to more than four HSPs. HomeAdvisor also charged HSPs for mHelpDesk without knowledge or consent of the HSPs.   Furthermore, HomeAdvisor systemically disregarded the parameters and limits placed on the type and number of Leads to be charged to HSPs.   Finally, HomeAdvisor employed tactics that prevent HSPs from canceling their membership and Leads, and from disputing the propriety of a Lead in order to secure a refund.

368.   Accordingly, HomeAdvisor has breached the implied contract that was formed

between it and the McHenry Plaintiffs and members of the Colorado Class.

369.     As a result, the McHenry Plaintiffs and members of the Colorado Class have been harmed and/or injured have incurred economic damages as a proximate and direct result of the breach by HomeAdvisor.

**COUNT XI**
**Unjust Enrichment/Restitution**
**(On Behalf Of Plaintiffs Brad and Linda McHenry and the Colorado Class)**

370.     Plaintiffs Brad and Linda McHenry repeat, reallege and incorporate by reference each of the foregoing allegations as though fully set forth herein.

371.     HomeAdvisor is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 35-214.

372.     IAC is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 18, 38, 102, 206-229.

373.     ANGI is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 5, 19, 36-158, 218-229.

374.     As the intended and expected result of their conscious wrongdoing, HomeAdvisor, ANGI and IAC have profited and benefited from the McHenry Plaintiffs' and the Colorado Class' purchase of the membership programs and payment for the Leads and mHelpDesk.

375.     HomeAdvisor, ANGI and IAC have voluntarily accepted and retained these profits and benefits, with full knowledge and awareness that, as a result of HomeAdvisor's, ANGI's and IAC's misconduct alleged herein, Plaintiffs Brad and Linda McHenry and the Colorado Class were not receiving services of the quality, nature, fitness, or value that had been

126

represented by HomeAdvisor, and that a reasonable consumer would expect.

376.    HomeAdvisor, ANGI and IAC have been unjustly enriched by their fraudulent and deceptive conduct and withholding of benefits to the McHenry Plaintiffs and the Colorado Class, at the expense of these parties.

377.    Equity and good conscience militate against permitting HomeAdvisor, ANGI and IAC to retain these profits and benefits, and permitting HomeAdvisor, ANGI and IAC to do so would be unjust and inequitable because of HomeAdvisor's, ANGI's and IAC's misrepresentations and misconduct against the McHenry Plaintiffs and members of the Colorado Class, as alleged herein.

378.    Because HomeAdvisor's, ANGI's and IAC's retention of the non-gratuitous benefit conferred upon them by the McHenry Plaintiffs and the members of the Colorado Class is unjust and inequitable, HomeAdvisor, ANGI and IAC must pay restitution to the McHenry Plaintiffs and members of the Colorado Class, as ordered by the Court.

**Florida**

**COUNT XII**
**Violation of the Florida Deceptive and Unfair Trade Practices Act,**
**Fla. Stat. §501.201, *et seq.* ("DUTPA")**
**(On Behalf of Plaintiff Ervine and the Florida Class)**

379.    Plaintiff Ervine repeats and realleges the allegations above as if fully set forth herein.

380.    Plaintiff Ervine brings this count individually and on behalf of the Florida Class.

381.    HomeAdvisor is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 35-214.

382.    ANGI is named as a Defendant in this Count by virtue of its conduct summarized

as follows and set forth in greater detail at ¶¶ 5, 19, 36-158, 218-229.

383.    IAC is named as a Defendants in this Count by virtue of its conduct as follows and set forth in greater detail at ¶¶ 18, 38, 102, 206-229.

384.    The Florida Deceptive and Unfair Trade Practices Act ("DUTPA"), Fla. Stat. § 501.201, *et seq.*, makes unlawful any "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

385.    As amended by the Florida Legislature in 2001, a "person" who has suffered a loss as a result of a violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") has standing to sue under that statute.  *See* Fla. Stat. § 501.211(2).  This 2001 amendment replaced the word "consumer" with "person."  Plaintiff Ervine and the Florida Class members are "persons" within the meaning of the FDUTPA.

386.    As set forth herein, HomeAdvisor, ANGI and IAC engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of trade or commerce in violation of the FDUPTA by willfully failing to disclose and actively concealing material facts regarding the true nature of the membership programs, including the quality of the Leads and that the HSPs would be signed up and charged for mHelpDesk.  Accordingly, HomeAdvisor, ANGI and IAC engaged in deceptive trade practices, including knowingly making false and misleading statements and/or omitting material information of the true nature membership programs, including the quality of the Leads and the charges associated with mHelpDesk and that they did not contain the qualities or characteristics, or perform, as advertised. HomeAdvisor, ANGI and IAC intentionally concealed the foregoing from Plaintiff Ervine and the Florida Class; and/or HomeAdvisor, ANGI and IAC made

incomplete representations about the Leads while purposefully withholding and omitting material facts from Plaintiff Ervine and the Class that contradicted these representations.

387.     Under the FDUTPA, § 501.211(2) and § 501.2105, Plaintiff Ervine and the Florida Class are entitled to actual damages, injunctive relief and attorney's fees and costs.

## COUNT XIII
### Fraud/Fraudulent Concealment
### On Behalf of Plaintiff Ervine and the Florida Class)

388.     Plaintiff Ervine repeats, realleges, and incorporates by reference each of the foregoing allegations as though fully set forth herein.

389.     HomeAdvisor is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 35-214.

390.     ANGI is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 5, 19, 36-158, 218-229.

391.     HomeAdvisor and ANGI concealed and made misrepresentations of material facts concerning the nature of the membership programs – namely that the Leads were not from serious, project-ready homeowners and were sent to more than four HSPs – and the inclusion of the mHelpDesk in the membership programs and the monthly fees charged for mHelpDesk. Specifically, HomeAdvisor and ANGI knew (or should have known) that the membership programs were not of the nature that was advertised, including the nature and quality of the Leads and that mHelpDesk was included in the membership programs for an additional monthly fee. HomeAdvisor and ANGI concealed material facts and/or made the material misrepresentations in order to boost the sales of membership programs and Leads.

392.     HomeAdvisor and ANGI knew that Plaintiff Ervine and Florida Class Members

relied upon such material representations about the Leads, and HomeAdvisor and ANGI omitted material information and/or made such material representations to induce Plaintiff Ervine and members of the Florida Class to act, *i.e.* to pay for a membership program to get access to the Leads.   Moreover, to pay for the Leads, the HSPs were required to provide either a checking/savings account from which HomeAdvisor and ANGI can automatically debit all Membership Fees and Lead fees, or a credit card on which HomeAdvisor can automatically charge such fees.   Then, *on a weekly basis,* HomeAdvisor and ANGI automatically charged the HSPs for each Lead sent. The fee for each Lead is automatically charged to the HSPs' credit cards and/or debited from his/her/its debit accounts.   Consequently, the viability, accuracy, seriousness, qualified nature and limited distribution of each Lead are material to the HSPs.

393.   The representations about the Leads and the omissions about the Leads were material to Plaintiff Ervine and the Florida Class, such that, had Plaintiff Ervine and the Florida Class known that the representations were false and HomeAdvisor and ANGI have omitted material information, Plaintiff Ervine and the Florida Class would not have purchased a Membership Program and provided HomeAdvisor and ANGI with the means to charge their credit card and/or debit their bank accounts.   But Plaintiff Ervine and the Florida Class did not know the true facts, and relied upon the material representations and omissions made by HomeAdvisor and ANGI.

394.   Plaintiff Ervine and the members of the Florida Class had no way of knowing that HomeAdvisor's and ANGI's representations were false and gravely misleading, or that HomeAdvisor and ANGI had omitted imperative details. Plaintiff Ervine and the members of the Florida Class did not, and could not, unravel HomeAdvisor's and ANGI's deception on their

own.

395.     HomeAdvisor and ANGI knew their statements were false, and intended that Plaintiff Ervine and the members of the Florida Classes would rely upon the false representations.

396.     HomeAdvisor and ANGI concealed and failed to disclose to Plaintiff Ervine and members of the Florida Class that, despite their affirmative representations about the services, including the Leads, they would charge Plaintiff Ervine and the members of the Florida Class for unqualified Leads and mHelpDesk.  HomeAdvisor and ANGI concealed these material facts with the intention that Plaintiff Ervine and the members of the Florida Class would act.

397.     As a result of HomeAdvisor's and ANGI's fraudulent representations and omissions, Plaintiff Ervine and the members of the Florida Class were induced into the purchase of goods and/or services that they otherwise would not have purchased, or would have paid less, and have suffered injury, harm and damages as described herein.

398.     HomeAdvisor's and ANGI's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff Ervine's and the Florida Class' rights and well-being to enrich HomeAdvisor and ANGI. HomeAdvisor's and ANGI's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT XIV
### Aiding and Abetting Fraud/Fraudulent Concealment
### (On Behalf of Plaintiff Ervine and the Florida Class)

399.     Plaintiff Ervine repeats, realleges, and incorporates by reference each of the foregoing allegations as though fully set forth herein.

131

400.    IAC is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 18, 38, 102, 206-229.

401.    HomeAdvisor and ANGI committed fraud resulting in injury to Plaintiff Ervine and the Florida Class, as alleged herein.  IAC's conduct alleged herein enabled, substantially assisted, encouraged, and was a substantial factor in the commission of such fraud.

402.    As a result of its control over HomeAdvisor's business operations, IAC knew or was aware that HomeAdvisor and ANGI concealed and made misrepresentations of material facts concerning the nature of the membership programs – namely that the Leads were not from serious, project-ready homeowners and were sent to more than four HSPs – and the inclusion of the mHelpDesk in the membership programs and the monthly fees charged for mHelpDesk. Specifically, IAC knew (or should have known) that the membership programs were not of the nature that HomeAdvisor and ANGI advertised, including the nature and quality of the Leads and that mHelpDesk was included in the membership programs for an additional monthly fee. IAC aided and abetted HomeAdvisor's and ANGI's concealment of material facts and/or material misrepresentations in order to boost the sales of membership programs and Leads.

403.    As a result of its control over HomeAdvisor's business operations, IAC knew or was aware Plaintiff Ervine and the Florida Class Members relied upon such material representations about the Leads, and HomeAdvisor and ANGI omitted material information and/or made such material representations to induce Plaintiffs and members of the Florida Class to act, i.e. to pay for a membership program to get access to the Leads.  Moreover, to pay for the Leads, the HSPs were required to provide either a checking/savings account from which HomeAdvisor and ANGI can automatically debit all Membership Fees and Lead fees, or a credit

card on which HomeAdvisor can automatically charge such fees.   Then, on a weekly basis, HomeAdvisor and ANGI automatically charged the HSPs for each Lead sent. The fee for each Lead is automatically charged to the HSPs' credit cards and/or debited from his/her/its debit accounts.   Consequently, IAC knew, or was aware, that the viability, accuracy, seriousness, qualified nature and limited distribution of each Lead are material to the HSPs.

404.    As a result of its control of HomeAdvisor's business operations, IAC had actual knowledge, or should have known, of measures it could have taken to prevent HomeAdvisor and ANGI from utilizing fraudulent misrepresentations and ommissions to sell Memberships and Leads and to provide HSPs with accurate information but nevertheless chose to maintain policies that enabled and assisted the fraud.

405.    Before and during the commission of the fraud, IAC intended to aid and abet, and did substantially assist, HomeAdvisor and ANGI in the fraud perpetrated on Plaintiff Ervine and the Florida Class by making statements about the quality of the Leads in regulatory filings and concealing material information about the quality and nature of the Leads.

406.    IAC's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff Ervine's and the Florida Class' rights and well-being to enrich IAC.

## COUNT XV
### Breach Of Implied Contract
### (On Behalf of Plaintiff Ervine and the Florida Class)

407.    Plaintiff Ervine repeats, realleges and incorporates by reference each of the foregoing allegations as though fully set forth herein.

408.    HomeAdvisor is named as a Defendant in this Count by virtue of its conduct

summarized as follows and set forth in greater detail at ¶¶ 35-214.

409.     Plaintiff Ervine and the members of the Florida Class paid money to HomeAdvisor in exchange for Leads.

410.     An implied contract was created between HomeAdvisor and the HSPs whereby HomeAdvisor was to send and charge Plaintiff Ervine and HSPs for Leads that were from targeted, serious, qualified and/or project-ready homeowners.

411.     Plaintiff Ervine and the members of the Florida Class paid an annual fee to join a HomeAdvisor Membership Program and paid hundreds and thousands of dollars for Leads.

412.     The Leads, as well as HomeAdvisor's Lead generation process, however, are systemically flawed and HomeAdvisor does not and cannot generate Leads of targeted, serious, qualified and project-ready homeowners.

