**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:18-cv-01802-WJM

CHARLES COSTELLO, BRUCE FILIPIAK,
JOSH SELDNER, ANTHONY BAUMANN,
KOURTNEY ERVINE, HANS HASS, IVA HAUKENES,
and BRAD and LINDA McHENRY on behalf of
themselves and all others similarly situated,

      Plaintiffs,

v.

HOMEADVISOR, INC.,
IAC/INTERACTIVECORP., ANGI HOMESERVICES, INC.,
CROWDSTEER INC., and DOES 1 through 10,

      Defendants.

---

**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**
**AND DECLARATORY JUDGMENT**

---

Plaintiffs Kourtney Ervine, Iva Haukenes and Brad and Linda McHenry (collectively, the "Plaintiffs"), through counsel, respectfully submit this Motion for Preliminary Injunction and Declaratory Judgment ("Motion") on behalf of themselves and former HSPs[1], stating as follows.[2]

### CERTIFICATE OF CONFERRAL

The undersigned counsel conferred with counsel for Defendant HomeAdvisor, Inc. ("HA"). HA opposes the relief requested herein.

### INTRODUCTION

---

[1] All capitalized terms used herein are as defined in the Complaint (Dkt. 1, cited as ¶____).
[2] Plaintiffs will also file a motion seeking certification of the Lanham Act, Colorado, Florida and Idaho Misappropriation Classes (collectively the "Classes") which Plaintiffs respectfully request be considered attendant with this Motion to extend the relief awarded to members of the Classes.

A principal focus of this Action is HA's systemic sale of bogus Leads to Home Service Professionals ("HSPs") who have been misled into becoming members of a company uniformly dubbed by the HSPs as a "fraud", a "criminal enterprise", a "fraudulent business", and "theft by deception", and as a company that is nothing more than "scam artists", "thieves and liars". This Motion, however, is targeted at putting an immediate stop to a specific fraudulent practice that has an irreparable, detrimental and ongoing impact on former HSPs. It is predicated on the Machiavellian scheme of enticing HSPs into HA's centrifuge with the intent to exploit them to the fullest extent. After paying for bogus Leads and eventually extracting themselves from their HA memberships, the HSPs are not freed of HA's exploitation. Rather, HA uses its internet dominance and the HSPs' identities to steer the HSPs' prospective customers to HA-sponsored Online Profile Pages of former HSPs. The HA Online Profile Pages are riddled with deceptive tactics and falsities about the former HSPs, with the intent to divert business from the former HSPs in order to generate, from unwitting consumers, Leads that are sent to other active HA HSPs. The parasitic relationship derived from HA memberships is underscored by the fact that HA operates Online Profile Pages for nearly as many former HSPs as it does current HSPs.

In support of this Motion, Plaintiffs file herewith the Declaration of Stephanie E. Saunders and exhibits thereto including the Declarations of HSPs who exemplify how former HSPs are irreparably victimized by HA's conduct and by a Report of Peter Kent ("Kent Report"), an expert in e-commerce strategies and search engine marketing and optimization.

## FACTUAL BACKGROUND

### A. HA's Business

HA operates an internet based "two-sided home services marketplace[], where both consumers and high-quality service professionals come to be matched to one another." (¶35). While HA's services are free to consumers, HSPs pay an annual membership fee plus the fees for Leads that are described by HA as "qualified new business opportunities", "highly targeted

prospects", and "ready-to-hire homeowners." (¶37). Consequently, HA's revenue is primarily derived from Lead fees, and to a lesser extent HSP membership fees.[3]