413.     The Leads were not of the nature and quality of the Leads that were required, yet HomeAdvisor sent to and charged the HSPs for such Leads.  HomeAdvisor did not generate Leads for the Home Services Professionals that were targeted and from serious, qualified or project-ready homeowners. Also, HomeAdvisor charged Plaintiff Ervine and the members of the Florida Class for Leads that have been sent to more than four HSPs. HomeAdvisor also charged HSPs for mHelpDesk without knowledge or consent of the HSPs.  Furthermore, HomeAdvisor systemically disregarded the parameters and limits placed on the type and number of Leads to be charged to HSPs.  Finally, HomeAdvisor employed tactics that prevent HSPs from canceling their membership and Leads, and from disputing the propriety of a Lead in order to secure a refund.

414.     Accordingly, HomeAdvisor has breached the implied contract that was formed

between it and Plaintiff Ervine and members of the Florida Class.

415.     As a result, Plaintiff Ervine and members of the Florida Class have been harmed and/or injured have incurred economic damages as a proximate and direct result of the breach by HomeAdvisor.

**COUNT XVI**
**Unjust Enrichment/Restitution**
**(On Behalf of Plaintiff Ervine and the Florida Class)**

416.     Plaintiff Ervine repeats, realleges and incorporates by reference each of the foregoing allegations as though fully set forth herein.

417.     HomeAdvisor is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 35-214.

418.     IAC is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 18, 38, 102, 206-229.

419.     ANGI is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 5, 19, 36-158, 218-229.

420.     As the intended and expected result of their conscious wrongdoing, HomeAdvisor, ANGI and IAC have profited and benefited from Plaintiff Ervine and the Florida Class' purchase of the Membership Programs and payment for the Leads and mHelpDesk.

421.     HomeAdvisor, ANGI and IAC have voluntarily accepted and retained these profits and benefits, with full knowledge and awareness that, as a result of HomeAdvisor's, ANGI's and IAC's misconduct alleged herein, Plaintiff Ervine and the Florida Class were not receiving services of the quality, nature, fitness, or value that had been represented by HomeAdvisor, and that a reasonable consumer would expect.

135

422.     HomeAdvisor, ANGI and IAC have been unjustly enriched by their fraudulent and deceptive conduct and withholding of benefits to Plaintiff Ervine and the Florida Class, at the expense of these parties.

423.     Equity and good conscience militate against permitting HomeAdvisor, ANGI and IAC to retain these profits and benefits, and permitting HomeAdvisor, ANGI and IAC to do so would be unjust and inequitable because of HomeAdvisor's, ANGI's and IAC's misrepresentations and misconduct against Plaintiff Ervine and members of the Florida Class, as alleged herein.

424.     Because HomeAdvisor's, ANGI's and IAC's retention of the non-gratuitous benefit conferred upon them by Plaintiff Ervine and the members of the Florida Class is unjust and inequitable, HomeAdvisor, ANGI and IAC must pay restitution to Plaintiff Ervine and members of the Florida Class, as ordered by the Court.

**Idaho**

**COUNT XVII**
**Violations of the Idaho Consumer Protection Act,**
**Idaho Civ. Code, § 480,** *et seq.*
**(On Behalf of Plaintiff Haukenes and the Idaho Class)**

425.     Plaintiff Haukenes realleges and incorporates by reference all paragraphs as though fully set forth herein.

426.     HomeAdvisor is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 35-214.

427.     ANGI is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 5, 19, 36-158, 218-229.

428.     HomeAdvisor and ANGI and Plaintiff Haukenes are "persons" under Idaho Civil

Code § 48-602(1).

429.     HomeAdvisor and ANGI engaged in unfair methods and practices in the conduct of trade or commerce in violation of the Idaho Consumer Protection Act ("ICPA"), Idaho Civ. Code § 48-603, including:

a.     Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, connection, qualifications or license that he does not have;

b.     Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;

c.     Advertising goods or services with intent not to sell them as advertised;

d.     Engaging in any act or practice which is otherwise misleading, false, or deceptive to the consumer; or

e.     Engaging in any unconscionable method, act or practice in the conduct of trade or commerce.

430.     As set forth herein, HomeAdvisor and ANGI engaged in unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of trade or commerce in violation of the ICPA.   HomeAdvisor and ANGI willfully failed to disclose and actively concealed material facts regarding the true nature of the membership programs, including the nature and quality of the Leads and that the HSPs would be signed up and charged for mHelpDesk.   Accordingly, HomeAdvisor and ANGI engaged in deceptive trade practices, including knowingly making false and misleading statements and/or omitting material

information of the true nature of the membership programs, including the nature and quality of the Leads and the charges associated with mHelpDesk and that they did not contain the qualities or characteristics, or perform, as advertised. HomeAdvisor and ANGI intentionally concealed the foregoing from Plaintiff Haukenes and the Idaho Class; and/or HomeAdvisor and ANGI made incomplete representations about the Leads while purposefully withholding and omitting material facts from and the Class that contradicted these representations.

431.    HomeAdvisor's and ANGI's misleading, false, or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff Haukenes.

432.    As a result of its violations of the ICPA detailed above, HomeAdvisor and ANGI caused actual damage and ascertainable loss to Plaintiff Haukenes.

433.    HomeAdvisor's and ANGI'S deliberate, widespread and systematic business practices are so egregious and carried out with such willful and conscious disregard of the rights of its customers that its sales conduct would outrage or offend the public conscience, and is therefore an unconscionable method, act or practice under the ICPA as provided in Idaho Civil Code § 48-603C.

434.    Plaintiff Haukenes seeks punitive damages against HomeAdvisor and ANGI because their violations were repeated and flagrant, conducted over the course of many years, with knowledge of the illegality of the conduct, and therefore warrants the imposition of punitive damages under Idaho Civil Code § 48-608(1).

435.    Plaintiff Haukenes further seeks an order enjoining HomeAdvisor's and ANGI's unfair or deceptive acts or practices, punitive damages, costs of Court, attorney's fees under Idaho Civil Code § 48-608, and any other just and proper relief available under the ICPA.

**COUNT XVIII**
**Fraud/Fraudulent Concealment**
**(On Behalf of Plaintiff Haukenes and the Idaho Class)**

436.     Plaintiff Haukenes repeats, realleges, and incorporates by reference each of the foregoing allegations as though fully set forth herein.

437.     HomeAdvisor is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 35-214.

438.     ANGI is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 5, 19, 36-158, 218-229.

439.     HomeAdvisor and ANGI concealed and made misrepresentations of material facts concerning the nature of the membership programs, including the nature and quality of the Leads – namely that the Leads were not from serious, project-ready homeowners and were sent to more than four HSPs – and the inclusion of the mHelpDesk in the membership programs and the monthly fees charged for mHelpDesk. Specifically, HomeAdvisor and ANGI knew (or should have known) that the membership programs were not of the nature that was advertised, including the nature and quality of the Leads and that mHelpDesk was included in the membership programs for an additional monthly fee. HomeAdvisor and ANGI concealed material facts and/or made the material misrepresentations in order to boost the sales of membership programs and Leads.

440.     HomeAdvisor and ANGI knew that Plaintiff Haukenes and Idaho Class Members relied upon such material representations about the Leads, and HomeAdvisor omitted material information and/or made such material representations to induce Plaintiff Haukenes and members of the Idaho Class to act, *i.e.* to pay for a membership program to get access to the

Leads.   Moreover, to pay for the Leads, the HSPs were required to provide either a checking/savings account from which HomeAdvisor and ANGI can automatically debit all membership fees and Lead fees, or a credit card on which HomeAdvisor can automatically charge such fees.   Then, *on a weekly basis,* HomeAdvisor and ANGI automatically charged the HSPs for each Lead sent. The fee for each Lead is automatically charged to the HSPs' credit cards and/or debited from his/her/its debit accounts.   Consequently, the viability, accuracy, seriousness, qualified nature and limited distribution of each Lead are material to the HSPs.

441.   The representations about the Leads and the omissions about the Leads were material to Plaintiff Haukenes, such that, had Plaintiff Haukenes known that the representations were false and HomeAdvisor had omitted material information, Plaintiff Haukenes would not have purchased a Membership Program and provided HomeAdvisor with the means to charge their credit card and/or debit their bank accounts.   But Plaintiff Haukenes and the Idaho Class did not know the true facts, and relied upon the material representations and omissions made by HomeAdvisor and ANGI.

442.   Plaintiff Haukenes and the members of the Idaho Class had no way of knowing that HomeAdvisor's and ANGI's representations were false and gravely misleading, or that HomeAdvisor and ANGI had omitted imperative details. Plaintiff Haukenes and the members of the Idaho Class did not, and could not, unravel HomeAdvisor's and ANGI's deception on their own.

443.   HomeAdvisor and ANGI knew their statements were false, and intended that Plaintiff Haukenes and the members of the Idaho Class would rely upon the false representations.

444.     HomeAdvisor and ANGI concealed and failed to disclose to Plaintiff Haukenes and members of the Idaho Class that, despite their affirmative representations about the membership programs, including the Leads, they would charge Plaintiff Haukenes and the members of the Idaho Class for unqualified Leads and mHelpDesk.  HomeAdvisor and ANGI concealed these material facts with the intention that Plaintiff Haukenes and the members of the Idaho Class would act.

445.     As a result of HomeAdvisor's and ANGI's fraudulent representations and omissions, Plaintiff Haukenes and the members of the Idaho Class were induced into the purchase of goods and/or services that they otherwise would not have purchased, or would have paid less, and have suffered injury, harm and damages as described herein.

446.     HomeAdvisor's and ANGI's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff Haukenes' and the Idaho Class' rights and well-being to enrich HomeAdvisor and ANGI. HomeAdvisor's and ANGI's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

### COUNT XIX
### Aiding and Abetting Fraud/Fraudulent Concealment
### (On Behalf of Plaintiff Haukenes and the Idaho Class)

447.     Plaintiffs Haukenes repeats, realleges, and incorporates by reference each of the foregoing allegations as though fully set forth herein.

448.     IAC is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 18, 38, 102, 206-229.

449.     HomeAdvisor and ANGI committed fraud resulting in injury to Plaintiff

Haukenes and the Idaho Class, as alleged herein. IAC's conduct alleged herein enabled, substantially assisted, encouraged, and was a substantial factor in the commission of such fraud.

450. As a result of its control over HomeAdvisor's business operations, IAC knew or was aware that HomeAdvisor and ANGI concealed and made misrepresentations of material facts concerning the nature of the membership programs, including the nature and quality of the Leads – namely that the Leads were not from serious, project-ready homeowners and were sent to more than four HSPs – and the inclusion of the mHelpDesk in the membership programs and the monthly fees charged for mHelpDesk. Specifically, IAC knew (or should have known) that the membership programs were not of the nature that HomeAdvisor and ANGI advertised, including the nature and quality of the Leads and that mHelpDesk was included in the Membership Programs for an additional monthly fee. IAC aided and abetted HomeAdvisor's and ANGI's concealment of material facts and/or material misrepresentations in order to boost the sales of Membership Programs and Leads.

451. As a result of its control over HomeAdvisor's business operations, IAC knew or was aware Plaintiff Haukenes and Idaho Class Members relied upon such material representations about the Leads, and HomeAdvisor and ANGI omitted material information and/or made such material representations to induce Plaintiffs and members of the Idaho Class to act, i.e. to pay for a Membership Program to get access to the Leads. Moreover, to pay for the Leads, the HSPs were required to provide either a checking/savings account from which HomeAdvisor and ANGI can automatically debit all Membership Fees and Lead fees, or a credit card on which HomeAdvisor can automatically charge such fees. Then, on a weekly basis, HomeAdvisor and ANGI automatically charged the HSPs for each Lead sent. The fee for each

Lead is automatically charged to the HSPs' credit cards and/or debited from his/her/its debit accounts.  Consequently, IAC knew, or was aware, that the viability, accuracy, seriousness, qualified nature and limited distribution of each Lead are material to the HSPs.

452.    As a result of its control over HomeAdvisor's business operations, IAC had actual knowledge, or should have known, of measures it could have taken to prevent HomeAdvisor and ANGI from utilizing fraudulent misrepresentations and ommissions to sell Memberships and Leads and to provide HSPs with accurate information but nevertheless chose to maintain policies that enabled and assisted the fraud.

453.    Before and during the commission of the fraud, IAC intended to aid and abet, and did substantially assist, HomeAdvisor and ANGI in the fraud perpetrated on Plaintiff Haukenes and the Idaho Class by making statements about the quality of the Leads in regulatory filings and concealing material information about the quality and nature of the Leads.

454.    IAC's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff Haukenes' and the Idaho Class' rights and well-being to enrich IAC.