To attract HSPs to join its network, HA advertises its basic annual membership package as including membership in HA's network, delivery of quality Leads, "and a listing in the HomeAdvisor online directory and certain other affiliate directories. Membership also includes a business profile page on HomeAdvisor.com…"[4] At its core HA is a Lead service; however, the online directory and business profiles ("Online Profile Pages") that are presented to HSPs as auxiliary "benefits" are, in actuality, designed and maintained in a manner that is intended to confer significant financial benefits upon HA to the detriment of the HSPs. (¶¶159-190). HA's motivation to create Online Profile Pages is self-serving. HA seeks to capitalize upon the company names of current HSPs, as well as HSPs who have terminated or do not renew ("Former HSPs") by usurping their online presence and driving traffic to Online Profile Pages hosted by HA with the intent to generate Leads by intercepting and/or redirecting service requests made to Former HSPs and converting them to Leads that are then charged to HA's current HSPs. For HA this scheme generates unauthorized and deceptively derived revenue, while also diverting business to market competitors of the Former HSPs.

### B. HA Leverages Online Profile Pages to Drive Traffic

Online Profile Pages are created for HSPs that join HA's network based upon information gathered during the enrollment process and extracted from HSPs' websites and/or sources. The Online Profile Pages are accessible through internet search engine results or through HA's online directory. *See* Exhibit A, Kent Report at ¶¶17-18. HA represents that these customized Online Profile Pages will result in an increase in customer contacts by getting HSPs'

---

[3] In the Fiscal Year Ended 12/31/17, HA generated revenues of $763.4 million, comprised of $521.5 million in Lead fees and $56.1 million in membership fees. *See* ¶213; *see also* ANGI's Annual Report on Form 10-K for the Fiscal Year Ended 12/31/17.

[4] *See* ANGI's Annual Report on Form 10-K for the Fiscal Year Ended 12/31/17.

names "out there on the most searched internet sites and business directories" (¶181), and putting HSPs "in front of ready-to-hire homeowners." *See* Exhibit B; *see also* https://pro.HA.com/r/membership/ (last visited 10/10/18).

Once enrolled, HSPs' customized Online Profile Pages, which look nearly uniform to the McHenry Plaintiffs' Online Profile Page (*see* Exhibit C), become active. *See also* Exhibit D, Schedule of HSP Declarations[5], Section I. Then HA's online marketing and search engine optimization ("SEO") capabilities are employed to rank the HSPs' HA Online Public Profiles at the top of internet search results, outranking even the HSPs' own websites, paid adwords, and other listings. Kent Report at ¶¶16-43. HA's SEO convinces search engines, such as Google, that the Online Profile Pages on HA's website are more relevant and useful to a user than other search results. *Id.* at ¶¶35-43. As a result, propsective customers searching for a specfic HSP are more likely to select the HSP's HA Online Profile Page than other results since it is among the top search results, if not the first. *See id.*; *see also* Exhibit D, Section II.

HA's dominant online marketing and SEO tactics are no match for the marketing and advertising efforts of the average HSP whose online presence becomes synonymous with HA, even after an HSP leaves HA's network. *See* Kent Report at ¶¶35-64. In essence, when HSPs are bamboozled to join HA's network they are unwittingly ceding to HA their internet presence and visibility not only for the duration of their HA membership, which judging from evidence adduced from HSPs' submissions to Plaintiffs' counsel is remarkably abbreviated, but subsequent to member termination.

## C. **HA Uses Former HSPs' Online Profile Pages to Hijack Customers and Generate Lead Revenue**

HA's business model thrives due to the inexhaustive number of potential HSPs available

---

[5] Exhibit D is a Schedule categorizing and compiling the supporting paragraphs from the Declarations of HSPs that are attached thereto as Exhibits D-1 through D-16.

to victimize through membership sales and bogus Lead charges (¶102), yet HA also garners an inherent dividend when HSPs depart. HA does this by its use and maintenance of Online Profile Pages and associated SEO to generate and steer service requests away from Former HSPs and convert them into Leads that are then charged to current HSPs. *See* Kent Report at ¶¶46-72. HA develops and maintains Online Profile Pages for HSPs as a method of driving traffic to its website with the intent to generate Leads. The perpetual misuse of Former HSPs' company names and Online Profile Pages is an essential and calculated part of HA's business model, as evidenced by the number of Online Profile Pages HA maintains. As of June 30, 2018, HA reported that approximately 202,000 HSPs were members of its network; yet, HA has more than 390,000 Online Profile Pages indexed. *See id.* at ¶124. Therefore, it can be deduced that HA currently maintains Online Profile Pages for approximately **188,000 Former HSPs.**