## COUNT XX
### Breach Of Implied Contract
### (On Behalf of Plaintiff Haukenes and the Idaho Class)

455.    Plaintiff Haukenes repeats, realleges and incorporates by reference each of the foregoing allegations as though fully set forth herein.

456.    HomeAdvisor is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 35-214.

457.    Plaintiff Haukenes and the members of the Idaho Class paid money to

HomeAdvisor in exchange for Leads.

458.    An implied contract was created between HomeAdvisor and the HSPs whereby HomeAdvisor was to send and charge Plaintiff Haukenes and HSPs for Leads that were from targeted, serious, qualified and/or project-ready homeowners.

459.    The Plaintiff Haukenes and the members of the Idaho Class paid an annual fee to join a HomeAdvisor membership program and paid hundreds and thousands of dollars for Leads.

460.    The Leads, as well as HomeAdvisor's Lead generation process, however, are systemically flawed and HomeAdvisor does not and cannot generate Leads of targeted, serious, qualified and project-ready homeowners.

461.    The Leads were not of the nature and quality of the Leads that were required, yet HomeAdvisor sent to and charged the HSPs for such Leads.  HomeAdvisor did not generate Leads for the Home Services Professionals that were targeted and from serious, qualified or project-ready homeowners. Also, HomeAdvisor charged Plaintiff Haukenes and the members of the Idaho Class for Leads that have been sent to more than four HSPs.  HomeAdvisor also charged HSPs for mHelpDesk without knowledge or consent of the HSPs.  Furthermore, HomeAdvisor systemically disregarded the parameters and limits placed on the type and number of Leads to be charged to HSPs.  Finally, HomeAdvisor employed tactics that prevent HSPs from canceling their membership and Leads, and from disputing the propriety of a Lead in order to secure a refund.

462.    Accordingly, HomeAdvisor has breached the implied contract that was formed between it and Plaintiff Haukenes and members of the Idaho Class.

463.    As a result, Plaintiff Haukenes and members of the Idaho Class have been harmed

and/or injured have incurred economic damages as a proximate and direct result of the breach by HomeAdvisor.

## COUNT XXI
### Unjust Enrichment/Restitution
### (On Behalf of Plaintiff Haukenes and the Idaho Class)

464.     Plaintiff Haukenes repeats, realleges and incorporates by reference each of the foregoing allegations as though fully set forth herein.

465.     HomeAdvisor is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 35-214.

466.     IAC is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 18, 38, 102, 206-229.

467.     ANGI is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 5, 19, 36-158, 218-229.

468.     As the intended and expected result of their conscious wrongdoing HomeAdvisor, ANGI and IAC have profited and benefited from Plaintiff Haukenes and the Idaho Class' purchase of the membership programs and payment for the Leads and mHelpDesk.

469.     HomeAdvisor, ANGI and IAC have voluntarily accepted and retained these profits and benefits, with full knowledge and awareness that, as a result of HomeAdvisor's, ANGI's and IAC's misconduct alleged herein, Plaintiff Haukenes and the Idaho Class were not receiving services of the quality, nature, fitness, or value that had been represented by HomeAdvisor, and that a reasonable consumer would expect.

470.     HomeAdvisor, ANGI and IAC have been unjustly enriched by their fraudulent and deceptive conduct and withholding of benefits to Plaintiff Haukenes and the Idaho Class, at

the expense of these parties.

471.    Equity and good conscience militate against permitting HomeAdvisor, ANGI and IAC to retain these profits and benefits, and permitting HomeAdvisor, ANGI and IAC to do so would be unjust and inequitable because of HomeAdvisor's, ANGI's and IAC's misrepresentations and misconduct against Plaintiff Haukenes and members of the Idaho Class, as alleged herein.

472.    Because HomeAdvisor, ANGI and IAC retention of the non-gratuitous benefit conferred upon it by Plaintiff Haukenes and the members of the Idaho Class is unjust and inequitable, HomeAdvisor, ANGI and IAC must pay restitution to Plaintiff Haukenes and members of the Idaho Class, as ordered by the Court.

**Illinois**

**COUNT XXII**
**Violations Of The Illinois Uniform Deceptive**
**Trade Practices Act ("Illinois DTPA")**
**815 Ill. Comp. Stat. §§ 510/1, *et seq.***
**(On Behalf of Plaintiff Filipiak and the Illinois Class)**

473.    Plaintiff Filipiak repeats and realleges the allegations above as if fully set forth herein.

474.    HomeAdvisor is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 35-214.

475.    ANGI is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 5, 19, 36-158, 218-229.

476.    This claim is brought on behalf of Plaintiff Filipiak and the Illinois Class.

477.    The Illinois DTPA prohibits deceptive trade practices, including among others,

146

(a)      Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

(b)      Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have;

(c)      Representing that goods or services are of a particular standard, quality, or grade if they are of another;

(d)      Advertising goods or services with intent not to sell them as advertised; and

(e)      Engaging in any other conduct which similarly creates a likelihood of confusion or misunderstanding.

478.      HomeAdvisor and ANGI are a "person" as defined in 815 Ill. Comp. Stat. § 510/1(5).

479.      In the course of HomeAdvisor's business, HomeAdvisor and ANGI knowingly or willfully concealed, suppressed or failed to disclose material facts from Plaintiff Filipiak and the members of the Illinois Class and by making affirmative misrepresentations in order to induce Plaintiff Filipiak and members of the Illinois Class to pay for a Membership Program to get access to the Leads. Accordingly, HomeAdvisor and ANGI engaged in deceptive trade practices as defined in 815 Ill. Comp. Stat. § 510/2, including representing that the Leads have characteristics, uses, benefits, and qualities which they do not have; representing that the Leads are of a particular standard and quality when they are not; advertising the Leads with the intent not to sell them as advertised; and otherwise engaging in conduct likely to deceive.

480.      HomeAdvisor and ANGI intended for Plaintiff Filipiak and the other Illinois Class members to rely on its aforementioned unfair and deceptive acts and practices, including

the misrepresentations and omissions alleged herein above.

481.     HomeAdvisor's and ANGI actions as set forth above occurred in the conduct of trade or commerce.

482.     HomeAdvisor and ANGI knew or should have known that its conduct violated the Illinois DTPA.

483.     HomeAdvisor and ANGI owed Plaintiff a duty to disclose the true nature of the membership programs, including the nature and quality of the Leads and that the HSPs would be signed up and charged for mHelpDesk because HomeAdvisor and ANGI possessed exclusive knowledge of the true nature of the membership programs, including the quality of the quality of the Leads and the charges associated with mHelpDesk and that they did not contain the qualities or characteristics, or perform, as advertised; HomeAdvisor and ANGI intentionally concealed the foregoing from Plaintiff Filipiak and the Illinois Class; and/or HomeAdvisor and ANGI made incomplete representations about the Leads while purposefully withholding and omitting material facts from and the Class that contradicted these representations.

484.     HomeAdvisor's and ANGI's conduct and false representations/omissions were material to Plaintiff Filipiak and the Illinois Class.

485.     Plaintiff and the Illinois Class suffered ascertainable loss caused by HomeAdvisor's and ANGI's concealment of and failure to disclose material information. Class members who purchased a Membership Program or Leads either would have paid less for the Membership Program or Leads or would not have purchased a Membership Program or Leads at all but for HomeAdvisor's and ANGI's violations of the Illinois DTPA.

486.     HomeAdvisor and ANGI had an ongoing duty to consumers to refrain from

148

unfair and deceptive acts and practices under the Illinois DTPA. All HSPs who signed up for a Membership Program or purchased Leads suffered ascertainable loss as a result of HomeAdvisor's and ANGI's deceptive and unfair acts and practices made in the course of HomeAdvisor's business.

487.     HomeAdvisor's and ANGI's conduct alleged herein proximately caused injuries to Plaintiff Filipiak and the other Class members.

488.     Plaintiff Filipiak and the other Illinois Class members were injured as a result of HomeAdvisor's and ANGI's conduct in that Plaintiff Filipiak and the other Class members overpaid for a Membership Program or Leads and did not receive the benefit of their bargain. These injuries are the direct and natural consequence of HomeAdvisor's and ANGI's omissions in violation of the Illinois DTPA.

489.     Pursuant to 815 Ill. Comp. Stat. § 510/3, Plaintiff and the Class are entitled to an award of injunctive relief to prevent HomeAdvisor's and ANGI's deceptive trade practices and, because HomeAdvisor's and ANGI's conduct was willful, an award of reasonable attorneys' fees.

**COUNT XXIII**
**Fraud/Fraudulent Concealment**
**(On Behalf of Plaintiff Filipiak and the Illinois Class)**

490.     Plaintiff Filipiak repeats, realleges, and incorporates by reference each of the foregoing allegations as though fully set forth herein.

491.     HomeAdvisor is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 35-214.

492.     ANGI is named as a Defendant in this Count by virtue of its conduct summarized

as follows and set forth in greater detail at ¶¶ 5, 19, 36-158, 218-229.

493.    HomeAdvisor and ANGI concealed and made misrepresentations of material facts concerning the nature of the membership programs, including the nature and quality of the Leads – namely that the Leads were not from serious, project-ready homeowners and were sent to more than four HSPs – and the inclusion of the mHelpDesk in the membership programs and the monthly fees charged for mHelpDesk. Specifically, HomeAdvisor and ANGI knew (or should have known) that the membership programs, were not of the nature that was advertised, including the nature and quality of the Leads and that mHelpDesk was included in the membership programs for an additional monthly fee. HomeAdvisor and ANGI concealed material facts and/or made the material misrepresentations in order to boost the sales of Membership Programs and Leads.

494.    HomeAdvisor and ANGI knew that Plaintiff Filipiak and Illinois Class Members relied upon such material representations about the Leads, and HomeAdvisor and ANGI omitted material information and/or made such material representations to induce Plaintiff Filipiak and members of the Illinois Class to act, *i.e.* to pay for a membership program to get access to the Leads.    Moreover, to pay for the Leads, the HSPs were required to provide either a checking/savings account from which HomeAdvisor and ANGI can automatically debit all Membership Fees and Lead fees, or a credit card on which HomeAdvisor and ANGI can automatically charge such fees.    Then, *on a weekly basis,* HomeAdvisor and ANGI automatically charged the HSPs for each Lead sent. The fee for each Lead is automatically charged to the HSPs' credit cards and/or debited from his/her/its debit accounts.  Consequently, the viability, accuracy, seriousness, qualified nature and limited distribution of each Lead are

material to the HSPs.

495.    The representations about the Leads and the omissions about the Leads were material to Plaintiff Filipiak and the Illinois Class, such that, had Plaintiff Filipiak and the Illinois Class known that the representations were false and HomeAdvisor had omitted material information, Plaintiff Filipiak and the Illinois Class would not have purchased a Membership Program and provided HomeAdvisor with the means to charge their credit card and/or debit their bank accounts.  But Plaintiff Filipiak and the Illinois Class did not know the true facts, and relied upon the material representations and omissions made by HomeAdvisor.

496.    Plaintiff Filipiak and the members of the Illinois Class had no way of knowing that HomeAdvisor's and ANGI's representations were false and gravely misleading, or that HomeAdvisor and ANGI had omitted imperative details. Plaintiff Filipiak and the members of the Illinois Class did not, and could not, unravel HomeAdvisor's and ANGI's deception on their own.

497.    HomeAdvisor and ANGI knew their statements were false, and intended that Plaintiff Filipiak and the members of the Illinois Class would rely upon the false representations.

498.    HomeAdvisor and ANGI concealed and failed to disclose to Plaintiff Filipiak and members of the Illinois Class that, despite their affirmative representations about the membership programs, including the Leads, they would charge Plaintiff Filipiak and the members of the Illinois Class for unqualified Leads and mHelpDesk.  HomeAdvisor and ANGI concealed these material facts with the intention that Plaintiff Filipiak and the members of the Illinois Class would act.

499.    As a result of HomeAdvisor's and ANGI's fraudulent representations and

omissions, Plaintiff Filipiak and the members of the Illinois Class were induced into the purchase

of goods and/or services that they otherwise would not have purchased, or would have paid less,

and have suffered injury, harm and damages as described herein.

500.    HomeAdvisor's and ANGI's acts were done maliciously, oppressively,

deliberately, with intent to defraud, and in reckless disregard of Plaintiff Filipiak' and the Illinois

Class' rights and well-being to enrich HomeAdvisor and ANGI. HomeAdvisor's and ANGI's

conduct warrants an assessment of punitive damages in an amount sufficient to deter such

conduct in the future, which amount is to be determined according to proof.