After cannibalizing the online presence of Former HSPs and driving prospective or even current customers to the Online Profile Pages of Former HSPs, HA makes misleading and false representations about the Former HSPs on the variations of the Online Public Profiles to generate revenue for HA.

***1. Online Profile Pages With a "Get a Quote" Button.*** HA uses a deceptive "Get a Quote" button on Former HSP Online Profile Pages, which are indistinguishable from the Online Profile Pages of current HSPs, to intentionally mislead customers into believing that they are submitting a request for a quote directly to the desired HSP. *See id.* at ¶¶65-72, 100-107. Once a prospective customer enters their address, one of two pop-up windows will display. *See* Exhibit E; Kent Report at ¶¶65-72.

The first window prepopulates the address that was entered and gives the customer the ability to provide project details that, supposedly, are then submitted directly to the selected HSP upon clicking "Get a Quote". *See* Exhibit D, Section III(1)(A); *see also* Kent Report at ¶¶65-66. However, HA intercepts this service request that was generated under false pretenses, and

converts it into a Lead that is then sold to other active HSPs. *See id.* at ¶¶70-72. This harms both the Former and current HSPs, and the customer. Prospective customers are being siphoned away from Former HSPs to other active HSPs who are paying for Leads with the expectation that the customer is interested in being contacted by them, meanwhile the customers are bewildered as to why they are being contacted by a bevy of HSPs, none of which include the Former HSP that the customer requested. The only party with transparency and profiting from this scheme is HA.

The second window displays a false statement that the Former HSP does not provide service in the area selected by the prospective customer. *See* Exhibit D, Section III(1)(B); *see also* Kent Report at ¶¶67-68. Furthering the deception, the page also states: "See Pros who provide service to [zip code]" which is hyperlinked to a HA webpage containing a list of featured HSPs offering similar services in the selected service area. *Id.* Thereby, HA is deliberately falsifying information about Former HSPs, whose company names and Online Profile Pages were used to drive traffic to HA's site initially, in an effort to redirect prospective customers to active, Lead-buying HA HSPs. *See id.* at ¶¶100-107.

  **2. *Online Profile Pages With a Misleading "Alert".*** HA places the following "alert" on Former HSPs Online Profile Pages, which is denoted by an exclamation point and bold red font: "Please Note: This business is not a screened and approved member of HA." *See* Exhibit D, Section III(2). This is an obvious misleading and deceptive statement intended to cast the Former HSPs in a negative light, so as to confuse and cause the prospective customer to alter course and submit a service request to another active HA HSP. *See* Kent Report at ¶¶108-110. HA accomplishes this through the use of a service request solictiation that appears immediately below the "alert", offering customers the option to get quotes from "3 Prescreened" HSPs (emphasis added). *See* Exhibit D-12 ("Haukenes Decl.") at ¶7. Upon submission of the service request, HA generates a "Lead" that HA then charges to active HSPs, the Former HSPs' competitors. Such misconduct is detrimental: it denigrates the public's perception of the Former

HSPs' businesses; it misleads prospective customers; and, it seeks to coerce Former HSPs into rejoining (at a cost) the HA network in order to try to correct the negative and false language HA puts on the Former HSPs' Online Profile Page. Kent Report at ¶108-110.