**COUNT XXIV**
**Aiding and Abetting Fraud/Fraudulent Concealment**
**(On Behalf of Plaintiff Filipiak and the Illinois Class)**

501.    Plaintiffs Filipiak repeats, realleges, and incorporates by reference each of the

foregoing allegations as though fully set forth herein.

502.    IAC is named as a Defendant in this Count by virtue of its conduct summarized as

follows and set forth in greater detail at ¶¶ 18, 38, 102, 206-229.

503.    HomeAdvisor and ANGI committed fraud resulting in injury to Plaintiff Filipiak

and the Illinois Class, as alleged herein.  IAC's conduct alleged herein enabled, substantially

assisted, encouraged, and was a substantial factor in the commission of such fraud.

504.    As a result of its control over HomeAdvisor's business operations, IAC knew or

was aware that HomeAdvisor and ANGI concealed and made misrepresentations of material

facts concerning the nature and quality of the membership programs, including the nature and

quality of the Leads – namely that the Leads were not from serious, project-ready homeowners

and were sent to more than four HSPs – and the inclusion of the mHelpDesk in the membership

programs and the monthly fees charged for mHelpDesk. Specifically, IAC knew (or should have known) that the membership programs were not of the nature that HomeAdvisor and ANGI advertised, including the nature and quality of the Leads and that mHelpDesk was included in the membership programs for an additional monthly fee. IAC aided and abetted HomeAdvisor's and ANGI's concealment of material facts and/or material misrepresentations in order to boost the sales of membership programs and Leads.

505.    As a result of its control over HomeAdvisor's business operations, IAC knew or was aware Plaintiff Filipiak and the Illinois Class Members relied upon such material representations about the Leads, and HomeAdvisor and ANGI omitted material information and/or made such material representations to induce Plaintiffs and members of the Illinois Class to act, i.e. to pay for a membership program to get access to the Leads. Moreover, to pay for the Leads, the HSPs were required to provide either a checking/savings account from which HomeAdvisor and ANGI can automatically debit all Membership Fees and Lead fees, or a credit card on which HomeAdvisor can automatically charge such fees. Then, on a weekly basis, HomeAdvisor and ANGI automatically charged the HSPs for each Lead sent. The fee for each Lead is automatically charged to the HSPs' credit cards and/or debited from his/her/its debit accounts. Consequently, IAC knew, or was aware, that the viability, accuracy, seriousness, qualified nature and limited distribution of each Lead are material to the HSPs.

506.    As a result of its control over HomeAdvisor's business operations, IAC had actual knowledge, or should have known, of measures it could have taken to prevent HomeAdvisor and ANGI from utilizing fraudulent misrepresentations and ommissions to sell Memberships and Leads and to provide HSPs with accurate information but nevertheless chose to maintain policies

that enabled and assisted the fraud.

507.    Before and during the commission of the fraud, IAC intended to aid and abet, and did substantially assist, HomeAdvisor and ANGI in the fraud perpetrated on Plaintiff Filipiak and the Illinois Class by making statements about the quality of the Leads in regulatory filings and concealing material information about the quality and nature of the Leads.

508.    IAC's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff Filipiak's and the Illinois Class' rights and well-being to enrich IAC.

**COUNT XXV**
**Breach Of Implied Contract**
**(On Behalf of Plaintiff Filipiak and the Illinois Class)**

509.    Plaintiff Filipiak repeats, realleges and incorporates by reference each of the foregoing allegations as though fully set forth herein.

510.    HomeAdvisor is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 35-214.

511.    Plaintiff Filipiak and the members of the Illinois Class paid money to HomeAdvisor in exchange for Leads.

512.    An implied contract was created between HomeAdvisor and the HSPs whereby HomeAdvisor was to send and charge Plaintiff Filipiak and HSPs for Leads that were from targeted, serious, qualified and/or project-ready homeowners.

513.    The Plaintiff Filipiak and the members of the Illinois Class paid an annual fee to join a HomeAdvisor Membership Program and paid hundreds and thousands of dollars for Leads.

514.    The Leads, as well as HomeAdvisor's Lead generation process, however, are systemically flawed and HomeAdvisor does not and cannot generate Leads of targeted, serious, qualified and project-ready homeowners.

515.    The Leads were not of the nature and quality of the Leads that were required, yet HomeAdvisor sent to and charged the HSPs for such Leads.  HomeAdvisor did not generate Leads for the Home Services Professionals that were targeted and from serious, qualified or project-ready homeowners. Also, HomeAdvisor charged Plaintiff Filipiak and the members of the Illinois Class for Leads that have been sent to more than four HSPs. HomeAdvisor also charged HSPs for mHelpDesk without knowledge or consent of the HSPs.  Furthermore, HomeAdvisor systemically disregarded the parameters and limits placed on the type and number of Leads to be charged to HSPs.  Finally, HomeAdvisor employed tactics that prevent HSPs from canceling their membership and Leads, and from disputing the propriety of a Lead in order to secure a refund.

516.    Accordingly, HomeAdvisor has breached the implied contract that was formed between it and Plaintiff Filipiak and members of the Illinois Class.

517.    As a result, Plaintiff Filipiak and members of the Illinois Class have been harmed and/or injured have incurred economic damages as a proximate and direct result of the breach by HomeAdvisor.

### COUNT XXVI
### Unjust Enrichment/Restitution
### (On Behalf of Plaintiff Filipiak and the Illinois Class)

518.    Plaintiff Filipiak repeats, realleges and incorporates by reference each of the foregoing allegations as though fully set forth herein.

519.    HomeAdvisor is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 35-214.

520.    IAC is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 18, 38, 102, 206-229.

521.    ANGI is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 5, 19, 36-158, 218-229.

522.    As the intended and expected result of their conscious wrongdoing, HomeAdvisor, ANGI and IAC have profited and benefited from Plaintiff Filipiak and the Illinois Class' purchase of the membership programs and payment for the Leads and mHelpDesk.

523.    HomeAdvisor, ANGI and IAC have voluntarily accepted and retained these profits and benefits, with full knowledge and awareness that, as a result of HomeAdvisor's, ANGI's and IAC's misconduct alleged herein, Plaintiff Filipiak and the Illinois Class were not receiving services of the quality, nature, fitness, or value that had been represented by HomeAdvisor, and that a reasonable consumer would expect.

524.    HomeAdvisor, ANGI and IAC have been unjustly enriched by their fraudulent and deceptive conduct and withholding of benefits to Plaintiff Filipiak and the Illinois Class, at the expense of these parties.

525.    Equity and good conscience militate against permitting HomeAdvisor, ANGI and IAC to retain these profits and benefits, and permitting HomeAdvisor, ANGI and IAC to do so would be unjust and inequitable because of HomeAdvisor's, ANGI's and IAC's misrepresentations and misconduct against Plaintiff Filipiak and members of the Illinois Class, as alleged herein.

526.    Because HomeAdvisor's, ANGI's and IAC's retention of the non-gratuitous benefit conferred upon it by Plaintiff Filipiak and the members of the Illinois Class is unjust and inequitable, HomeAdvisor, ANGI and IAC must pay restitution to Plaintiff Filipiak and members of the Illinois Class, as ordered by the Court.

**New Jersey**

**COUNT XXVII**
**Violations Of The New Jersey Consumer Fraud Act**
**N.J.S.A. §§ 56:8-1, *et seq.* ("NJCFA")**
**(On Behalf of Plaintiff Costello and the New Jersey Class)**

527.    Plaintiff Costello incorporates by reference all preceding allegations as though fully set forth herein.

528.    HomeAdvisor is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 35-214.

529.    ANGI is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 5, 19, 36-158, 218-229.

530.    Plaintiff Costello bring this Count on behalf of New Jersey Class members.

531.    The NJCFA prohibits the use or employment of any deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with the intent that others rely upon such concealment, suppression or omission in connection with the sale or advertisement of any good or services.

532.    HomeAdvisor and ANGI violated the NJCFA by, at minimum employing deception, deceptive acts or practices, fraud, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of the Membership Programs and Leads.

533.     In advertising and selling the Membership Programs containing the bogus Leads, falsely representing the quality and nature of the Leads; failing to disclose the cost of MHelp Desk; and misrepresenting the availability of refunds and/or credits HomeAdvisor and ANGI violated the N.J.S.A. by engaging in unconscionable, false, misleading or deceptive act(s) or practice(s), which were false or had the capacity to deceive.

534.     HomeAdvisor's and ANGI's actions as set forth above occurred in the conduct of trade or commerce.

535.     HomeAdvisor's and ANGI's unfair or deceptive acts or practices were likely to and did in fact deceive Plaintiff Costello and the New Jersey Class.

536.     HomeAdvisor and ANGI intentionally and knowingly omitted material facts regarding the Membership Programs and Leads with an intent to mislead Plaintiff Costello and the New Jersey Class.

537.     HomeAdvisor and ANGI knew or should have known that its conduct violated the NJCFA.

538.     HomeAdvisor and ANGI owed Plaintiff Costello and the New Jersey Class a duty to disclose the truth about the Membership Programs and quality of the Leads because HomeAdvisor:

a.     Possessed exclusive knowledge of the bogus nature of the Leads;

b.     Intentionally concealed the foregoing from Plaintiff Costello and the New Jersey Class; and/or

c.     Made incomplete representations regarding the Membership Programs and Leads, while purposefully withholding material facts from Plaintiff Costello and

the New Jersey Class including with respect to the nature and quality of the Leads.

539.    HomeAdvisor's and ANGI's conduct proximately caused injuries to Plaintiff Costello and the other Class members. Plaintiff Costello and the other New Jersey Class members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of HomeAdvisor's and ANGI's conduct in that Plaintiff Costello and the other New Jersey Class members overpaid for their Membership Programs and Leads and did not receive the benefit of their bargain.  These injuries are the direct and natural consequence of HomeAdvisor's and ANGI's concealment and omissions.

540.    HomeAdvisor's and ANGI's violations present a continuing risk to Plaintiff Costello as well as to the general public. HomeAdvisor's and ANGI's unlawful acts and practices complained of herein affect the public interest.

541.    Pursuant to N.J.S.A. § 56:8-20, Plaintiffs will serve the New Jersey Attorney General with a copy of this Complaint within 10 days of filing.

## COUNT XXVIII
### Fraud/Fraudulent Concealment
### (On Behalf of Plaintiff Costello and the New Jersey Class)

542.    Plaintiff Costello repeats, realleges, and incorporates by reference each of the foregoing allegations as though fully set forth herein.

543.    HomeAdvisor is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 35-214.

544.    ANGI is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 5, 19, 36-158, 218-229.

545.    HomeAdvisor and ANGI concealed and made misrepresentations of material facts concerning the nature of the membership programs, including the nature and quality of the Leads – namely that the Leads were not from serious, project-ready homeowners and were sent to more than four HSPs – and the inclusion of the mHelpDesk in the membership programs and the monthly fees charged for mHelpDesk. Specifically, HomeAdvisor and ANGI knew (or should have known) that the membership programs were not of the nature that was advertised, including the nature and quality of the Leads and that mHelpDesk was included in the membership programs for an additional monthly fee. HomeAdvisor and ANGI concealed material facts and/or made the material misrepresentations in order to boost the sales of membership programs and Leads.

546.    HomeAdvisor and ANGI knew that Plaintiff Costello and New Jersey Class Members relied upon such material representations about the Leads, and HomeAdvisor and ANGI omitted material information and/or made such material representations to induce Plaintiff Costello and members of the New Jersey Class to act, *i.e.* to pay for a Membership Program to get access to the Leads.  Moreover, to pay for the Leads, the HSPs were required to provide either a checking/savings account from which HomeAdvisor and ANGI can automatically debit all Membership Fees and Lead fees, or a credit card on which HomeAdvisor and ANGI can automatically charge such fees.   Then, *on a weekly basis,* HomeAdvisor and ANGI automatically charged the HSPs for each Lead sent. The fee for each Lead is automatically charged to the HSPs' credit cards and/or debited from his/her/its debit accounts.  Consequently, the viability, accuracy, seriousness, qualified nature and limited distribution of each Lead are material to the HSPs.

547. The representations about the Leads and the omissions about the Leads were material to Plaintiff Costello, such that, had Plaintiff Costello known that the representations were false and HomeAdvisor and ANGI had omitted material information, Plaintiff Costello would not have purchased a Membership Program and provided HomeAdvisor and ANGI with the means to charge their credit card and/or debit their bank accounts.  But Plaintiff Costello and the New Jersey Class did not know the true facts, and relied upon the material representations and omissions made by HomeAdvisor and ANGI.

548. Plaintiff Costello and the members of the New Jersey Class had no way of knowing that HomeAdvisor's and ANGI's representations were false and gravely misleading, or that HomeAdvisor and ANGI had omitted imperative details. Plaintiff Costello and the members of the New Jersey Class did not, and could not, unravel HomeAdvisor's deception on their own.