### 3. *Online Profile Pages Associated with the Company Names of Former HSPs.*

HA's other parasitic tactic involves deleting the content of the Former HSPs' Online Profile Pages, but continuing to maintain a URL that includes Former HSPs' business names. *See* Exhibit D, Section III(3). The overt act of altering the Online Profile Pages of Former HSPs, but retaining the URL reflecting the name of the Former HSPs is done with the intent to capture prospective customers who are affirmatively searching for the Former HSPs and redirect them to HA's website. *See* Kent Report at ¶¶81-87. Once on the Former HSPs Online Profile Page, hosted on HA's site, prospective customers are informed that the "page [they] are looking for is no longer available", which gives the false impression that the Former HSPs are no longer in business. HA then prompts prospective customers to "Follow the links below to be matched to top-rated pros for your projects." *See id.* at ¶81. A submission will then be transformed by HA into a Lead sent and charged to the Former HSPs' competition.

At bottom, HA's failure to totally disengage HSPs from its grasp is deliberate and damaging. HA has devised a scheme, utilizing SEO tactics and misleading Online Profile Pages for Former HSPs, to generate illicit revenue for HA at the expense of Former HSPs.

**ARGUMENT**

Absent a preliminary injunction, the irreparable damage will continue to the Former HSPs' businesses and reputations from HA's unrelenting and unlawful use of the former HSPs' Online Profile Pages and its deceptive tactics.[6] "A preliminary injunction may issue if the

---

[6] The Supreme Court has admonished the gamesmanship that one may expect from HA in response to this Motion, including deleting the Plaintiffs' Online Profile Pages or offering to do so, in an attempt to moot Plaintiffs' claims. The Supreme Court in *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 666 (2016)("Gomez")(Ginsburg, J.), held that an "unaccepted settlement

movant clearly shows: (1) a substantial likelihood of success on the merits; (2) irreparable injury if the injunction is not granted; (3) the threatened injury outweighs any harm the preliminary injunction will cause the opposing party; and (4) the preliminary injunction is not adverse to the public interest." *Big O Tires, Inc. v. Bigfoot 4X4, Inc.*, 167 F. Supp. 2d 1216, 1221 (D. Colo. 2001). The moving party has the burden of making a prima facie showing of a probable right to the ultimate relief and a probable danger of injury if the motion is denied. *Id.* at 1221.

### A. **Plaintiffs are likely to succeed on the merits.**

#### *1. HA Engages In False Advertising Under The Lanham Act*

The elements of a claim for false advertising under the Lanham Act are: "(1) defendant made false or misleading representations of fact in connection with the commercial [advertising] *sic* or promotion of its product or services; (2) in commerce; (3) the misrepresentations are material, *i.e.*, likely to influence the purchasing decision; (4) that are either likely to cause confusion or mistake as to (a) the origin, association or approval of the product or services with or by another; or (b) the characteristics of the goods or services; and (5) injured plaintiff." *Electrology Lab., Inc. v. Kunze*, 169 F. Supp. 3d 1119, 1157 (D. Colo. March 14, 2016). "To qualify as a false or misleading statement, a plaintiff must show defendant's statement was either: (1) literally false, either on its face or by necessary implication, or (2) literally true or ambiguous, but implicitly false, misleading in context, or likely to deceive." *Id.* at 1157-1158

---

offer has no force…the defendant's continuing denial of liability [and] adversity between the parties persists." *See also Lucero v. Bureau of Collection Recovery, Inc.*, 639 F.3d 1239, 1242 (10th Cir. 2011)(discussing the "exceptions" to the general rule against consideration of moot cases, as where a plaintiff's status is "capable of repetition yet evading review."); *Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 339 (1980)(the voluntary cessation exception is significant in the class action context because "[r]equiring multiple plaintiffs to bring separate actions, which effectively could be 'picked off' by a defendant's tender of judgment before an affirmative ruling on class certification could be obtained, obviously would frustrate the objectives of class actions"); *Payne v. Tri-State Careflight*, 322 F.R.D. 647, 673 (D.N.M. 2017)(holding that even a Rule 68 "offer cannot moot a plaintiff's claims")(citing *Gomez*).