549. HomeAdvisor and ANGI knew their statements were false, and intended that Plaintiff Costello and the members of the Classes would rely upon the false representations.

550. HomeAdvisor and ANGI concealed and failed to disclose to Plaintiff Costello and members of the New Jersey Class that, despite their affirmative representations about the membership programs, including the Leads, they would charge Plaintiff Costello and the members of the New Jersey Class for unqualified Leads and mHelpDesk.  HomeAdvisor and ANGI concealed these material facts with the intention that Plaintiff Costello and the members of the New Jersey Class would act.

551. As a result of HomeAdvisor's and ANGI's fraudulent representations and omissions, Plaintiff Costello and the members of the New Jersey Class were induced into the purchase of goods and/or services that they otherwise would not have purchased, or would have

paid less, and have suffered injury, harm and damages as described herein.

552.     HomeAdvisor's and ANGI's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff Costello's and the New Jersey Class' rights and well-being to enrich HomeAdvisor and ANGI. HomeAdvisor's and ANGI's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT XXIX
### Aiding and Abetting Fraud/Fraudulent Concealment
### (On Behalf of Plaintiff Costello and the New Jersey Class)

553.     Plaintiffs Costello repeats, realleges, and incorporates by reference each of the foregoing allegations as though fully set forth herein.

554.     IAC is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 18, 38, 102, 206-229.

555.     HomeAdvisor and ANGI committed fraud resulting in injury to Plaintiff Costello and the New Jersey Class, as alleged herein.  IAC's conduct alleged herein enabled, substantially assisted, encouraged, and was a substantial factor in the commission of such fraud.

556.     As a result of its control over HomeAdvisor's business operations, IAC knew or was aware that HomeAdvisor and ANGI concealed and made misrepresentations of material facts concerning the nature of the membership programs, including the nature and quality of the Leads – namely that the Leads were not from serious, project-ready homeowners and were sent to more than four HSPs – and the inclusion of the mHelpDesk in the Membership Programs and the monthly fees charged for mHelpDesk. Specifically, IAC knew (or should have known) that the membership programs were not of the nature that HomeAdvisor and ANGI advertised,

including the nature and quality of the Leads and that mHelpDesk was included in the Membership Programs for an additional monthly fee. IAC aided and abetted HomeAdvisor's and ANGI's concealment of material facts and/or material misrepresentations in order to boost the sales of Membership Programs and Leads.

557. As a result of its control over HomeAdvisor's business operations, IAC knew or was aware Plaintiff Costello and the New Jersey Class Members relied upon such material representations about the Leads, and HomeAdvisor and ANGI omitted material information and/or made such material representations to induce Plaintiffs and members of the New Jersey Class to act, i.e. to pay for a Membership Program to get access to the Leads. Moreover, to pay for the Leads, the HSPs were required to provide either a checking/savings account from which HomeAdvisor and ANGI can automatically debit all Membership Fees and Lead fees, or a credit card on which HomeAdvisor can automatically charge such fees. Then, on a weekly basis, HomeAdvisor and ANGI automatically charged the HSPs for each Lead sent. The fee for each Lead is automatically charged to the HSPs' credit cards and/or debited from his/her/its debit accounts. Consequently, IAC knew, or was aware, that the viability, accuracy, seriousness, qualified nature and limited distribution of each Lead are material to the HSPs.

558. As a result of its control over HomeAdvisor's business operations, IAC had actual knowledge, or should have known, of measures it could have taken to prevent HomeAdvisor and ANGI from utilizing fraudulent misrepresentations and ommissions to sell Memberships and Leads and to provide HSPs with accurate information but nevertheless chose to maintain policies that enabled and assisted the fraud.

559. Before and during the commission of the fraud, IAC intended to aid and abet, and

did substantially assist, HomeAdvisor and ANGI in the fraud perpetrated on Plaintiff Costello and the New Jersey Class by making statements about the quality of the Leads in regulatory filings and concealing material information about the quality and nature of the Leads.

560.     IAC's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff Costello's and the New Jersey Class' rights and well-being to enrich IAC.

**COUNT XXX**
**Breach Of Implied Contract**
**(On Behalf of Plaintiff Costello and the New Jersey Class)**

561.     Plaintiff Costello repeats, realleges and incorporates by reference each of the foregoing allegations as though fully set forth herein.

562.     HomeAdvisor is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 35-214.

563.     Plaintiff Costello and the members of the New Jersey Class paid money to HomeAdvisor in exchange for Leads.

564.     An implied contract was created between HomeAdvisor and the HSPs whereby HomeAdvisor was to send and charge Plaintiff Costello and HSPs for Leads that were from targeted, serious, qualified and/or project-ready homeowners.

565.     The Plaintiff Costello and the members of the New Jersey Class paid an annual fee to join a HomeAdvisor Membership Program and paid hundreds and thousands of dollars for Leads.

566.     The Leads, as well as HomeAdvisor's Lead generation process, however, are systemically flawed and HomeAdvisor does not and cannot generate Leads of targeted, serious,

qualified and project-ready homeowners.

567.    The Leads were not of the nature and quality of the Leads that were required, yet HomeAdvisor sent to and charged the HSPs for such Leads.  HomeAdvisor did not generate Leads for the Home Services Professionals that were targeted and from serious, qualified or project-ready homeowners. Also, HomeAdvisor charged Plaintiff Costello and the members of the New Jersey Class for Leads that have been sent to more than four HSPs. HomeAdvisor also charged HSPs for mHelpDesk without knowledge or consent of the HSPs.  Furthermore, HomeAdvisor systemically disregarded the parameters and limits placed on the type and number of Leads to be charged to HSPs.  Finally, HomeAdvisor employed tactics that prevent HSPs from canceling their membership and Leads, and from disputing the propriety of a Lead in order to secure a refund.

568.    Accordingly, HomeAdvisor has breached the implied contract that was formed between it and Plaintiff Costello and members of the New Jersey Class.

569.    As a result, Plaintiff Costello and members of the New Jersey Class have been harmed and/or injured have incurred economic damages as a proximate and direct result of the breach by HomeAdvisor.

**COUNT XXXI**
**Unjust Enrichment/Restitution**
**(On Behalf of Plaintiff Costello and the New Jersey Class)**

570.    Plaintiff Costello repeats, realleges and incorporates by reference each of the foregoing allegations as though fully set forth herein.

571.    HomeAdvisor is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 35-214.

572.    IAC is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 18, 38, 102, 206-229.

573.    ANGI is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 5, 19, 36-158, 218-229.

574.    As the intended and expected result of their conscious wrongdoing, HomeAdvisor, ANGI and IAC have profited and benefited from Plaintiff Costello and the New Jersey Class' purchase of the membership programs and payment for the Leads and mHelpDesk.

575.    HomeAdvisor, ANGI and IAC have voluntarily accepted and retained these profits and benefits, with full knowledge and awareness that, as a result of HomeAdvisor's, ANGI's and IAC's misconduct alleged herein, Plaintiff Costello and the New Jersey Class were not receiving services of the quality, nature, fitness, or value that had been represented by HomeAdvisor, and that a reasonable consumer would expect.

576.    HomeAdvisor, ANGI and IAC have been unjustly enriched by their fraudulent and deceptive conduct and withholding of benefits to Plaintiff Costello and the New Jersey Class, at the expense of these parties.

577.    Equity and good conscience militate against permitting HomeAdvisor, ANGI and IAC to retain these profits and benefits, and permitting HomeAdvisor, ANGI and IAC to do so would be unjust and inequitable because of HomeAdvisor's, ANGI's and IAC's misrepresentations and misconduct against Plaintiff Costello and members of the New Jersey Class, as alleged herein.

578.    Because HomeAdvisor's, ANGI's and IAC's retention of the non-gratuitous benefit conferred upon it by Plaintiff Costello and the members of the New Jersey Class is unjust

and inequitable, HomeAdvisor, ANGI and IAC must pay restitution to Plaintiff Costello and members of the New Jersey Class, as ordered by the Court.

**Ohio**

**COUNT XXXII**
**Violations Of The Ohio Deceptive**
**Trade Practices Act ("Ohio DTPA")**
**O.R.C. 4165.01,** *et seq.*
**(On Behalf of Plaintiff Baumann and the Ohio Class)**

579.     Plaintiff Baumann repeats and realleges the allegations above as if fully set forth herein.

580.     HomeAdvisor is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 35-214.

581.     ANGI is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 5, 19, 36-158, 218-229.

582.     This claim is brought on behalf of Plaintiff Baumann and the Ohio Class.

583.     The Ohio DTPA prohibits deceptive trade practices, including among others,

(a)     Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

(b)     Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have; and

(c)     Representing that goods or services are of a particular standard, quality, or grade if they are of another;

(d)     Advertising goods or services with intent not to sell them as advertised.

584.     HomeAdvisor and ANGI are a "person" as defined in O.R.C. § 4165.01(D).

167

585.    In the course of HomeAdvisor's and ANGI's business, they knowingly or willfully concealed, suppressed or failed to disclose material facts from Plaintiff Baumann and the members of the Ohio Class and by making affirmative misrepresentations in order to induce Plaintiff Baumann and members of the Ohio Class to pay for a membership program to get access to the Leads.  Accordingly, HomeAdvisor and ANGI engaged in deceptive trade practices as defined in O.R.C. § 4165.02, including representing that the Leads have characteristics, uses, benefits, and qualities which they do not have; representing that the Leads are of a particular standard and quality when they are not; advertising the Leads with the intent not to sell them as advertised; failing to disclose the inclusion of or costs associated with mHelpDesk and otherwise engaging in conduct likely to deceive.

586.    HomeAdvisor and ANGI intended for Plaintiff Baumann and the other Ohio Class members to rely on its aforementioned unfair and deceptive acts and practices, including the misrepresentations and omissions alleged herein above.

587.    HomeAdvisor's and ANGI's actions as set forth above occurred in the conduct of trade or commerce.

588.    HomeAdvisor and ANGI knew or should have known that its conduct violated the Ohio DTPA.

589.    HomeAdvisor and ANGI owed Plaintiff Baumann a duty to disclose the true nature of the membership programs, including the nature and quality of the Leads because HomeAdvisor and ANGI possessed exclusive knowledge of the true nature and quality of the membership programs and Leads, and that they did not contain the qualities or characteristics, or perform, as advertised; HomeAdvisor and ANGI intentionally concealed the foregoing from

Plaintiff Baumann and the Ohio Class; and/or HomeAdvisor and ANGI made incomplete representations about the Leads while purposefully withholding and omitting material facts from and the Class that contradicted these representations.

590.    HomeAdvisor's and ANGI's conduct and false representations/omissions were material to Plaintiff Baumann and the Ohio Class.

591.    Plaintiff Baumann and the Ohio Class suffered ascertainable loss caused by HomeAdvisor's and ANGI's concealment of and failure to disclose material information. Class members who purchased a membership program, including Leads and/or mHelpDesk, either would have paid less for the membership program or Leads or would not have purchased a membership program, Leads or mHelpDesk at all but for HomeAdvisor's and ANGI's violations of the Ohio DTPA.

592.    HomeAdvisor and ANGI had an ongoing duty to refrain from unfair and deceptive acts and practices under the Ohio DTPA. All HSPs who signed up for a membership program and paid for Leads and/or mHelpDesk suffered ascertainable loss as a result of HomeAdvisor's and ANGI's deceptive and unfair acts and practices made in the course of HomeAdvisor's business.

593.    HomeAdvisor's and ANGI's conduct alleged herein proximately caused injuries to Plaintiff Baumann and the other Class members.

594.    Plaintiff Baumann and the other Ohio Class members were injured as a result of HomeAdvisor's and ANGI's conduct in that Plaintiff Baumann and the other Class members overpaid for a membership program, and paid for Leads and/or mHelpDesk and did not receive the benefit of their bargain.    These injuries are the direct and natural consequence of

HomeAdvisor's and ANGI's omissions in violation of the Ohio DTPA.

595.     Pursuant to O.R.C. § 4165.03, Plaintiff Baumann and the Ohio Class are entitled to an award of injunctive relief to prevent HomeAdvisor's and ANGI's deceptive trade practices, an award of damages and, because HomeAdvisor's and ANGI's conduct was willful, an award of reasonable attorneys' fees.

**COUNT XXXIII**
**Fraud/Fraudulent Concealment**
**(On Behalf of Plaintiff Baumann and the Ohio Class)**

596.     Plaintiff Baumann repeats, realleges, and incorporates by reference each of the foregoing allegations as though fully set forth herein.