(citation omitted). "*Section 43(a)* of the Lanham Act encompasses more than literal falsehoods,' because otherwise, 'clever use of innuendo, indirect intimations, and ambiguous suggestions could shield the advertisement from scrutiny precisely when protection against…deception is most needed." *Cottrell, Ltd. v. Biotrol Int'l, Inc.,* 191 F.3d 1248, 1252 (10th Cir. 1999).

HA makes false and misleading statements about the Former HSPs on the four variations of the Online Profile Pages it maintains for Former HSPs with the intent to redirect prospective customers to generate Leads that are then sold to current HA HSPs. HA's conduct irreparably harms the Former HSPs because it conveys material misrepresentations about the Former HSPs that influence the decisions made by the prospective customers, resulting ultimately in the misappropriation of business opportunities for the Former HSPs. *See Netquote, Inc. v. Byrd*, 2008 U.S. Dist. LEXIS 103870, *9 (D. Colo. Dec. 15, 2008) (consumer confusion is presumed where a statement is literally false) (citation omitted).

*(1) Online Profile Pages With a "Get a Quote" Button*. HA's misrepresentations to prospective customers, that they are directly submitting a request to "Get a Quote" from the HSP of their choice, are literally false, and are designed to deceive and/or confuse prospective customers. *See* Exhibit D, Section III(1)(A); *see also* Kent Report at ¶¶65-72, 100-107. Here, prospective customers submit quote requests with the expectation that they are communicating with and will hear from the selected Former HSP but instead the prospective customers are not contacted by the selected Former HSP – rather they get bombarded by other HA HSPs. Consequently, as a result of HA's rechanneling, HA garners revenue at the expense of the Former HSP, and the Former HSPs do not receive and cannot respond to the requests submitted by potential customers, thereby resulting in the loss of a potential job to a HA HSP-competitor and harm to the Former HSP's reputation.

HA's alternative statement that is used in conjunction with the "Get a Quote" button falsely indicates that Former HSPs do not provide service within the specified area. *See* Exhibit

D, Section III(1)(B). This statement is patently false and designed to misinform the prospective customer as to the Former HSPs' availability to render the desired service with the objective of steering potential customers to submit requests for quotes to active HA HSPs. HA's fraudulent and/or misleading statements used in the Online Profile Pages of Former HSPs were calculated to influence the decision-making of prospective customers and irreparably harms the Former HSPs. *See* Kent Report at ¶¶100-107.

*(2) Online Profile Pages With a Misleading "Alert".* HA's use of the "alert" on Former HSPs' Online Profile Pages is implicitly false as it states that the Former HSP "is not a screened and approved member of HA." *See* Exhibit D, Section III(2); *see also* Kent Report at ¶¶108-110. In maintaining the Online Profile Pages with this "alert," HA is acting with the intent to deceive potential customers into believing that the Former HSPs, who were screened and approved by HA during the enrollment process, are now of lesser stature and quality than active HA HSPs, when, in fact, the only qualitative characteristic at play is that the Former HSP had decided (unsurprisingly) to terminate its HA membership. *Netquote*, 2008 U.S. Dist. LEXIS 103870, *9. The language and presentation of the alert, which is highlighted in red with an exclamation point, warns prospective customers not to engage with the Former HSPs and is immediately followed by a large quote solicitation window offering to connect the prospective customers to "3 Prescreened" HSPs (emphasis added). HA's superficial "alert" is intended to deceive consumers and deter them from contacting Former HSPs, which harms the perception and reputation of the Former HSPs and wrongfully usurps business opportunities from them.

*(3) Online Profile Pages Associated with the Company Names of Former HSPs.* Similarly, the Online Profile Pages of Former HSPs that state that the "page you are looking for is no longer available" is likely to confuse and mislead prospective customers given that the customer was directed to the page only after conducting a search that populated the Former HSP's HA Online Profile Page which reflects the company name in the URL address. *See*

Exhibit D, Section III(3). The deceptive messaging inserted by HA on the Online Profile Pages coupled with HA's removal of the profile content and insertion of the offer to match customers to "pre-screened, local pros", gives the false impression that the Former HSPs are no longer in business and/or not a "Trusted Pro". The construct of this Online Profile Page causes irreparable harm to the Former HSPs by implying that the businesses are no longer operational and/or reputable, and confuses potential customers for the purpose of diverting them away from the Former HSPs to active HSPs. *See* Kent Report at ¶¶111-114.