597.     HomeAdvisor is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 35-214.

598.     ANGI is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 5, 19, 36-158, 218-229.

599.     HomeAdvisor and ANGI concealed and made misrepresentations of material facts concerning the nature and quality of the Leads – namely that the Leads were not from serious, project-ready homeowners and were sent to more than four HSPs. Specifically, HomeAdvisor and ANGI knew (or should have known) that the Leads were not of the nature and quality that was advertised. HomeAdvisor and ANGI concealed material facts and/or made the material misrepresentations in order to boost the sales of Membership Programs and Leads.

600.     HomeAdvisor and ANGI knew that Plaintiff Ohio and Ohio Class Members relied upon such material representations about the Leads, and HomeAdvisor and ANGI omitted material information and/or made such material representations to induce Plaintiff Baumann and

members of the Ohio Class to act, *i.e.* to pay for a Membership Program to get access to the Leads.   Moreover, to pay for the Leads, the HSPs were required to provide either a checking/savings account from which HomeAdvisor and ANGI can automatically debit all Membership Fees and Lead fees, or a credit card on which HomeAdvisor can automatically charge such fees.   Then, *on a weekly basis,* HomeAdvisor and ANGI automatically charged the HSPs for each Lead sent. The fee for each Lead is automatically charged to the HSPs' credit cards and/or debited from his/her/its debit accounts.   Consequently, the viability, accuracy, seriousness, qualified nature and limited distribution of each Lead are material to the HSPs.

601.   The representations about the Leads and the omissions about the Leads were material to Plaintiff Baumann, such that, had Plaintiff Baumann known that the representations were false and HomeAdvisor and ANGI had omitted material information, Plaintiff Baumann would not have purchased a Membership Program and provided HomeAdvisor and ANGI with the means to charge their credit card and/or debit their bank accounts.   But Plaintiff Baumann and the Ohio Class did not know the true facts, and relied upon the material representations and omissions made by HomeAdvisor and ANGI.

602.   Plaintiff Baumann and the members of the Ohio Class had no way of knowing that HomeAdvisor's and ANGI's representations were false and gravely misleading, or that HomeAdvisor and ANGI had omitted imperative details. Plaintiff Baumann and the members of the Ohio Class did not, and could not, unravel HomeAdvisor's and ANGI's deception on their own.

603.   HomeAdvisor and ANGI knew their statements were false, and intended that Plaintiff Baumann and the members of the Ohio Class would rely upon the false representations.

604.    HomeAdvisor and ANGI concealed and failed to disclose to Plaintiff Baumann and members of the Ohio Class that, despite their affirmative representations about the membership programs, including the nature and quality of the Leads, they would charge Plaintiff Baumann and the members of the Ohio Class for unqualified Leads and mHelpDesk. HomeAdvisor and ANGI concealed these material facts with the intention that Plaintiff Baumann and the members of the Ohio Class would act.

605.    As a result of HomeAdvisor's and ANGI's fraudulent representations and omissions, Plaintiff Baumann and the members of the Ohio Class were induced into the purchase of goods and/or services that they otherwise would not have purchased, or would have paid less, and have suffered injury, harm and damages as described herein.

606.    HomeAdvisor's and ANGI's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff Baumann' and the Ohio Class' rights and well-being to enrich HomeAdvisor and ANGI. HomeAdvisor's and ANGI's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**COUNT XXXIV**
**Breach Of Implied Contract**
**(On Behalf of Plaintiff Baumann and the Ohio Class)**

607.    Plaintiff Baumann repeat, reallege and incorporate by reference each of the foregoing allegations as though fully set forth herein.

608.    HomeAdvisor is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 35-214.

609.    Plaintiff Baumann and the members of the Ohio Class paid money to

HomeAdvisor in exchange for Leads.

610.    An implied contract was created between HomeAdvisor and the HSPs whereby HomeAdvisor was to send and charge Plaintiff Baumann and HSPs for Leads that were from targeted, serious, qualified and/or project-ready homeowners.

611.    Plaintiff Baumann and the members of the Ohio Class paid an annual fee to join a HomeAdvisor Membership Program and paid hundreds and thousands of dollars for Leads.

612.    The Leads, as well as HomeAdvisor's Lead generation process, however, are systemically flawed and HomeAdvisor does not and cannot generate Leads of targeted, serious, qualified and project-ready homeowners.

613.    The Leads were not of the nature and quality of the Leads that were required, yet HomeAdvisor sent to and charged the HSPs for such Leads.  HomeAdvisor did not generate Leads for the Home Services Professionals that were targeted and from serious, qualified or project-ready homeowners. Also, HomeAdvisor charged Plaintiff Baumann and the members of the Ohio Class for Leads that have been sent to more than four HSPs.  HomeAdvisor also charged HSPs for mHelpDesk without knowledge or consent of the HSPs.  Furthermore, HomeAdvisor systemically disregarded the parameters and limits placed on the type and number of Leads to be charged to HSPs.  Finally, HomeAdvisor employed tactics that prevent HSPs from canceling their membership and Leads, and from disputing the propriety of a Lead in order to secure a refund.

614.    Accordingly, HomeAdvisor has breached the implied contract that was formed between it and Plaintiff Baumann and members of the Ohio Class.

615.    As a result, Plaintiff Baumann and members of the Ohio Class have been harmed

and/or injured have incurred economic damages as a proximate and direct result of the breach by HomeAdvisor.

## COUNT XXXV
### Unjust Enrichment/Restitution
### (On Behalf Of Plaintiff Baumann and the Ohio Class)

616.    Plaintiff Baumann repeat, reallege and incorporate by reference each of the foregoing allegations as though fully set forth herein.

617.    HomeAdvisor is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 35-214.

618.    IAC is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 18, 38, 102, 206-229.

619.    ANGI is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 5, 19, 36-158, 218-229.

620.    CrowdSteer is named as a Defendant in this Count by virtue of its conduct summarized as follows and as set forth in ¶¶ 20, 192-196, 202 *supra*.

621.    As the intended and expected result of their conscious wrongdoing, HomeAdvisor, ANGI and IAC have profited and benefited from Plaintiff Baumann and the Ohio Class' purchase of the membership programs and payment for the Leads and mHelpDesk.

622.    HomeAdvisor, ANGI and IAC have voluntarily accepted and retained these profits and benefits, with full knowledge and awareness that, as a result of HomeAdvisor's, ANGI's and IAC's misconduct alleged herein, Plaintiff Baumann and the Ohio Class were not receiving services of the quality, nature, fitness, or value that had been represented by HomeAdvisor, ANGI and IAC, and that a reasonable consumer would expect.

623.    HomeAdvisor, ANGI and IAC have been unjustly enriched by their fraudulent and deceptive conduct and withholding of benefits to Plaintiff Baumann and the Ohio Class, at the expense of these parties.

624.    Equity and good conscience militate against permitting HomeAdvisor, ANGI and IAC to retain these profits and benefits, and permitting HomeAdvisor, ANGI and IAC to do so would be unjust and inequitable because of HomeAdvisor's, ANGI's and IAC's misrepresentations and misconduct against Plaintiff Baumann and members of the Ohio Class, as alleged herein.

625.    Because HomeAdvisor's, ANGI's and IAC's retention of the non-gratuitous benefit conferred upon it by Plaintiff Baumann and the members of the Ohio Class is unjust and inequitable, HomeAdvisor, ANGI and IAC must pay restitution to Plaintiff Baumann and members of the Ohio Class, as ordered by the Court.

## II.    **The Misappropriation Claims**

**Lanham Act**

### COUNT XXXVI
**Violation Of The Lanham Act Section 43(a), 15 U.S.C. § 1125(a)(1)(A)**
**(False Association and Trademark Infringement)**
**(On Behalf of the Lanham Act Class)**

626.    The Misappropriation Plaintiffs re-allege and incorporate by reference all allegations set forth in the preceding paragraphs.

627.    The Lanham Act Defendants are named as Defendants in this Count by acting as alleged above in ¶¶ 11-15 and 159-204 and by diverting business from HSPs through the unlawful use of (i) Online Public Profiles, (ii) HomeAdvisor Premier Online Directory, (iii) the Exclusive Partner Network, (iv) Exact Match Listings, and (v) Website Hijacking.

628.    The Lanham Act Defendants violated section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)(1)(A)) by using in commerce words, terms, names, or symbols, or a combination thereof, which were likely to cause confusion, mistake or deception as to the affiliation, connection, or association of the Lanham Act Defendants with the Misappropriation Plaintiffs and members of the Lanham Act Class, or as to the origin, sponsorship, or approval of their services or commercial activities.

629.    In acting as alleged above, the Lanham Act Defendants also violated section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)(1)(A)) by using in commerce false designations of origin, false or misleading descriptions of fact, or false or misleading representations of fact, which were likely to cause confusion, mistake, or deception as to the affiliation, connection, or association of the Lanham Act Defendants with the Misappropriation Plaintiffs and members of the Class, or as to the origin, sponsorship, or approval of their services or commercial activities.

630.    The Lanham Act Defendants' misrepresentations and actions in violation of 15 U.S.C. § 1125(a)(1)(A) proximately caused an injury to a commercial interest in sales or business reputation of the Lanham Act Plaintiff and members of the Lanham Act Class.

631.    The Lanham Act Defendants' misrepresentations and actions in violation of 15 U.S.C. § 1125(a)(1)(A) have also deprived and will continue to deprive the Misappropriation Plaintiffs and members of the Lanham Act Class of the ability to control the consumer perception of its products and services offered under their names and marks, placing the valuable reputation and goodwill of the Misappropriation Plaintiffs and members of the Lanham Act Class in the hands of the Lanham Act Defendants.

632.    The Lanham Act Defendants had direct and full knowledge of the

Misappropriation Plaintiffs' and the Lanham Act Class Members' prior use of and rights in their names and marks before the acts complained of herein. The knowing, intentional and willful nature of the acts set forth herein renders this an exceptional case under 15 U.S.C. § 1117(a).

633.    Accordingly, pursuant to 15 U.S.C. § 1117, the Misappropriation Plaintiffs and members of the Lanham Act Class are entitled to recover: (1) the Lanham Act Defendants' profits, or an amount that is adequate, which the Court finds to be just according to the circumstances of the case, as compensation; (2) the damages sustained by the Misappropriation Plaintiffs and the Lanham Act Class Members, in a sum above the amount found as actual damages, not exceeding three times such amount; (3) the costs of the action; and (4) reasonable attorney fees.

634.    As a result of the Lanham Act Defendants' aforesaid conduct and in addition to other damages, the Misappropriation Plaintiffs and the Lanham Act Class Members have suffered the continuing loss of the goodwill and reputation established by their names and marks. This continuing loss of goodwill cannot be properly calculated and thus constitutes irreparable harm and an injury for which the Misappropriation Plaintiffs and the Lanham Act Class Members have no adequate remedy at law. The Misappropriation Plaintiffs and the Lanham Act Class Members will continue to suffer irreparable harm unless this Court enjoins the Lanham Act Defendants' conduct pursuant to 15 U.S.C. §1125 (c)(1).

### COUNT XXXVII
### Violation Of The Lanham Act, 15 U.S.C. § 1125(a)(1)(B)
### (False Advertising and Trademark Infringement)
### (On Behalf of the Lanham Act Class)

635.    The Misappropriation Plaintiffs re-allege and incorporate by reference all allegations set forth in the preceding paragraphs.

636.     The Lanham Act Defendants are named as Defendants in this Count by acting as alleged above in ¶¶ 11-15 and 159-204 and by diverting business from HSPs through the unlawful use of (i) Online Public Profiles, (ii) HomeAdvisor Premier Online Directory, (iii) the Exclusive Partner Network, (iv) Exact Match Listings, and (v) Website Hijacking.

637.     The Lanham Act Defendants violated section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)(1)(B)) by using in commerce words, terms, names, or symbols, or a combination thereof, which in commercial advertising or promotion, misrepresented the nature, characteristics, or qualities of the Misappropriation Plaintiffs' and the Lanham Act Class Members' services or commercial activities.

638.     In acting as alleged above, the Lanham Act Defendants also violated section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)(1)(B)) by using in commerce false designations of origin, false or misleading descriptions of fact, or false or misleading representations of fact, which in commercial advertising or promotion, misrepresented the nature, characteristics, or qualities of the Misappropriation Plaintiffs' and the Lanham Acts Class Members' services or commercial activities.

639.     The Lanham Acts Defendants' misrepresentations and actions in violation of 15 U.S.C. § 1125(a)(1)(B) proximately caused an injury to a commercial interest in sales or business reputation of the Misappropriation Plaintiffs and the Lanham Act Class Members.