HA maintains the Online Profile Pages of Former HSPs for its own benefit by confusing or deceiving prospective customers through misleading or false messaging thereby causing irreparable harm to Former HSPs. For these reasons, Plaintiffs submit that they will prevail on their Lanham Act false advertising claim.

**B. Unfair competition and deceptive business practices under Colorado and Florida law.**

To prove a claim for unfair competition under Colorado law, a plaintiff must prove "that the defendant has copied the plaintiff's products or services or misappropriated plaintiff's name or operations in some regard, and second, that this conduct is likely to deceive or confuse the public because of the difficulties in distinguishing between the plaintiff's and defendant's products and services." *L-3 Communs. Corp. v. Jaxon Eng'g & Maint., Inc.*, 2013 U.S. Dist. LEXIS 43410 (D. Colo., Feb. 25, 2013). Relatedly, under Florida law "a party must show (1) deceptive or fraudulent conduct of a competitor and (2) likelihood of consumer confusion." *Procaps S.A. v. Patheon Inc.*, 36 F. Supp. 3d 1306, 1332 (S.D. Fla. 2014) (citations omitted).

As discussed above, HA has hijacked the McHenry Plaintiffs' (Colorado) business name and information in an attempt to deceive customers into believing they are still actively associated with HA. Exhibit D-5 ("McHenry Decl.") at ¶¶9-11. Through the use of the "Get a Quote" Button HA makes deceptive and literally false statements about Former HSPs that cause public confusion. For example, the McHenry Plaintiffs' Online Profile Page makes the literally

false statement, "Get a quote from B&B Carpentry" in an effort to confuse potential customers by implying that a request for a quote is being directly submitted to the McHenry Plaintiffs. McHenry Decl. at ¶10. HA then doubles down with an even more egregious false statement when it states the McHenry Plaintiffs do not provide service in the customers selected area. *Id*.

Moreover, as discussed above, HA's use of Plaintiff Ervine's Online Profile Page URL is an intentional decision by HA to hijack Plaintiff Ervine's web traffic and confuse consumers into believing Plaintiff Ervine is no longer in business. *See* Kent Report at ¶¶111-114.

**C. Deceptive business practices under Colorado, Florida and Idaho statutory law.**

Colorado law prohibits a person or business entity from engaging in a deceptive trade practice, which includes knowingly making false representations "as to the source, sponsorship, approval, or certification of goods, services, or property" and "affiliation, connection, or association with or certification by another." § 6-1-105(1)(b) and (c), C.R.S. Moreover, any person who "is injured as a result of such deceptive trade practice" may bring a civil action under the state's Consumer Protection Act. § 6-1-113(1)(c), C.R.S. As discussed above, HA's use of the McHenry Plaintiffs' Online Profile Page is a deceptive act or practice that harms the McHenry Plaintiffs because it makes false statements about the McHenry's business and availability, and significantly impacts the public's decision making process. *See* McHenry Decl. at ¶¶9-14; *see also Hall v. Walter*, 969 P.2d 224, 234 (Colo. 1998).

Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA") makes unlawful any "[u]nfair methods of competition, unconscionable acts or practices and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. §501, 204(1). Section 501.211(1) of the FDUTPA allows any aggrieved party to seek injunctive relief for any unfair or deceptive act. *Wyndham Vacation Resorts, Inc. v. Timeshares Direct, Inc.*, 123 SO.3d 1149, 1151 (Fla. 5th DCA 2012). HA's use of Online Profile Pages of Former HSPs, such as Plaintiff Ervine's, is an unfair or deceptive act that is designed to: deceive potential customers about the

Former HSP and its business; garner customer information through tactics falsely associated with the Former HSP; and, use false and deceptive statements to denigrate the Former HSP (*e.g.,* the Former HSP provides substandard services or is no longer in business), all to generate Leads used by HA. *Id.* (Deceptive representations likely to cause consumer confusion as to affiliation are actionable under FDUTPA); *see also* Ervine Decl. at ¶¶9-13.

Similarly, Idaho law prohibits a business from engaging in unfair deceptive trade practices including: engaging in any act or practice which is misleading, false or deceptive; and disparaging the goods, services or business by false or misleading representations of fact. *See* Idaho code §48-603. HA utilized fraudulent statements and omissions in failing to disclose during the enrollment process that HA would continue to utilize Former HSPs' Online Profile Pages to generate Leads for active HSPs. *See* Haukenes Decl. at ¶¶7-10. HA's use of the "alert" is misleading, false and deceptive, and designed to denigrate Former HSPs' businesses in an effort to steer customers into contacting active HA HSPs under the impression that those businesses are of higher-quality and more trustworthy. *See* Kent Report at ¶¶108-110.

### D. **Plaintiffs will be irreparably harmed without an injunction.**

In unfair competition cases, once a plaintiff establishes a statement is literally false or misleading, irreparable harm is usually presumed. *Skycam, LLC v. Bennett*, 2012 U.S. Dist. LEXIS 138891, *15 (N. D. Okla. Sept. 27, 2012). HA's act of maintaining Online Profile Pages for *Former* HSPs and conduct of making false, misleading and deceptive statements on such Online Profile Pages, constitutes the false and misleading statements mandating the presumption that absent an injunction the Former HSPs will be irreparably harmed.

Former HSPs have suffered and will continue to suffer substantial, irreparable harm as a result of HA's continued use of their Online Profile Pages and the deceptive practices deployed attendant to such pages. HA continues to utilize Former HSPs' Online Profile Pages to direct customers away from the Former HSPs and denigrate the Former HSPs' businesses and ability to

compete in their markets. *See* Exhibit D, Section IV. HA's actions harm Former HSPs by causing a loss of customers, loss of goodwill and erodes the Former HSPs' competitive position in their markets. For the HSPs, such harms are "difficult to calculate in monetary terms" and, as such, constitute irreparable harm. *DTC Energy Grp., Inc. v. Hirschfeld*, 2018 U.S. Dist. LEXIS 34491, *26-27 (D. Colo. March 2, 2018) (citation omitted); *Am. Family Mut. Ins. Co. v. Gustafson*, 2008 U.S. Dist. LEXIS 103068 at *6 (D. Colo. Dec. 22, 2008) ("the loss of customers (and the associated goodwill) to an unfair competitor can constitute irreparable harm").

### E. The balance of harms weighs in Plaintiffs' favor.

In the instant case, the balance of harm tips strongly in favor of the issuance of an injunction. There is no harm experienced by HA as a result of an injunction prohibiting its use of a Former HSPs' Online Profile Page; the only "harm" is the conduct sought to be stopped, namely, HA wrongly profiting at the expense of the Former HSPs' businesses and reputations. In contrast, if the Court permits HA to continue utilizing the Former HSPs' Online Profile Pages, HA will be permitted to make false and deceptive statements about the Former HSPs and their businesses, and usurp for its financial gain business opportunities from the Former HSPs who have no other recourse or means to stop such ongoing, harmful and wrong misconduct.

### F. An injunction will serve the public interest.

In false and deceptive advertising cases, the public "has a right not to be deceived or confused." *Church & Dwight Co. v. S.C. Johnson & Son*, 873 F. Supp. 893, 912 (D.N.J. Nov. 23, 1994); *see also General Steel Domestic Sales v. Chumley*, 2013 U.S. Dist. LEXIS 64932, *50 (D. Colo. May 7, 2013)("…the public has a considerable interest in preventing false or misleading advertising and promoting lawful competition."). Where, as here, the likelihood of confusion has been shown, the public interest is served with the imposition of the sought injunction.