640.     The Lanham Act Defendants' misrepresentations and actions in violation of 15 U.S.C. § 1125(a)(1)(B) have also deprived and will continue to deprive the Misappropriation Plaintiffs and the Lanham Act Class Members of the ability to control the consumer perception of their products and services offered under their names and marks, placing the valuable

reputation and goodwill of Misappropriation Plaintiffs and the Lanham Act Class Members in the hands of Lanham Act Defendants.

641. The Lanham Act Defendants had direct and full knowledge of the Misappropriation Plaintiffs' and the Lanham Act Class Members' prior use of and rights in their names and marks before the acts complained of herein. The knowing, intentional and willful nature of the acts set forth herein renders this an exceptional case under 15 U.S.C. § 1117(a).

642. Accordingly, pursuant to 15 U.S.C. § 1117, the Misappropriation Plaintiffs and the Lanham Act Class Members are entitled to recover: (1) the Lanham Act Defendants' profits, or an amount that is just and adequate compensation according to the circumstances of the case; (2) the damages sustained by the Misappropriation Plaintiffs and the Lanham Act Class Members, in a sum above the amount found as actual damages, not exceeding three times such amount; (3) the costs of the action; and (4) reasonable attorney fees should the Court find this to be an exceptional action.

643. As a result of the Lanham Act Defendants' aforesaid conduct and in addition to other damages, the Misappropriation Plaintiffs and the Lanham Act Class Members have suffered the continuing loss of the goodwill and reputation established by their names and marks. This continuing loss of goodwill cannot be properly calculated and thus constitutes irreparable harm and an injury for which the Misappropriation Plaintiffs and the Lanham Act Class Members have no adequate remedy at law. The Misappropriation Plaintiffs and the Lanham Act Class Members will continue to suffer irreparable harm unless this Court enjoins the Lanham Act Defendants' conduct pursuant to 15 U.S.C. § 1125(c)(1).

**Colorado**

## COUNT XXXVIII
**Violations of Colorado Consumer Protection Act ("CCPA"),**
**Colo. Rev. Stat. § 6-1-101, *et seq*.**
**(On Behalf of the McHenry Plaintiffs and the Colorado Misappropriation Class)**

644.    Plaintiffs Brad and Linda McHenry repeat and reallege the allegations above as if fully set forth herein.

645.    HomeAdvisor and John Doe are named as Defendants in this Count by virtue of their conduct summarized as follows and set forth in greater detail at ¶¶ 15 and 159-204.

646.    Plaintiffs Brad and Linda McHenry bring this claim on behalf of themselves and the Colorado Misappropriation Class.

647.    This cause of action is brought on behalf of Plaintiffs Brad and Linda Mc Henry and all similarly situated members of the Colorado Misappropriation Class, pursuant to COLO. REV. STAT. § 6-1-105(a), (b), (c), and (h), which provide, in pertinent part, that "a person engages in a deceptive trade practice when, in the course of such person's business, vocation, or occupation, such person —

\*        \*        \*

(a)  Knowingly passes off goods, services, or property as those of another;

\*        \*        \*

(b)  Knowingly makes a false representation as to the source, sponsorship, approval, or certification of goods, services, or property;

\*        \*        \*

(c)  Knowingly makes a false representation as to affiliation, connection, or association with or certification by another;

\*        \*        \*

(h)  Disparages the goods, services, property, or business of another by false or misleading representation of fact;

648.    As set forth herein, HomeAdvisor and John Doe engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of trade or commerce in violation of the CCPA by:

a.    advertising, promoting or offering services under the McHenry Plaintiff's and the Colorado Misappropriation Class Member's names with full knowledge of the McHenry Plaintiffs and the Colorado Misappropriation Class  Member's prior use and rights in their name;

b.    unfairly competing with the McHenry Plaintiffs and the Colorado Misappropriation Class Members by creating the impression among and confusing relevant consumers that the goods or services offered by HomeAdvisor and John Doe are endorsed by, licensed by, sponsored by, originated with, and/or otherwise affiliated with the McHenry Plaintiffs and the Colorado Misappropriation Class Members, or that the source of the services offered by HomeAdvisor or John Doe are affiliated with or associated with Plaintiff the McHenry Plaintiffs and the Colorado  Misappropriation Class Members, when HomeAdvisor and John Doe have no connection with or authorization from the McHenry Plaintiffs and the Colorado  Misappropriation Class Members;

c.    misappropriating the McHenry Plaintiff's and the Colorado Misappropriation Class Member's goodwill and public recognition;

d.    making false and misleading statements about the McHenry Plaintiff's and the Colorado Misappropriation Class Member's business; and

e.    unlawfully benefiting from such activities.

649. In addition, C.R.S. § 6-1-105(3) provides: "The deceptive trade practices listed in this section are in addition to and do not limit the types of unfair trade practices actionable at common law or under other statutes of this state."

650. HomeAdvisor's and John Doe's deceptive practices occurred in the course of HomeAdvisor's business, vocation or occupation.

651. HomeAdvisor's and John Doe's misconduct significantly impacts the public as actual or potential consumers of HomeAdvisor's services described herein. The misappropriation and false representations through electronic media, internet and direct marketing were directed to the market generally resulting in deception of actual and prospective purchasers.

652. HomeAdvisor's and John Doe's deceptive practices caused damage to Plaintiffs Brad and Linda McHenry and all Colorado Misappropriation Class Members. Because of HomeAdvisor's unfair, deceptive and fraudulent business practices, Plaintiffs Brad and Linda McHenry and the Misappropriation Class Members suffered and continue to suffer injuries by way of monetary loss.

653. Plaintiffs Brad and Linda McHenry therefore seeks an order of this Court:

    a. Enjoining HomeAdvisor and John Doe from continuing to engage, use, or employ any unfair and/or deceptive business acts or practices related to HomeAdvisor's and John Doe's misappropriation of the McHenry Plaintiffs; and the Colorado Misappropriation Class' names and likenesses to generate Leads for HomeAdvisor, in such manner as set forth in detail above;

    b. Enjoining HomeAdvisor and John Doe from making false and misleading

statements about the McHenry Plaintiffs' and the Colorado Misappropriation Class Member's business; and

c.   Requiring HomeAdvisor to remove the McHenry Plaintiffs' and the Colorado Misappropriation Class Members from HomeAdvisor website and any of HomeAdvisor's affiliate websites.

654.   Plaintiffs Brad and Linda McHenry and the members of the Colorado Misappropriation Class may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted. The unfair and/or deceptive acts and practices of HomeAdvisor, as described above, present a serious threat to the McHenry Plaintiffs and the members of the Colorado Misappropriation Class.

**COUNT XXXIX**
**Common Law Unfair Competition**
**(On Behalf of the McHenry Plaintiffs and the Colorado  Misappropriation Class)**

655.   Plaintiffs Brad and Linda McHenry re-allege and incorporate by reference all allegations set forth in the preceding paragraphs.

656.   HomeAdvisor and John Doe are named as Defendants in this Count by virtue of their conduct summarized as follows and set forth in greater detail at ¶¶ 15 and 159-204.

657.   HomeAdvisor and John Doe have advertised, promoted or offered services under the McHenry Plaintiff's and the Colorado Misappropriation Class Member's names with full knowledge of the McHenry Plaintiff's and the Colorado Misappropriation Class Member's prior use and rights in their name.

658.   HomeAdvisor and John Doe have unfairly competed with the McHenry Plaintiffs and the Colorado Misappropriation Class Members by creating the impression among relevant

consumers that the goods or services offered by HomeAdvisor and John Doe are endorsed by, licensed by, sponsored by, originated with, and/or otherwise affiliated with the McHenry Plaintiffs and the Colorado Misappropriation Class Members, or that the source of the services offered by HomeAdvisor and John Doe are affiliated with or associated with the McHenry Plaintiffs and the Colorado Misappropriation Class Members, when HomeAdvisor and John Doe have no connection with or authorization from the McHenry's Plaintiffs or the Colorado Misappropriation Class Members.

659.    HomeAdvisor and John Doe have misappropriated the McHenry Plaintiff's and the Colorado Misappropriation Class Member's goodwill and public recognition, and HomeAdvisor and John Doe have unlawfully benefited from such activities.

660.    Continued use by HomeAdvisor and John Doe of the business names of the McHenry Plaintiffs and the Colorado Misappropriation Class Members with any goods or services constitutes unfair competition under the common law of Colorado.

661.    HomeAdvisor's and John Doe's actions have injured the business reputation of the McHenry Plaintiffs and the Colorado Misappropriation Class Members and will cause irreparable harm, damage and injury to the McHenry Plaintiffs and the Colorado Misappropriation Class Members unless restrained and enjoined by the Court.

**Florida**

**COUNT XL**
**Violation of the Florida Deceptive and Unfair Trade Practices Act,**
**Fla. Stat. §501.201, *et seq.* ("DUTPA")**
**(On Behalf of Plaintiffs Ervine and the Florida Misappropriation Class)**

662.    Plaintiff Ervine repeats and realleges the allegations above as if fully set forth herein.

184

663. Plaintiff Ervine brings this count individually and on behalf of the Florida Class.

664. HomeAdvisor and John Doe are named as Defendants in this Count by virtue of their conduct summarized as follows and set forth in greater detail at ¶¶ 12 and 159-204.

665. The Florida Deceptive and Unfair Trade Practices Act ("DUTPA"), Fla. Stat. § 501.201, *et seq.*, makes unlawful any "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

666. As amended by the Florida Legislature in 2001, a "person" who has suffered a loss as a result of a violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") has standing to sue under that statute. *See* Fla. Stat. § 501.211(2). This 2001 amendment replaced the word "consumer" with "person." Plaintiffs and Class members are "persons" within the meaning of the FDUTPA.

667. As set forth herein, HomeAdvisor and John Doe engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of trade or commerce in violation of the FDUPTA by:

   a. advertising, promoting or offering services under Plaintiff Ervine's and the Florida Misappropriation Class Member's names with full knowledge of Plaintiff Ervine's and the Florida Misappropriation Class Member's prior use and rights in their name;

   b. unfairly competing with Plaintiff Ervine and the Florida Misappropriation Class Members by creating the impression among and confusing relevant consumers that the goods or services offered by HomeAdvisor and John Doe are endorsed by, licensed by, sponsored by, originated with, and/or otherwise

185

affiliated with Plaintiff Ervine and the Florida Misappropriation Class Members, or that the source of the services offered by HomeAdvisor or John Doe are affiliated with or associated with Plaintiff Ervine and the Florida Misappropriation Class Members, when HomeAdvisor and John Doe have no connection with or authorization from Plaintiffs or the Florida Misappropriation Class Members;

    c.  misappropriating Plaintiff Ervine's and the Florida Misappropriation Class Member's goodwill and public recognition;

    d.  making false and misleading statements about Plaintiff Ervine's and the Florida Misappropriation Class Member's business; and

    e.  unlawfully benefiting from such activities.

668.    Under the FDUTPA, § 501.211(2) and § 501.2105, Plaintiff Ervine and the Florida Class are entitled to actual damages, injunctive relief and attorney's fees and costs.

### COUNT XLI
### Common Law Unfair Competition
### (On Behalf of Plaintiff Ervine and the Florida Misappropriation Class)

669.    Plaintiff Ervine realleges and incorporates by reference all allegations set forth in the preceding paragraphs.

670.    HomeAdvisor and John Doe are named as Defendants in this Count by virtue of their conduct summarized as follows and set forth in greater detail at ¶¶ 12 and 159-204.

671.    HomeAdvisor and John Doe have advertised, promoted or offered services under Plaintiff Ervine's and the Florida  Misappropriation Class Member's names with full knowledge of Plaintiff Ervine's and the Florida Misappropriation Class  Member's prior use and rights in

their name.

672.    HomeAdvisor has unfairly competed with Plaintiff Ervine and the Florida Misappropriation Class Members by creating the impression among relevant consumers that the goods or services offered by HomeAdvisor and John Doe are endorsed by, licensed by, sponsored by, originated with, and/or otherwise affiliated with Plaintiff Ervine and the Florida Misappropriation Class Members, or that the source of the services offered by HomeAdvisor or John Doe are affiliated with or associated with Plaintiff Ervine and the Florida Misappropriation Class Members, when HomeAdvisor and John Doe have no connection with or authorization from  Plaintiffs or the Florida Misappropriation Class Members.

673.    HomeAdvisor and John Doe have misappropriated Plaintiff Ervine's and the Florida Misappropriation Class Member's goodwill and public recognition, and HomeAdvisor and John Doe have unlawfully benefited from such activities.

674.    Continued use by HomeAdvisor and John Doe of the business names of Plaintiff Ervine and the Florida Misappropriation Class Members with any goods or services constitutes unfair competition under the common law of Florida.