### G. Declaratory relief is proper.

A declaratory judgment is proper when: 1) an actual controversy exists; and 2) it would be equitable and prudential for the Court to exercise its declaratory judgment authority. *Prof'l Solutions Ins. Co. v. Mohrlang*, 2009 U.S. Dist. LEXIS 14187, *13 (D. Colo. Feb. 10, 2009) (citation omitted). Both of these elements are met in this case. HA has been on notice of Plaintiffs' claims regarding its nefarious use of Former HSPs Online Profile Pages since May 2018 when similar claims were filed in a proposed amended complaint in *Airquip, Inc. et al. v. HomeAdvisor, Inc. et al.*, 1:16-cv-01849-PAB-KLM (D. Colo) and has refused to cease its improper actions. In addition, the granting of declaratory relief would be equitable because it: (1) would settle the controversy regarding HA's use of Former HSPs' Online Profile Pages; (2) would serve to clarify the legal relations at issue; (3) is not being used for procedural gamesmanship; (4) would not encroach upon state jurisdiction because no state court action is active or contemplated; and (5) no alternative remedy exists which is better or more effective. *Prof'l Solutions*, 2009 U.S. Dist. LEXIS 14187 at *16-18. Moreover, a declaratory judgment finding that HA's use of the Former HSPs Online Profile Pages violates the Lanham Act, Colorado Consumer Protection Act, Florida Deceptive and Unfair Practices Act and the Idaho Consumer Protection Act would serve to protect the interests of all Former HSPs who are being victimized by HA. *See e.g.*, *Kansas Health Care Ass'n v. Kansas Dep't of Social & Rehabilitation Servs.*, 31 F.3d 1536, 1548 (10th Cir. 1994)(recognizing "that a class certification is unnecessary if all the class members will benefit from an injunction issued on behalf of the named plaintiffs."). These factors, as well as the interests of judicial efficiency and in settling controversies in an expeditious manner, support Plaintiffs' request for a declaratory judgment.

## CONCLUSION

Plaintiffs respectfully request that the Court grant this motion and the relief requested in the accompanying Proposed Order.

Respectfully submitted this 11th day of October 2018.

| **SHERMAN & HOWARD, L.L.C.** | **CHIMICLES & TIKELLIS LLP** |
|---|---|
| */s/    Gordon W. Netzorg* | */s/    Nicholas E. Chimicles* |
| Gordon W. Netzorg | Nicholas E. Chimicles |
| Mark W. Williams | Kimberly M. Donaldson Smith |
| Carla R. Martin | Stephanie E. Saunders |
| 633 17th Street, Suite 3000 | 361 West Lancaster Avenue |
| Denver, CO 80202 | One Haverford Centre |
| Phone: 303-299-8381 | Haverford, PA 19041 |
| Fax: 303-298-0940 | Phone: 610-642-8500 |
| gnetzorg@shermanhoward.com | Fax: 610-649-3633 |
| mwilliams@shermanhoward.com | nec@chimicles.com |
| cmartin@shermanhoward.com | kds@chimicles.com |
|  | ses@chimicles.com |

*Attorneys for Plaintiffs*

and

Scott M. Tucker
**CHIMICLES & TIKELLIS LLP**
222 Delaware Avenue
Suite 1100
P.O. Box 1035
Wilmington, DE  19899
Phone: 302-656-2500
Fax: 302-656-9053
Scotttucker@chimicles.com

*Attorneys for Plaintiffs*

-17-

## CERTIFICATE OF SERVICE

I hereby certify that on October 11, 2018, I electronically filed the foregoing **PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND DECLARATORY JUDGMENT** with the Clerk of the Court using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

*/s/     Nicholas E. Chimicles*