675.    HomeAdvisor's and John Doe's actions have injured the business reputation of Plaintiff Ervine and the Florida Misappropriation Class Members and will cause irreparable harm, damage and injury to Plaintiff Ervine and Florida Misappropriation Class Members unless restrained and enjoined by the Court.

**Idaho**

## COUNT XLII
### Violations of the Idaho Consumer Protection Act,
### Idaho Civ. Code, § 480, *et seq.*
### (On Behalf of Plaintiff Haukenes and the Idaho Misappropriation Class)

676.     Plaintiff Haukenes realleges and incorporates by reference all paragraphs as though fully set forth herein.

677.     HomeAdvisor and John Doe are named as Defendants in this Count by virtue of their conduct summarized as follows and set forth in greater detail at ¶¶ 14 and 159-204.

678.     HomeAdvisor, John Doe and Plaintiff Haukenes are "persons" under Idaho Civil Code § 48-602(1).

679.     HomeAdvisor engaged in unfair methods and practices in the conduct of its trade or commerce in violation of the Idaho Consumer Protection Act ("ICPA"), Idaho Civ. Code § 48-603, including:

    a.     Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, connection, qualifications or license that he does not have;

    b.     Passing off goods or services as those of another;

    c.     Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

    d.     Causing likelihood of confusion or of misunderstanding as to affiliation, connection, or association with, or certification by, another;

    e.     Representing that goods or services have sponsorship, approval, characteristics,

ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, connection, qualifications or license that he does not have; and

f.      Disparaging the goods, services, or business of another by false or misleading representation of fact.

680.    As set forth herein, HomeAdvisor and John Doe engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of trade or commerce in violation of the ICPA by:

a.      advertising, promoting or offering services under Plaintiff Haukenes' and the Idaho Misappropriation Class Member's names with full knowledge of Plaintiff Haukenes' and the Idaho Misappropriation Class Member's prior use and rights in their name;

b.      unfairly competing with Plaintiff Haukenes' and the Idaho Misappropriation Class Members by creating the impression among and confusing relevant consumers that the goods or services offered by HomeAdvisor and John Doe are endorsed by, licensed by, sponsored by, originated with, and/or otherwise affiliated with Plaintiff Haukenes' and the Idaho Misappropriation Class Members, or that the source of the services offered by HomeAdvisor or John Doe are affiliated with or associated with Plaintiff Haukenes' and the Idaho Misappropriation Class Members, when HomeAdvisor and John Doe have no connection with or authorization from  Plaintiff Haukenes' and the Idaho Misappropriation Class Members;

c.      misappropriating Plaintiff Haukenes' and the Idaho Misappropriation Class
        Member's goodwill and public recognition;

d.      making false and misleading statements about Plaintiff Haukenes' and the Idaho
        Misappropriation Class Members' business; and

e.      unlawfully benefiting from such activities.

681.    As a result of its violations of the ICPA detailed above, HomeAdvisor caused
actual damage and ascertainable loss to Plaintiff Haukenes and the Idaho Misappropriation
Class.

682.    HomeAdvisor's and John Doe's deliberate, widespread and systematic
misappropriation, disparaging and fraudulent statements and unfair competition was so egregious
and carried out with such willful and conscious disregard of the rights of its customers that its
sales conduct would outrage or offend the public conscience, and is therefore an unconscionable
method, act or practice under the ICPA as provided in Idaho Civil Code § 48-603C.

683.    Plaintiff Haukenes seeks punitive damages against HomeAdvisor and John Doe
because their violations were repeated and flagrant, conducted with knowledge of the illegality
of the conduct, and therefore warrants the imposition of punitive damages under Idaho Civil
Code § 48-608(1).

684.    Plaintiff Haukenes further seeks an order enjoining HomeAdvisor's and John
Doe's unfair or deceptive acts or practices, punitive damages, costs of Court, attorney's fees
under Idaho Civil Code § 48-608, and any other just and proper relief available under the ICPA.

**New York**

## COUNT XLIII
## Common Law Unfair Competition
## (On Behalf of Plaintiff Hass and the New York Misappropriation Class)

685.    Plaintiff Hass re-alleges and incorporates by reference all allegations set forth in the preceding paragraphs.

686.    HomeAdvisor and John Doe are named as Defendants in this Count by virtue of their conduct summarized as follows and set forth in greater detail at ¶¶ 13 and 159-204.

687.    HomeAdvisor and John Doe #1 have advertised, promoted or offered services under Plaintiff Hass's and the New York Misappropriation Class Member's names with full knowledge of Plaintiff Hass's and the New York Misappropriation Class Member's prior use and rights in their name.

688.    HomeAdvisor and John Doe #1 have unfairly competed with Plaintiff Hass and the New York Misappropriation Class Members by creating the impression among relevant consumers that the goods or services offered by HomeAdvisor and John Doe #1 are endorsed by, licensed by, sponsored by, originated with, and/or otherwise affiliated with Plaintiff Hass and the New York Misappropriation Class Members, or that the source of the services offered by HomeAdvisor and John Doe #1 are affiliated with or associated with Plaintiff Hass and the New York Misappropriation Class Members, when HomeAdvisor and John Doe #1 has no connection with or authorization from  Plaintiff Hass or the New York Misappropriation Class Members.

689.    HomeAdvisor has misappropriated Plaintiff Hass and the New York Misappropriation Class Member's goodwill and public recognition, and HomeAdvisor and John Doe #1 has unlawfully benefited from such activities.

690.    Continued use by HomeAdvisor and John Doe #1 of the business names of Plaintiff Hass and the New York Misappropriation Class Members with any goods or services constitutes unfair competition under the common law of New York.

691.    HomeAdvisor's and John Doe #1's actions have injured the business reputation of Plaintiff Hass and the New York Misappropriation Class Members and will cause irreparable harm, damage and injury to Plaintiff Hass and New York Misappropriation Class Members unless restrained and enjoined by the Court.

**Ohio**

**COUNT XLIV**
**Violations Of The Ohio Deceptive**
**Trade Practices Act ("Ohio DTPA")**
**O.R.C. 4165.01, *et seq*.**
**(On Behalf of Plaintiff Baumann and the Ohio Misappropriation Class)**

692.    Plaintiff Baumann repeats and realleges the allegations above as if fully set forth herein.

693.    The Lanham Act Defendants are named as Defendants in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 11 and 159-204.

694.    This claim is brought on behalf of Plaintiff Baumann and the Ohio Misappropriation Class.

695.    The Ohio DTPA prohibits deceptive trade practices, including among others,

a.    Passing off goods or services as those of another;

b.    Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

c.    Causing likelihood of confusion or of misunderstanding as to affiliation,

connection, or association with or certification by another; and

d.       disparaging the goods, services, or business of another by false representation of fact.

696.       The Lanham Act Defendants are "persons" as defined in O.R.C. § 4165.01(D).

697.       As set forth herein, Lanham Act Defendants engaged in unfair or deceptive acts or practices in the conduct of trade or commerce in violation of the Ohio DTPA by:

a.       advertising, promoting or offering services under Plaintiff Baumann and the Ohio Misappropriation Class Member's names with full knowledge of Plaintiff Baumann's and the Ohio Misappropriation Class Member's prior use and rights in their name;

b.       unfairly competing with Plaintiff Baumann and the Ohio Misappropriation Class Members by creating the impression among and confusing relevant consumers that the goods or services offered by Lanham Act Defendants are endorsed by, licensed by, sponsored by, originated with, and/or otherwise affiliated with Plaintiff Baumann and the Ohio Misappropriation Class Members, or that the source of the services offered by Lanham Act Defendants are affiliated with or associated with Plaintiff Baumann and the Ohio Misappropriation Class Members, when the Lanham Act Defendants have no connection with or authorization from Plaintiff Baumann and the Ohio's Misappropriation Class Members;

c.       misappropriating Plaintiff Baumann's and the Ohio Misappropriation Class Member's goodwill and public recognition;

d.       making false and misleading statements about Plaintiff Baumann's and the Ohio Misappropriation Class Members' business; and

e.       unlawfully benefiting from such activities.

698.     The Lanham Act Defendants' actions as set forth above occurred in the conduct of trade or commerce.

699.     The Lanham Act Defendants knew or should have known that its conduct violated the Ohio DTPA.

700.     Plaintiff Baumann and the Ohio Misappropriation Class suffered ascertainable loss caused by the Lanham Act Defendants' violations of the Ohio DTPA in the form of lost business opportunities and harm to their reputation and goodwill.

701.     The Lanham Act Defendants' conduct alleged herein proximately caused injuries to Plaintiff Baumann and the Ohio Misappropriation Class members.

702.     Pursuant to O.R.C. § 4165.03, Plaintiff and the Class are entitled to an award of injunctive relief to prevent the Lanham Act Defendants' deceptive trade practices and, because the Lanham Act Defendants' conduct was willful, an award of reasonable attorneys' fees.

## COUNT XLV
## Common Law Unfair Competition
### (On Behalf of Plaintiff Baumann and the Ohio Misappropriation Class)

703.     Plaintiff Baumann re-alleges and incorporates by reference all allegations set forth in the preceding paragraphs.

704.     The Lanham Act Defendants are named as Defendants in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 11 and 159-204.

705.     The Lanham Act Defendants have advertised, promoted or offered services under Plaintiff Baumann's and the Ohio Misappropriation Class Members' names with full knowledge of Plaintiff Baumann's and the Ohio Misappropriation Class Member's prior use and rights in their name.

706.     The Lanham Act Defendants have unfairly competed with Plaintiff Baumann and the Ohio Misappropriation Class Members by creating the impression among relevant consumers that the goods or services offered by HomeAdvisor are endorsed by, licensed by, sponsored by, originated with, and/or otherwise affiliated with Plaintiff Baumann and the Ohio Misappropriation Class Members, or that the source of the services offered by HomeAdvisor are affiliated with or associated with Plaintiff Baumann and the Ohio Misappropriation Class Members, when The Lanham Act Defendants have no connection with or authorization from Plaintiff Baumann or the Ohio Misappropriation Class Members.

707.     The Lanham Act Defendants has misappropriated Plaintiff Baumann's and the Ohio Misappropriation Class Members' goodwill and public recognition, and HomeAdvisor has unlawfully benefited from such activities.

708.     Continued use by the Lanham Act Defendants of the business names of Plaintiff Baumann and the Ohio Misappropriation Class Members with any goods or services constitutes unfair competition under the common law of Ohio.

709.     The Lanham Act Defendants' actions have injured the business reputation of Plaintiff Baumann and the Ohio Misappropriation Class Members and will cause irreparable harm, damage and injury to Plaintiff Baumann and Ohio Misappropriation Class Members unless restrained and enjoined by the Court.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, individually on behalf of themselves and on behalf of members of the Classes, respectfully request that this Court:

A.     Determine that the claims alleged herein may be maintained as a class action

under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying the Classes;

B.      Appoint Plaintiffs as the representatives of the Class and their counsel as Class counsel;

C.      Award all actual, general, special, incidental, statutory, treble, punitive, and consequential damages to which Plaintiffs and Members of the Classes are entitled;

D.      Award pre-judgment and post-judgment interest on such monetary relief;

E.      Award Defendants' profits, or an amount that is adequate, pursuant to 15 U.S.C. § 1117;

F.      Award reasonable attorneys' fees and costs;

G.      Award injunctive relief is appropriate and necessary to remedy Defendants' wrongful conduct and to prevent the wrongful conduct from continuing; and

H.      Award all other relief deemed appropriate by the Court.

## JURY DEMAND

Plaintiffs demand a trial by jury for all claims asserted in this Complaint so triable.

Dated: July 16, 2018

**SHERMAN & HOWARD, L.L.C.**

*/s/ Gordon W. Netzorg*
Gordon W. Netzorg
Mark W. Williams
Carla R. Martin
633 17th Street, Suite 3000
Denver, CO 80202
Phone: 303-299-8381
Fax: 303-298-0940
gnetzorg@shermanhoward.com
mwilliams@shermanhoward.com
cmartin@shermanhoward.com

196

Nicholas E. Chimicles
Kimberly M. Donaldson Smith
Stephanie E. Saunders
**CHIMICLES & TIKELLIS LLP**
361 West Lancaster Avenue
One Haverford Centre
Haverford, PA 19041
Phone: 610-642-8500
Fax: 610-649-3633
nec@chimicles.com
kds@chimicles.com
ses@chimicles.com

and

Scott M. Tucker
**CHIMICLES & TIKELLIS LLP**
222 Delaware Avenue
Suite 1100
P.O. Box 1035
Wilmington, DE  19899
Phone: 302-656-2500
Fax: 302-656-9053
Scotttucker@chimicles.com

***Attorneys for Plaintiffs***